IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Kurt Bunk and Daniel Heuser, )<br>)<br>Plaintiffs/Relators, )<br>)<br>v. )<br>)<br>BIRKART GLOBISTICS GmbH & CO., *et al.*, )<br>)<br>Defendants. ) | No. 1:02cv1168 (AJT/TRJ) |
| UNITED STATES OF AMERICA *ex rel.* Ray Ammons, )<br>)<br>Plaintiff/Relator, )<br>)<br>v. )<br>)<br>THE PASHA GROUP, *et al.*, )<br>)<br>Defendants. ) | No. 1:07cv1198 (AJT/TRJ) |

### Memorandum Opinion

This matter is before the Court on the United States' Objections to the Magistrate Judge's Order Granting the Gosselin Defendants' Motion to Compel Discovery Directed to Plaintiff United States of America (Doc. No. 635) (the "Objections"). On March 22, 2010, the Magistrate Judge issued an Order compelling the Untied States to produce certain documents listed on its privilege log (the "Order"). On April 5, 2010, the United States filed its Objections (Doc. No. 635) and on June 4, 2010, the Court held a hearing on the United States' Objections. For the reasons discussed below, the Court vacates the Order and remands this matter to the Magistrate

Judge for further consideration and findings with respect to the privileges asserted by the government, including whether some or all of the documents at issue should be reviewed *in camera*.

## Background

It is alleged that beginning as early as 1999, the defendants entered into a scheme to fix prices concerning their transportation and moving services for United States military personnel and property between the United States and Europe.[1] It is undisputed that by letters dated December 26, 2001 and January 8, 2002, the Gosselin defendants[2] and others confirmed their agreement to collude and price fix as to what is referred to as the IS02 bidding cycle, which had a bidding deadline of January 16, 2002.[3] In Mid-December, 2001, the Gosselin defendants were involved in causing competing shippers to set a higher rate for shipping, and forcing shippers who had planned to enter lower bids to raise them. As a result, during the IS02 cycle, from April 2002 to October 2002, the United States' costs to transport military household goods were greater than they would have been had the shipments moved at rates set by competition, and the United States paid invoices for shipping throughout that time period that were higher as a result.

In February, 2002, relators Bunk and Heuser first brought the bid rigging scheme to the attention of the government, through the U.S. Department of Defense, Defense Criminal

---

[1] The Relators allege that defendants formed their first price fixing scheme in 1999. *See* Third Amended Complaint, at ¶ 86. The United States intervened, alleging a price fixing beginning in November, 2000, that is also included in the Relators' Complaint. *See* Third Amended Complaint at ¶ 91; Complaint in Intervention (Doc. No. 110) at ¶¶ 46-47.

[2] For the purposes of this motion, Gosselin Group N.V., Gosselin Worldwide Moving N.V., and Marc Smet will be referred to as "Gosselin" or the "Gosselin defendants."

[3] The IS02 bidding cycle refers to the "International Summer 2002" bidding cycle in which companies competed to receive contracts to transport military and house hold goods across Europe from April to September, 2002.

Investigative Services ("DCIS"). *See* Third Amended Complaint (Doc. No. 448). Beginning in March, 2002, and continuing over approximately four years, the government interviewed what appears to be dozens of persons as part of both criminal and civil investigations.

On August 7, 2002, relators Bunk and Heuser filed their claims with the government, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* On November 13, 2003, an Indictment was returned against Gosselin World Wide Moving N.V. and its Managing Director, Marc Smet. On February 18, 2004, that Gosselin entity, through Smet, entered a guilty plea pursuant to a plea agreement and written statement of facts in which he admitted that the Gosselin defendants had engaged in the alleged price fixing scheme.

On January 25, 2010, based on the guilty plea and written statement of facts in the criminal proceedings, this Court entered partial summary judgment against the Gosselin defendants as to liability under the False Claims Act (See Doc. No. 557).

## Standard of Review

"Review of a magistrate's discovery order, usually a non-dispositive matter, is properly governed by the 'clearly erroneous or contrary to law' standard of review." *Montanile v. Botticelli*, 2009 WL 2378684 *2 (E.D.Va. 2009) (citing *Jesselson v. Outlet Assocs. of Williamsburg, Ltd. P'ship*, 784 F.Supp. 1223, 1228 (E.D.Va.1991)). Only if a Magistrate Judge's decision is "clearly erroneous or contrary to law" may a District Court modify or set aside any portion of the decision. *Id.* (citing Fed. R. Civ. P. 72(a)); *see also* 28 U.S.C. § 636(b)(1)(A). This "clearly erroneous" standard is deferential and a Magistrate's findings should be affirmed unless the reviewing court's view of the entire record leaves the Court with "the definite and firm conviction that a mistake has been committed." *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir. 1985) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Although not *de*

*novo*, the standard of review permits a district court "the power . . . to make needed modifications in the magistrate judge's directives." *Montanile v. Botticelli*, No. 1:08cv716, 2009 WL 2378684, at *2 (E.D. Va. July 28, 2009). That standard of review, as a circuit court's review of a district court order, is predicated on an adequate record that allows the reviewing court to know the actual basis for the ruling and where multiple factors are relevant and may affect an issue's resolution, what determinations as to which factors led to the challenged decision. *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1208 (4th Cir. 1990) (remanding where inadequacy of record will not permit meaningful review).

**Analysis**

**1. The nature of the documents**

There are 132 entries on the government's privilege log, some of which clearly contain multiple documents. They fall into a number of time period and subject matter categories.

a. There are 114 entries concerning interviews with witnesses. Five of them are described as "transcripts of interviews" with dates of August 8, October 9, and October 10, 2006 conducted by Department of Justice lawyers in the Civil Division and relators' counsel.[4] The remaining 109 entries appear to be memoranda or notes about witness interviews. Between March 5, 2002 and December 11, 2002, a period during which it appears likely that most of the IS02, were submitted or paid, there are 59 documents containing witness interview memoranda and notes prepared by DCIS, the Antitrust Division of the Justice Department, or the Army Criminal Investigation Division. Between the period January 6, 2003 and April 22, 2004, there are 48 documents containing witness interview memoranda and notes prepared by DCIS or the Antitrust

---

[4] It is unclear whether the dates refer to the dates of the interviews set forth in the transcripts or the dates on which the transcripts were prepared.

Division. In addition, one memorandum concerning a witness interview was prepared on June 20, 2005 by the Antitrust Division and another dated December 5, 2006 by the Civil Division. The privilege log does not identify any of the persons that were the subject of the interviews and the government claims that such information itself is confidential and privileged.[5] The government asserts the work product privilege and the investigative files privilege as to each of these entries, and the attorney client privilege as to 17 of these entries.

b. There are 10 entries consisting of e-mails and other communications between United States and European law enforcement agencies concerning their respective investigations during the period August 29, 2003 and November 7, 2006. As described in the privilege log, these communications concern "cartel activity in the moving of household goods," "threat analysis for witnesses in protective custody," as well as memorandum "summarizing results of bid rigging investigation referencing subjects investigated," and other related subjects. Six of these entries concern documents evidencing communications between February and September, 2006, after Gosselin entered a guilty plea. The government asserts the work product privilege and the investigative files privilege as to each of these entries, and the attorney client privilege as to 2 of these entries.

c. Finally, there are eight miscellaneous entries that are more difficult to fit into a category. These include five entries described as "Notes, memoranda, interoffice correspondence, [and] work papers" concerning various aspects of the litigation, prepared by

---

[5] Nor does it appear whether the identity of all these persons has otherwise been disclosed by the government as persons with discoverable knowledge or information. In this regard, the government has represented only that it has disclosed the identities of those persons who have "relevant information concerning the government's claims and defenses."

5

both attorneys and staff of the Civil Division and the U.S. Attorney's Office of the Eastern District of Virginia, the Antitrust Division of the Justice Department, the Surface Deployment Distribution Command, DCIS, and the U.S. Army Criminal Investigative Service. The government asserts the work product privilege, the investigative files privilege, the attorney client privilege, and the deliberative process privilege to all five of these entries. There is also one undated entry concerning the government's leniency agreement, and two entries regarding a confidential Order by the Federal Cartel Office (Bundersktellamt) in Germany, as to which the government asserts the work product or investigative files privilege.

The Gosselin defendants moved before the Magistrate Judge to compel production of three categories of documents: (1) "June 26, 2006 memorandum by a CID agent summarizing the investigation"; (2) "Communications with the German Cartel Office and German officials relating to matters relevant to issues in this case"; and (3) "Witness interviews or memoranda/notes of interviews conducted between May 2002 and April 2004." *See* Doc. No. 621, at 3. These three categories comprise the large majority of the documents in the privilege log.[6]

After briefing and argument, the Magistrate Judge ordered production of all of the documents sought by the Gosselin defendants. The Court's reasoning and findings are contained in its Order which provides "(a) that the material in issue is fact work product to the extent that the work product doctrine might apply; (b) that the material is related to the claims and defenses

---

[6] In its Memorandum in Support of its Objections to the Magistrate Judge's Order, the United States claims the following entries are at issue: 1- 8, 10, 13-28, 30-40, 43-47, 51-59, 62-73, 77-82, 86-90, 92-100, 102-109, 111-114, 116-119, and 131-132 *See* Doc. No. 635, Ex. 1 at 3, n. 2. This list excludes all entries for which the deliberative process privilege and the attorney client privilege are asserted, with the exception of entry 7, as to which the United States claims that only those portions of documents that do not contained attorney client privilege information are at issue. The Gosselin defendants have not disputed the government's list of documents at issue or the assertion of the attorney client deliberative process privilege.

herein and that defendants have shown substantial need for the material; and (c) that upon consideration of the factors relevant to the 'investigative files' privilege, that privilege does not protect the material in issue from disclosure."

After review of the record and the parties' arguments, the Court concludes that there does not exist a sufficient record upon which to review the Order in light of the applicable standard of review by this Court. The Court has no doubt that the Magistrate Judge, who has effectively addressed the many faceted discovery and other challenges of this complex litigation, considered a wide range of factors. However, the record does not disclose the basis on which the Magistrate Judge concluded that the Gosselin defendants had demonstrated substantial need sufficient to overcome any work product privilege, either as to fact work product or opinion work product.[7] Likewise, the Court, based on the

---

[7] Gosselin does not seriously contest that the documents at issue are work product but maintains that work product created during the criminal proceedings lost its protections in these proceedings. The Court cannot determine whether the Magistrate Judge specifically considered this issue and if so how he decided it.

Gosselin contends that, in any event, it has a substantial need for the documents because the documents could (1) establish government knowledge of the scheme; (2) refute the relators' position that they were an "original source"; and (3) could be used for impeachment. Gosselin essentially conceded at the hearing on June 4, 2010 that impeachment alone is not sufficient to show a substantial need. *See U.S. ex rel. Carter v. Halliburton*, 2010 WL 723795 (E.D. Va. Mar. 3, 2010) (overturning the magistrate judge's order finding "substantial need" for relator's work product based on impeachment purposes). Further, as there has been no allegation of a public disclosure, the "original source" defense does not appear available. *See* 31 U.S.C. §§ 3730(e)(4)(A)-(B); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 350 (4th Cir. 2009). In addition, government knowledge is, at this point, irrelevant with respect to liability. However, the government's knowledge may not be entirely irrelevant as to damages and the memoranda at issue may constitute admissible evidence concerning relevant government knowledge at the time it paid allegedly false invoices. *See United States v. Ehrlich*, 643 F.2d 634, 639 (9th Cir. 1981) (finding government knowledge did not negate damages because the government had no choice but to pay when it discovered the submitted claims were fraudulent); *see also* JOHN BOESE, CIVIL FALSE CLAIMS AND *QUI TAM* ACTIONS, 3rd Ed., at 3-32.3 (2010) ("[I]f the government does not

present record, cannot assess the basis on which the Magistrate Judge rejected the investigative files privilege, and whether or to what extent the Court actually received and reviewed the documents at issue or thought such review unnecessary.

## Conclusion

The Court finds that the present record is insufficient to review the Order as to the issues raised on appeal in the Objections, and the matter is therefore remanded to the Magistrate Judge for further proceedings.[8]

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 18, 2010

---

rely on the false statement in overpaying, the damages cannot be attributable to the false statement."). For that reason, the Magistrate Judge may have determined that the Gosselin defendants had demonstrated substantial need and could not obtain the "substantial equivalent by other means" and that such needed disclosure outweighed any continuing government interest in maintaining the confidentiality of the persons interviewed. However, the Court would necessarily need to speculate as to whether this was, in fact, the basis for the Order.

[8] The government urges the Court, at a minimum, to remand for an *in camera* review of the documents in question. Courts have recognized that "*in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege," in part because it "is a relatively costless and eminently worthwhile method to insure that the balance between [an asserting party's] claims of irrelevance and privilege and [a requesting party's] asserted need for the documents is correctly struck." *Kerr v. United States Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 405-06 (1976). Nevertheless, the government did not request *in camera* review before the Magistrate Judge and on remand, whether or to conduct an *in camera* review, in whole or in part, or to require any other information necessary to assess the documents in question, remains within the sound discretion of the Magistrate Judge.

present record, cannot assess the basis on which the Magistrate Judge rejected the investigative files privilege, and whether or to what extent the Court actually received and reviewed the documents at issue or thought such review unnecessary.

## Conclusion

The Court finds that the present record is insufficient to review the Order as to the issues raised on appeal in the Objections, and the matter is therefore remanded to the Magistrate Judge for further proceedings.[8]

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 17, 2010

---

rely on the false statement in overpaying, the damages cannot be attributable to the false statement."). For that reason, the Magistrate Judge may have determined that the Gosselin defendants had demonstrated substantial need and could not obtain the "substantial equivalent by other means" and that such needed disclosure outweighed any continuing government interest in maintaining the confidentiality of the persons interviewed. However, the Court would necessarily need to speculate as to whether this was, in fact, the basis for the Order.

[8] The government urges the Court, at a minimum, to remand for an *in camera* review of the documents in question. Courts have recognized that "*in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege," in part because it "is a relatively costless and eminently worthwhile method to insure that the balance between [an asserting party's] claims of irrelevance and privilege and [a requesting party's] asserted need for the documents is correctly struck." *Kerr v. United States Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 405-06 (1976). Nevertheless, the government did not request *in camera* review before the Magistrate Judge and on remand, whether or to conduct an *in camera* review, in whole or in part, or to require any other information necessary to assess the documents in question, remains within the sound discretion of the Magistrate Judge.