**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* Kurt Bunk and Daniel Heuser, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil No. 1:02cv1168 |
| | ) | |
| Birkart Globistics GmbH & Co. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| *ex rel*. Ray Ammons, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 1:07cv1198 |
| | ) | |
| The Pasha Group, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF RENEWED MOTION**
**FOR JUDGMENT AS A MATTER OF LAW AND**
**ALTERNATIVE MOTION FOR PARTIAL NEW TRIAL**

Defendants Gosselin Worldwide Moving, N.V., Gosselin Group N.V. and Marc Smet ("Defendants"), through counsel, renew their Rule 50 motion on DPM liability and the number of false claims for the Cartwright channels, and alternatively request a new trial on the DPM claim. Plaintiffs failed to produce sufficient evidence to prove Defendants intended to restrict competition on the DPM contract to sustain the verdict.  The jury was mischarged on all key knowledge issues and was not charged on antitrust issues that were relevant to "restricting competition."  And, the number of Cartwright false claims was wholly speculative, was estopped by the Government's own prior admissions, and was entirely based on a Government exhibit that violated Fed. R. Civ. P. 37 and Fed. R. Evid. 1006.

## ARGUMENT[1]

### I.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 50(b), the Court may grant judgment as a matter of law notwithstanding a jury verdict if there is not "substantial evidence in the record to support the jury's findings." *Wilhelm v. Blue Bell*, 773 F.2d 1429, 1433 (4th Cir. 1985).[2]   The evidence is examined in the light most favorable to the non-moving party. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 404-05 (4th Cir. 1999).   However, all inferences drawn from the evidence must be "reasonably probable." *Lust v. Clark Equip.*, 792 F.2d 436, 37 (4th Cir. 1986).

Under Federal Rule of Civil Procedure 59, the Court may grant a new trial, *inter alia*, where "the verdict is against the clear weight of the evidence." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citations omitted).   In ruling on the motion, "a trial court may weigh the evidence and consider the credibility of the witnesses." *Chumbley v. Rockland Industries, Inc.*, 829 F.2d 1119 (Table), Nos. 86-3584, 86-3618, 1987 WL 38213 at *3 (4th Cir. Sept. 17, 1987).   It is the trial judge's "duty to set aside a verdict and grant a new trial even though it is supported by substantial evidence, if he is of the opinion that the verdict is against the clear weight of the evidence." *Id.* (citing *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir. 1959)).   Alternatively, a partial new trial is appropriate where the issues to be re-tried "are

---

[1] Defendants hereby incorporate and maintain all prior objections and arguments filed in this matter.

[2] To the extent damages are a required element for liability under FCA section 3729(a)(1), the Court should set aside the jury's verdict on the DPM claim because that element is not satisfied. *See U.S. ex rel. Berge v. Board of Trustees of the University of Alabama*, 104 F.3d 1453, 1458 (4th Cir. 1997) ("[i]t must be admitted that, notwithstanding a *qui tam* relator's general standing as the government's representative, the government, as the real party in interest, must still have suffered an injury in fact."); *see also* Boese, John T., *Civil False Claims and Qui Tam Actions*, 3rd Ed., Section 2.01[A][4], pp. 2-24 – 2-26 n. 49, 50 (2010-2 Supp.) (listing cases in nine different circuit courts and several district courts holding that damage or a potential effect on U.S. Treasury is a required element of the FCA); *but see* Boese, *supra*, at 2.01[A][4], p. 2-23 n. 47 (listing cases in ten different circuit courts holding damage is not a required element of FCA).   As Boese notes, imposing liability under section (a)(1) where the claim had no impact on the Treasury "would seem to divorce the civil False Claims Act from its essential purpose – recovering monies wrongfully taken from the federal Treasury." *Id.* at p. 2-26.

sufficiently distinct and separable" from the other issues in the case. *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir. 1996).

## II. THE SUBSTANTIAL WEIGHT OF THE EVIDENCE EVISCERATES THE JURY'S FINDING THAT GOSSELIN KNOWINGLY SUBMITTED A FALSE CERTIFICATE OF INDEPENDENT PRICE DETERMINATION.

Relator Bunk theorized that Gosselin lied in its Certificate of Independent Price Determination ("CIPD") in the DPM Europe Solicitation, rendering all claims submitted false in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1). *See, e.g.*, Trial Tr. at 1464:10-19 (Ex. A, attached). Specifically, Mr. Bunk contended Gosselin agreed with some other bidding German agents about subcontracting prices and territories, violating subsection (a)(1) of the CIPD:

> (a) The offeror certifies that –
>
> (1) The prices in this offer have been arrived at independently, without, <u>for the purpose of restricting competition</u>, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods of [sic] factors used to calculate the prices offered.

Relators' Ex. 181 at GOS015833 (emphasis added) (Ex. B, attached). To prove his claim, Relator Bunk had to adduce substantial evidence that Gosselin intended to restrict competition when it agreed on pricing and territories with the other agents. The trial evidence could not reasonably have supported such a finding by the jury.

### A. Mr. Bunk's Limited Allegations of Wrongdoing Regarding the DPM Europe Solicitation Are Uncorroborated and Stem From a Material Lack of Understanding About the Solicitation's Requirements.

Relator Bunk's trial testimony regarding wrongdoing on the DPM Europe Solicitation boils down to the following assertions:

> Q.   And he [Erwin Weyand of Birkart] told you Birkart was not going to bid on the contract?
>
> A.   He told me that these prices were already fixed, that they agreed on

3

> the pricing, and the regions were already divided and defined.  And so the commissions were divided among the companies who agreed to participate in this contract.

Kurt Bunk Trial Tr. ("Bunk Tr.") at 298:21-299:2 (Ex. C, attached); *see also id.* at 376:13-18

(discussing Rel. Ex. 295) (Ex. D).

> Q.     And what rate were you [Relator Bunk] getting paid under the old DPM contract for the services you described as now getting paid at 35 Euros?
> A.     About half of that price.
> Q.     So the new price was twice as much as the old price?
> A.     Yes, about double the price.

Bunk Tr. at 300:5-11 (Ex. C).

Mr. Bunk's assertion that the rate he was paid under prior regional DPM contracts was

half of what he was paid under the DPM Europe contract is entirely uncorroborated and is belied

by the disclosure process mandated in the Solicitation.  First, the only other testimony about how

the prior rate compared to the DPM Europe rate for origin services was Mr. Smet's, who said 35

Euros "wasn't an abnormal amount."  Marc Smet Trial Testimony Tr. ("Smet Tr.") at 1369:10-

18 (Ex. E, attached).  Moreover, the Solicitation expressly required offerors to submit prices for

51 individual line items per country, which were then reviewed by the military.  *See* Def. Ex. 345

at GSD024354-72 (Ex. F, attached).  If the Army thought the price for this line item was too

high, or thought a similar high price in multiple offers was suspicious, it had ample opportunity

to question the offerors about that price.  Indeed, it was clear from Mr. Bunk's testimony that the

Army had many years of experience soliciting for exactly these same prices for regional DPM

contracts.  *See, e.g.*, Bunk Tr. at 295:20-23, 297:5-9, 299:25-300:4 (Ex. C).  Per the Solicitation,

Gosselin (and presumably all other offerors) provided specific line-item prices with its offer,

including the line item at issue.  There is no reasonable basis to conclude that the Army would

have awarded a contract at "double" the normal price, and no evidence the military objected to

the price for any reason. Rather, the Army exercised its options to renew the contract with Gosselin for both option years without re-bidding the contract to try to obtain a lower price.

Mr. Bunk's testimony, based entirely on what he claims Mr. Weyand told him, also wrongly assumes the subcontracting discussions were improper. But Mr. Bunk was not familiar with the unique and material requirements of this Solicitation. *See, e.g.*, Bunk Tr. at 297:19-23 (Ex. C) (Bunk only read portions of the solicitation); *id.* at 361:16-23, 365:4-13; *see also id.* at 365:14-20, 366:4-12 (Bunk did not know the Solicitation required offerors to guarantee a substantial minimum daily capacity for each of the four countries, all subject to performance with as little as one day's notice). He was totally unaware of the Solicitation's express requirements to list subcontractors, details of their capacity and which territories they would cover. *Id.* at 365:4-23 (Bunk did not know Solicitation required each offeror to list by name all subcontractors and the geographic areas each would service); *id.* at 367:6-21 (Bunk was not aware of oral presentation requirement or the fact that offerors had to explain how subcontractors were selected). Bunk did not even know that the Army itself anticipated significant subcontracting and joint ventures for any one offeror to be in a position to perform the contract. *Id.* at 344:13-20. Given his ignorance of the Solicitation's terms, it is not surprising that Mr. Bunk did not realize these communications and agreements were both necessary and expected. Mr. Bunk's uncorroborated, uninformed assumptions of misconduct were insufficient to sustain the jury's verdict, particularly in light of substantial evidence to the contrary, described below.

**B.      Relator Bunk Failed to Prove Defendants Engaged in the Discussions at Issue for the Purpose of Restricting Competition.**

Gosselin readily admitted agreeing on subcontracting prices and territories with other agents. There was no evidence, however, and no reasonable inference could be drawn, that Gosselin engaged in these discussions <u>for the purpose of restricting competition</u>. Rather, the

substantial weight of the evidence proved that Gosselin and the other offerors had to confirm subcontracting price and sufficient capacity to be able to submit their ultimate offers.

The trial evidence regarding the DPM claim was limited to the testimony of three witnesses – Mr. Bunk, Jurgen Graf and Marc Smet.  Mr. Bunk admitted he had no personal knowledge of the discussions at issue, and said his information came from what Mr. Weyand (of Birkart) told him.  Mr. Weyand, despite testifying at trial by video, did not corroborate Mr. Bunk's assertions.  As set forth below, Mr. Graf and Mr. Smet acknowledged that subcontracting discussions occurred, but explained that the purpose of those discussions was _not_ to restrict competition, but rather was to allow offerors to confirm available capacity in the relevant regions and the subcontracting costs they would have to factor into their independent offer prices.

> **1.  Subcontracting Prices and Capacity in the Relevant Geographic Regions Were Agreed Upon Before Submission of Offers.**

Jurgen Graf of ITO testified that, after a presentation by the Army on the DPM contract, German agents met and agreed on subcontracting rates and territories.  Graf Trial Testimony (by video) ("Graf Tr.") (Gov. Ex. 183) at 157:16-158:2, 159:8-10 (Ex. G, attached).  Marc Smet confirmed he agreed with other agents on subcontracting prices and territories, and thus "[w]e knew what the price would be for some line items in the contract if any of the other bidders would be a subcontractor to the other one."  Smet Tr. at 1192:4-11, 1192:22-1193:1 (Ex. E).

> **2.  Commitments on Price and Capacity Were Necessary Because No Single Company Could Fulfill the Contract Requirements Without Subcontracting From the Other German Agents and Failure to Fulfill the Requirements Could be Costly.**

The DPM Europe Solicitation provided: "[i]t is anticipated that significant subcontracting or joint ventures may be required for a single offeror to be able to perform throughout Germany, Benelux and Italy."   Def. Ex. 341 at GSD029511 (§ M.1 Award) (Ex. H, attached). The

Solicitation specifically required offerors to list subcontractors and the geographic regions they would service (*see id*. at GSD029512 (Factor 2D) (Ex. H)), which Gosselin did in its offer (*see* Def. Ex. 334 at GSD023952-56 (Ex. I, attached)).  Mr. Graf confirmed this need: "No single agent would have had the capacity to meet the requirements under this contract."  Graf Tr. (Def. Ex. 704) at 266:5-6 (Ex. G).

Likewise, Mr. Smet testified that subcontracting was required for any single company to have sufficient capacity to fulfill the contract requirements.  Smet Tr. at 1170:19-22, 1191:5-20 (Ex. E).  In fact, although Gosselin already had "owned and controlled branches" to perform services in some geographic areas, Mr. Smet secured back up subcontractors both to ensure sufficient capacity and to have a competitive edge in the offer process.  *Id*. at 1181:15-1182:2 (Ex. E) (discussing Rel. Ex. 271 (Ex. J, attached)).  Mr. Smet explained that offerors <u>had to</u> obtain commitments from potential subcontractors on price and capacity before responsibly submitting an offer.  If the winning bidder ultimately failed to meet the capacity requirements, the Government could fulfill its requirements elsewhere and charge back the difference to the DPM contract awardee.  Smet Tr. at 1371:2-25 (Ex. E).  The Solicitation required itemization of subcontractors and guarantees for capacity and geographic coverage; providing this information <u>without</u> advance commitments would have been irresponsible and even misleading.

### 3.    Total Offer Prices Were Not Discussed.

The trial evidence showed that actual line item and total prices submitted by the offerors were not discussed among the various companies.  The only "evidence" Mr. Bunk introduced at trial regarding this issue was Mr. Graf's handwritten note stating "Gosselin will make a high-priced offer, but certainly before the background of the contract management."  Graf Tr. (Gov. Ex. 183) at 156:9-11 (Ex. G).  When specifically asked about this note, Mr. Graf testified

unequivocally that Gosselin and ITO never colluded regarding total offer prices.  *See* Graf Tr. (Def. Ex. 704) at 268:6-9 (Ex. G) ("Those numbers that were in this bid that we submitted to the contractor were – we arrived independently and did not discuss those numbers with anybody else."); *see also id.* at 266:25-267:2 (Ex. G).   Likewise, Mr. Smet said he was "absolutely certain" he never discussed total offer prices with Mr. Graf.   Smet Tr. at 1202:12-17; 1204:15-1205:4 (Ex. E).  Regarding Mr. Graf's note that Gosselin would make a high-priced offer, Mr. Smet said this broad-brush comment was likely his effort to obscure Gosselin's bid price and overall strategy.  *See id.* at 1205:10-12 (Ex. E).  And, logically, suggesting he would bid a high price would <u>encourage</u>, <u>not discourage</u>, others to undercut him, thereby <u>promoting</u> competition.

### 4.   Companies Submitted Competitive Offers to Try to Win the Contract.

Contrary to the jury's apparent finding that the DPM subcontracting agreements were for the purpose of restricting competition, the evidence demonstrated that offerors <u>submitted competitive bids</u> to try to win the DPM Europe contract.  *See, e.g.*, Graf Tr. (Def. Ex. 704) at 267:25-268:3 (Ex. G).  Mr. Smet testified that Gosselin competed on the contract, and explained an internal February 10, 2001 e-mail he wrote setting forth a competitive strategy on the DPM Solicitation.  Smet Tr. at 1178:18-1179:2 (Ex. E) (discussing Rel. Ex. 264 (Ex. K, attached)). Mr. Smet further said Gosselin thought at the time that four or five other companies would submit offers on the contract.  *Id.* at 1185:25-1186:4 (Ex. E).  Even Mr. Bunk admitted Birkart submitted a competing bid for the DPM Europe contract in a joint venture with ITO, despite his testimony that Mr. Weyand refused to bid.  Bunk Tr. at 371:22-372:4 (Ex. C).

### 5.   Subcontracting Discussions and Agreements Were Not for the Purpose of Restricting Competition.

When expressly asked about the purpose of their subcontracting discussions, both Mr. Graf and Mr. Smet, the only two witnesses with personal knowledge to testify about the

Solicitation at trial, said unequivocally that their discussions were not for the purpose of restricting competition. Mr. Graf testified: "Q. Did you collude with Gosselin as to what Gosselin was going to charge? A. No." Graf Tr. (Def. Ex. 704) at 266:25-267:2 (Ex. G). When asked, "Were you trying to restrict competition on this DPM contract?" Mr. Graf responded, "No." *Id*. at 267:19-23. Mr. Graf said he read the CIPD, including section (a)(1), and complied with its terms. Graf Tr. (Gov. Ex. 183) at 162:11-14, 162:22-163:5, 163:14-15. Likewise, when Mr. Smet was asked "[W]ith respect to your communications with other companies on this portion of the DPM solicitation, were you having communications with these other companies to restrict competition?," he responded, "No." Smet Tr. at 1370:21-1371:1 (Ex. E).

### 6.      Subcontracting Agreements Do Not Violate the CIPD.

As a matter of law, a jury finding that prices were discussed "for the purpose of restricting competition" in violation of the CIPD cannot be based solely on exchanges of prices with subcontractors, which is all the trial evidence reflected in this case. The Sherman Act prohibits agreements that unreasonably restrain trade. *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). To determine whether the agreement is an unreasonable restraint, courts look at the agreement's effect on competition. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984). Courts consider how unique the alleged restraint is before deciding whether to analyze the conduct under a rule of reason, "quick look" analysis or *per se* approach. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508-09 (4th Cir. 2002) (*citing* 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1911a (1998)). Rule of reason analysis applies to conduct which cannot be <u>assumed</u> to be without pro-competitive justification. *See Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 24 (1979); *see also United States v. U.S. Gypsum*, 438 U.S. 422, 441-43 n. 16 (1978) (exchange of price data between competitors does not always have anticompetitive effects

but may actually increase market competition and economic efficiency; therefore such agreements should be subject to a rule of reason analysis).  Here, the Court cannot assume the German agents' discussions or agreements were anticompetitive, both because of the unique nature of the DPM Europe Solicitation's capacity, territory and disclosure obligations, and because the CIPD itself recognized there could and would likely be discussions and agreements among potential competitors that were <u>not</u> intended to restrict competition.  And, in fact, no agreement was ever reached that restricted any offeror's ability to compete for the contract.[3]

Under Federal procurement regulations, agreements between sub- and prime contractors are considered "teaming arrangements." Fed. Acquisition Regs. § 9.601 (48 C.F.R. § 9.601) (Ex. M) ("contractor team arrangement" includes agreements where "[a] potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program"). Price exchanges for teaming arrangements "are necessary to formulate offers and therefore are not performed 'for the purpose of restricting competition.'" William E. Kovacic, <u>Antitrust Analysis of Joint Ventures and Teaming Arrangements Involving Government Contractors</u> 58 Antitrust L. J. 1059, 1067 (1989) (Ex. N).

For price discussions or agreements to be "for the purpose of restricting competition," they must prejudice the government, for example by preventing competitive bids from being submitted.  This could occur where the subcontractor agrees not to submit its own bid or not to work for other prime contractors, thus rendering other prime contractors unable to submit bids. <em>See</em> Charles L. Eger, <u>Contractor Team Arrangements Under the Antitrust Laws</u> 17 Pub. Cont. L. J. 595, 603 (1988) (Ex. O) ("[A] disclosure from a prime contractor to its teaming subcontractor of terms of its intended offer that are made in the course of negotiations, and not 'for the purpose

---

[3] Because the rule of reason analysis was both relevant and material in this case, the Court erred in deciding not to instruct the jury as to the rule of reason, as Defendants requested.  <em>See</em> Def. Proposed Jury Instructions 91 and 92 (attached together as Ex. L hereto).

of restricting competition,' should not prevent the offeror from executing the certificate.  Of course, if the teaming subcontractor is thereby eliminated from competing, there may be antitrust consequences for both parties."). Without evidence that price discussions among competing bidders restricted the ability of other companies to submit offers, however, the Comptroller General[4] repeatedly has found that such discussions are not for the purpose of restricting competition[5] and the CIPD is not violated.  *See, e.g.*, *Columbus Marble Works, Inc.*, B-193754, 79-2 CPD P 138, 1979 WL 12140 (Comp. Gen.) at *2 (Ex. P) ("We have therefore held that even the fact that two bidders may have jointly prepared and submitted two bids does not constitute collusive bidding where there is no evidence of an attempt by these bidders to eliminate competition from other companies."); *So. Md. Gen. Contractors, Inc.*, 57 Comp. Gen. 277, B-190270 (Feb. 13, 1978) (Ex. Q) (company's submission of bids as sub- and prime contractor did not violate CIPD where there was no evidence the company refused to subcontract for other bidders or to do so only at higher rates); *P-III Associates*, B-213856, B-213856.2, 84-2 CPD P 136, 1984 WL 46399, at *5 (July 31, 1984) (Ex. R) (described "collusion" to be prevented by CIPD as "two or more bidders who are attempting, in violation of antitrust statutes, to keep a third from bidding"); *KDH Corporation*, B-209207, 82-2 CPD P 532, 1982 WL 27664, at *1-2 (Comp. Gen.) (Dec. 14, 1982) (Ex. S) (price discussions between two bidders for "legitimate business reasons" was not "collusive bidding" where "there was no evidence that they had attempted to eliminate competition from other firms") (citing 51 Comp. Gen. 403, 405 (1972)).

---

[4] The Comptroller General has jurisdiction to resolve bid protests related to government contracts under the Federal Acquisition Regulations, including the CIPD found at FAR 52.203-2.  *See* 31 U.S.C. § 3553.

[5] Although the parties did not request that the Court define "competition" for the jury, it was plain error for the Court not to do so, instead leaving the jury to define competition under the CIPD on its own.  *See, e.g., United States v. Ferguson, et al.,* No. 08–6211–cr, 2011 WL 3251464, at *9 (2d Cir. Aug. 1, 2011) (reversing convictions for plain error instructional defect in defining "willfully caused").

In a bid protest case involving the same CIPD as in the DPM Europe Solicitation, the Comptroller General found no CIPD violation in very similar circumstances. *American Printing House for the Blind, Inc.*, B-298011, 2006 CPD P 83, 2006 WL 1518965 (Comp. Gen. May 15, 2006) (Ex. T, attached). In *American Printing House*, the bid protester alleged that the two contract awardees, and a third bidder who also served as a subcontractor to the two winning bidders for one service required by the contract, falsely certified that prices were independently determined. The bid protestor argued that because the two winners both used the same subcontractor, "it was clear that [the two winners] had arrived at their prices for [a portion of the contract] after consultation with [the third bidder/ subcontractor], and thus none of the three could truthfully have certified to having determined their prices independently." *Id.* at *4. The Comptroller General rejected this argument, reasoning that although the three bidders knew the subcontracting price for one required service, there was "no evidence of collusion" because "there is no evidence [the subcontractor bidder] knew that the other bidders would quote that precise price, without any mark-up or mark-down, in their bids" and also because there was "no evidence that . . . any of the three [bidders] communicated with any other of the three [bidders] with regard to the prices that it intended to offer for [other parts of the contract]." *Id.* at *5  n.5.

Here, although Defendants and other agents agreed on subcontracting prices for packing services in Germany of €35, there is no evidence that Defendants discussed <u>offer</u> prices with any other agents or knew the prices each agent would include in their offers for that line item. *See, e.g.*, Graf Tr. (Def. Ex. 704) at 268:6-9 (Ex. G).  And, in fact, Gosselin added a mark up to the €35 price, submitting €36 for that line item in its offer.  Def. Ex. 345 at GSD024355 (Ex. F). There is no evidence in the record regarding whether the other offerors included the €35 price in their offers for this line item or whether they marked the price up or down.

12

Moreover, no company participating in the subcontracting agreements was prevented from submitting its own offer. Quite to the contrary, as discussed *supra* in sections II.B.2. and II.B.4., subcontracting agreements allowed the submission of competing offers in the first place. In fact, the subcontracting discussions occurred between just four of the nineteen companies that received the Solicitation. *See, e.g.*, Smet Tr. at 1189:12-14, 1194:1-6 (Ex. E). There is no evidence that these discussions did or were intended to prevent any of the other fifteen companies from submitting an offer. For example, there is no evidence Defendants agreed with anyone to an exclusive subcontracting arrangement (*i.e.*, not to provide subcontracting services to any other potential offerors), or agreed only to offer subcontracting services to other potential offerors at higher prices. Defendants did not violate the CIPD because their agreements did not, and were not intended to, restrict competition by preventing other bidders from submitting bids.[6] The verdict is not supported by sufficient evidence and should be set aside.

### C.    Relator Bunk Failed to Prove Defendants Acted Knowingly.

To prevail on an FCA claim, a plaintiff must prove, *inter alia*, that the defendant <u>knowingly</u> presented or caused to be presented a false or fraudulent claim to the government or <u>knowingly</u> used a false statement to get the government to pay a false claim. *See, e.g.*, *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Here, the jury would have had to find that Mr. Smet either (1) knew the CIPD was false in that the subcontracting agreements were entered into for the purpose of restricting competition; (2) was deliberately ignorant as to whether the subcontracting agreements were entered into for the

---

[6] To prove Defendants restricted competition under the CIPD by preventing other companies from effectively competing on the DPM contract, the Government also would have had to prove Defendants specifically intended to monopolize the relevant geographic and product markets at issue. Here, the Government failed to present any evidence from which the jury could determine the relevant geographic and product markets at issue, or to determine whether there was a dangerous probability that Defendants would achieve their alleged goal of monopoly power in those relevant markets. *See, e.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

purpose of restricting competition; or (3) acted with reckless disregard as to whether the subcontracting agreements were entered into for the purpose of restricting competition. 31 U.S.C. § 3729(b).  The evidence fails to support any of these types of "knowing" behavior.

### 1.   Actual Knowledge

To prevail based on actual knowledge, Relator Bunk had to prove Mr. Smet knew the CIPD was false because he had discussed subcontracting prices and geographic capacity for the "purpose of restricting competition."[7]   However, none of the participants in the discussion testified (or related to Mr. Bunk) that this was their purpose.  Rather, the testimony was clear that no offers could responsibly be submitted without first obtaining commitments on subcontractor pricing and capacity in relevant territories.  Therefore, in the context of this Solicitation the subcontracting agreements were affirmatively pro-competitive, as they allowed for the submission of responsible competitive bids. While the Court must credit all reasonable inferences in favor of the non-moving party, in light of the Solicitation's specific, unique disclosure and subcontracting requirements, it would not have been reasonable for the jury to infer that Marc Smet intended to restrict competition and knew the CIPD was false.

### 2.   Deliberate Ignorance

As the Supreme Court held in *Global-Tech Appliances, Inc. v. SEB S.A.* (a civil intellectual property case that Defendants submit is controlling here), deliberate ignorance requires:  (1) a subjective belief that there is a high probability of falsity and (2) deliberate actions to avoid learning of that falsity.  563 U.S. ___, 131 S. Ct. 2060, 2070-71 (2011).[8]   No

---

[7] Defendants objected to the first sentence of Jury Instruction 31 (Ex. U, attached) regarding actual knowledge, which instructed the jury that "actual knowledge" means "affirmative knowledge" that claims were false, as the word "affirmative" was undefined and confusing.  Trial Tr. at 1520:23-1521:1 (Ex. A).

[8] Jury Instruction 33 (Ex. U, attached), to which Defendants objected, incorrectly advised the jury that Mr. Smet had a duty to investigate whether his discussions and agreements would restrict competition if

evidence was presented at trial that Mr. Smet subjectively believed there was <u>any</u> probability, much less a "high probability," that the CIPD was false.  Even if he had so believed, there was no evidence whatsoever adduced that he took any steps to avoid confirming that belief.  To the contrary, the uncontroverted evidence shows that Mr. Smet believed in good faith[9] that the subcontracting discussions and agreements were necessary to enable any offeror to submit a responsible bid and, therefore, were not for the purpose of restricting competition.  *See* Smet Tr. at 1370:21-1372:5 (Ex. E).

### 3.    Reckless Disregard

Nor does the evidence support a finding that Marc Smet acted with reckless disregard as to whether the subcontracting agreements were for the purpose of restricting competition. Recklessness is a "linear extension" of gross negligence.  *United States v. Krizek*, 111 F.3d 934, 943 (D.C. Cir. 1997).  The Supreme Court defined recklessness in *Global-Tech* as requiring that the defendant "knows of a substantial and unjustified risk of [] wrongdoing."  131 S. Ct. at 2071.[10]  Thus, a defendant must have a <u>subjective</u> appreciation of the risk of falsity of the claim in order to be found to have acted in reckless disregard.

---

he merely suspected that would be the result.  This improper dilution of the deliberate ignorance standard is further grounds to set aside the jury's verdict and for a new trial.  *See Choi v. Kyu Chul Lee*, 312 Fed. App. 551, 555 (4th Cir. 2009) ("Because the jury instructions were flawed . . . the jury's verdict cannot be sustained.  Accordingly, we hereby vacate the jury verdict and remand for a new trial on those claims.").

[9] The Court, over defense objection, also erroneously instructed the jury regarding good faith (Instruction 34) (Ex. U, attached) by stating that "[t]he government has no burden to prove that the defendants did not act with a good faith belief with respect to their conduct."  However, it is the Plaintiffs' burden to prove the defendant acted knowingly, and good faith negates such a finding.  This instructional error improperly shifted the burden of proof on the knowledge element of the FCA offense to Mr. Smet and Gosselin. Further, the Court's Instruction 39 (Ex. U, attached), also given over defense objection, that benevolent motivation (namely, that the discussions and agreements were required and pro-competitive) was not a defense or legal justification for an alleged false claim further eviscerated Mr. Smet's basic defense theory.  These errors, too, are sufficient grounds to set aside the jury verdict and order a new trial.  *Choi*, 312 Fed. App. at 555.

[10] As Defendants argued during the charge conference and in their briefs in response to the Plaintiffs'

Here, there is no evidence that Marc Smet knew of any risk in the context of this first-of-its-kind Solicitation that he was falsifying the CIPD when he signed it.  Rather, the proof shows that Mr. Smet and the other offerors believed they were acting in compliance with the requirements of the Solicitation by discussing subcontracting rates and territories in advance of submitting an offer.  *See, e.g.*, Smet Tr. at 1370:21-1372:5 (Ex. E).  Even if the jury disbelieved Mr. Smet's and Mr. Graf's testimony on this point, there is no other evidence from which the jury reasonably could infer that Mr. Smet knew of a substantial and unjustified risk that the CIPD was false.  The jury merely had Mr. Greenberg's conclusory, speculative argument in closing that "there's absolutely no purpose for them all to get in a room and have this discussion" other than "to avoid competition."  *See* Trial Tr. at 1689-90 (Ex. A).  However, it is axiomatic that argument of counsel is not evidence and is insufficient to support a jury verdict.  *See, e.g.*, *Bennett v. Angelone*, 92 F.3d 1336, 1347 (4th Cir. 1996) (referring to "standard instruction" that attorney arguments are not evidence); *see also* Jury Instruction 9 (Ex. U).  The uncontroverted evidence shows that Gosselin engaged in subcontracting discussions to determine and confirm capacity, price and territory commitments to responsibly submit an offer on the Solicitation.

It is impossible to determine from the verdict form whether the jury's adverse DPM decision was based upon a finding of actual knowledge, deliberate ignorance, or reckless disregard.  If the jury was erroneously instructed on even one of these knowledge definitions –

---

proposed jury instructions, Jury Instruction 32 (Ex. U, attached) wrongly instructed the jury regarding recklessness because it simply stated that "'reckless' means 'gross negligence plus,'" and compounded that deficit by requiring Defendants to "properly" consider whether the CIPD was true or false.  Aside from being ambiguous because the instruction provides no guidance as to what "gross negligence plus" or "properly" mean, the instruction also fails to inform the jury that the defendant must have a subjective appreciation of the risk of falsity in order to be found to have acted recklessly, as required by *Global-Tech*.  This error is itself grounds for a new trial as to the DPM claim.  *See, e.g.*, *Wynn v. Wachovia Bank N.A.,* No. 3:09-CV-136, 2009 WL 5091364, at *1 (E.D. Va. Dec. 24, 2009) ("On a motion for a new trial addressing allegedly erroneous jury instructions, a new trial may be granted if the Court's charge was inaccurate on the law or confusing or misleading to the jury.").

and here the instructions were erroneous on all three – the verdict should be set aside. *See United States v. Joseph*, 542 F.3d 13, 18 (2d Cir. 2008) ("Where an instruction defining one of two alternative grounds is legally erroneous, a court must reverse unless it can determine with absolute certainty that the jury based its verdict on the ground on which it was correctly instructed.") (cited with approval in *United States v. Ferguson*, No. 08-6211-cr et al., 2011 WL 3251464, at *9 (2d Cir. Aug. 1, 2011) (reversing convictions for plain error instructional defect in defining "willfully caused")).

### 4.    Ratification by the Government

The law in this Circuit and elsewhere is clear that when the government is aware of and approves of the alleged falsity or fraud, the requisite scienter for a False Claims Act claim cannot be established.  For example, in *United States ex rel. Becker v. Westinghouse Savannah River Co.*, the Fourth Circuit affirmed summary judgment for the defendant because the government's "full knowledge of the material facts underlying any representations . . . negates any knowledge that [defendant] had regarding the truth or falsity of those representations."  305 F.3d 284, 289 (4th Cir. 2002) (no triable issue of fact as to defendants' scienter because government had as much knowledge as defendants regarding propriety of accounting codes and government asked defendant to use those codes anyway).  Numerous other circuits follow this rule and "decline to hold [defendants] liable for defrauding the government by following the government's explicit directions."  *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA."); *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008).

Here, the Army was fully aware of the subcontracting and even expected Gosselin and the other offerors to engage in subcontracting arrangements with other contractors. *See* Def. Ex. 345 at GSD024608 (Ex. F). The Army, itself, invited Gosselin and other potential offerors to attend a pre-proposal meeting to discuss the unique nature of the DPM Europe contract and to explain the subcontracting that likely would be necessary to fulfill the contract's requirements and the disclosures required by the Solicitation. The participants in the on-site meeting then met to discuss the very subcontracting that would be required under the DPM Europe Contract – as opposed to reaching those same agreements through numerous independent discussions. *See* Defendants' Memorandum Regarding Civil Penalties ("Civ. Pen. Mem.") at 21-23.

Gosselin's offer detailed the names of the subcontractors Gosselin would use in which geographic regions if Gosselin won the contract. *See* Def. Ex. 334 at GSD023952-56 (Ex. I). When the Army evaluated Gosselin's offer, it knew that some of the subcontractors Gosselin listed were also Gosselin's competitors as they, too, submitted competing offers to the Army. *See id.*; Smet Tr. at 1185:25-1186:24 (Ex. E). To be able to include these companies in its offer as subcontractors, Gosselin necessarily had to discuss the prices for the subcontractors' services with them prior to submitting an offer to the Government. Not only is this conduct lawful, the Government expected and requested that it occur. Because "[t]he government knew what it wanted and got what it paid for," Defendants did not have the requisite scienter for an FCA violation and the jury's verdict should be set aside as a matter of law. *Durcholz*, 189 F.3d at 545.

The Government ratified the alleged fraudulent conduct by approving and paying invoices based on that conduct. *See* Civ. Pen. Mem. at 10-13. This further undermines any finding that Defendants knowingly presented a false or fraudulent claim. Scienter can be lacking where "the defendant actually believed his claim was <u>not false</u> because the government approved

18

and paid the claim with full knowledge of the relevant facts." *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 686 (5th Cir. 2002) (emphasis in original). Similarly, in *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, the Fourth Circuit affirmed summary judgment for the defendant after finding scienter was lacking where uncontroverted evidence showed the government "knowingly ratified and approved" the allegedly substandard work underlying the defendant's claims. 612 F.3d 724, 730 (4th Cir. 2010).

Finally, as discussed in Defendants' Civil Penalties Memorandum at 10-11, it is undisputed that the Government exercised its option to renew the DPM Europe contract with Gosselin for 2003 and 2004 <u>after</u> Relator Bunk reported his allegations of wrongdoing in connection with the DPM Solicitation. The obvious and most reasonable inference from those renewals is that, at a minimum, the Army did not think Mr. Bunk's allegations were persuasive.

### D.   Relator Bunk's Testimony Was Based On Inadmissible Hearsay that Cannot Sustain the Jury's Finding.

The only evidence Mr. Bunk relied on for his DPM claims was Mr. Weyand's purported hearsay statements about agreements. The Court conditionally admitted this testimony, subject to proof that the statements satisfied the requirements of Federal Rule of Evidence 801(d)(2)(E). *See* Trial. Tr. at 258:7-13 (Ex. A). Throughout trial, Defendants maintained their objection to the admission of these statements. *See, e.g.*, Trial Tr. at 245:25-249:9, 950:20-24 (Ex. A).

#### 1.   Mr. Weyand's Hearsay Statements Could Not Satisfy the Rule.

To admit evidence of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), the court must conclude: (1) a conspiracy existed; (2) the declarant and the defendant were part of the conspiracy; and (3) the statements at issue were made during the course of and in furtherance of that conspiracy. "The government must establish these elements by a preponderance of the evidence." *United States v. Neal*, 78 F.3d 901, 905 (4th Cir. 1996)

19

(emphasis added) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)); *see also United States v. Rivera*, 292 F. Supp. 2d 827, 831 n.12 (E.D. Va. 2003).

Moreover, although Mr. Bunk asserted a conspiracy claim under section 3729 (a)(3) of the FCA in his complaint, he did not ultimately submit an (a)(3) claim to the jury. Relator Bunk did not prove, and the jury necessarily did not find, his charged conspiracy, thus testimony regarding Mr. Weyand's ambiguous purported statements to him – uncorroborated by Mr. Weyand, himself – should not have been admitted and cannot support the jury's verdict.

### 2.    Relator Bunk Did Not Prove Mr. Weyand's Statements to Him Were Made In the Course of and in Furtherance of That Conspiracy.

Even if Relator Bunk had proven, and the jury had found, the existence of a conspiracy as to the DPM Europe Solicitation and that Mr. Weyand and Mr. Smet were members, Mr. Bunk still did not present evidence sufficient to establish that Mr. Weyand's statements to him regarding the subcontracting negotiations were made during the course of or in furtherance of the conspiracy as is required by Rule 801(d)(2)(E). To have been "in furtherance" of a conspiracy, the statement must have been "designed to induce [the listener] either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives." *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). By contrast, "[i]dle conversation that touches on, but does not further, the purposes of the conspiracy does not constitute a statement in furtherance of a conspiracy under Rule 801(d)(2)(E)." *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001).

Here, even assuming an unlawful conspiracy to fix prices and allocate territories was established by a preponderance of the evidence – notwithstanding Relator Bunk's abandonment of his (a)(3) conspiracy claim – and further assuming Mr. Weyand's statement was made during the pendency of that conspiracy, there is no evidence that the statements were made <u>in furtherance</u> of the conspiracy. Rather, the evidence shows that, at most, Mr. Weyand was

informing Mr. Bunk of the subcontracting agreements.  There is no evidence that Mr. Weyand was attempting to induce Mr. Bunk to join the alleged conspiracy, or to stop Mr. Bunk from submitting a competing offer for the DPM Europe contract himself.  *See Shores*, 33 F.3d at 444. To the contrary, as Mr. Bunk testified, his company (UTD) worked as a subcontractor for Birkart on prior DPM contracts and did not itself have contracts with the U.S. military.  *See* Bunk Tr. at 282:14-17, 295:24-296:6, 297:24-298:14, 361:23-362:13 (Ex. C).  In fact, there is no evidence as to why Mr. Weyand made any statements to Mr. Bunk about the DPM Europe Solicitation. Mr. Bunk implied the conversation was about why Birkart would not submit an offer, but even that turned out to be wrong.  Regardless, it was not necessary to achieve the goals of the alleged conspiracy for Mr. Bunk to join the conspiracy, and Mr. Weyand's statements to Mr. Bunk would not have assisted the conspirators in accomplishing their objectives.  The plaintiff has the burden to prove that the alleged co-conspirator statements were "in furtherance of the conspiracy" as opposed to "narrative declarations" made without the requisite intent of furthering the common objectives of the conspiracy.  *See* Paul Marcus, <u>Prosecution and Defense of Criminal Conspiracy Cases</u>, § 5.05[1][a] (2008) (Ex. V, attached); *see also United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001); *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990); *United States v. Verbanic*, 801 F.2d 692, 698 (4th Cir. 1986).  Relator Bunk failed to meet this burden and Mr. Weyand's hearsay statements should have been excluded.

### III.   A NEW TRIAL ON THE DPM CLAIMS IS WARRANTED BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND WAS BASED ON ERRONEOUSLY ADMITTED HEARSAY TESTIMONY.

Even if the Court finds that sufficient evidence supports the jury's verdict, the verdict nonetheless is against the clear weight of the evidence and should be set aside in favor of a new trial on the DPM claim.  While a court must construe all evidence in the light most favorable to the nonmoving party for a Rule 50 motion, for a Rule 59 new trial motion the court weighs the

evidence and assesses the credibility of the witnesses.  *Chumbley v. Rockland Industries, Inc.*, 829 F.2d 1119 (Table), Nos. 86-3584, 86-3618, 1987 WL 38213 at *3 (4th Cir. Sept. 17, 1987).

Here, the only two witnesses who had personal knowledge of and testified about the subcontracting discussions – Mr. Graf and Mr. Smet – both said the discussions were not for the purpose of restricting competition and explained quite clearly why such discussions were expected and necessary for any company to submit a responsible offer on the Solicitation and ultimately to fulfill the contract requirements.  *See* Graf Tr. (Def. Ex. 704) at 266:1-11, 267:19-23 (Ex. G); Smet Tr. at 1370:23-1372:5 (Ex. E).  There was no testimony on this subject from any other participant in the discussions, such as Erwin Weyand or Horst Baur.

The only other witness to testify regarding these agreements, Mr. Bunk, did not participate in any of the discussions at issue and was unfamiliar with nearly every key provision of the Solicitation.  Bunk Tr. at 371:17-21 (Ex. C).  This ignorance substantially undercuts whatever weight or value Mr. Weyand's alleged statements otherwise would have had.  And, Mr. Weyand did submit a competing offer, and he did not corroborate Mr. Bunk's hearsay assertions.  At best, Mr. Bunk simply misinterpreted what Mr. Weyand allegedly told him in light of his own experience with prior regional DPM contracts and wrongly *assumed* that the subcontracting agreements were improper.

A new trial is warranted because of the prejudice to the Defendants from the erroneous admission of Mr. Weyand's hearsay statements to Mr. Bunk.  *See, e.g.*, *Reaching Hearts Int'l, Inc. v. Prince George's County*, 368 Fed. Appx. 370, No. 08-2281, 2010 WL 724162 at *2 (4th Cir. Mar. 3, 2010) (evidentiary errors warrant new trial where defendant "demonstrates sufficient resulting prejudice"). Given the lack of any other evidence that the DPM Europe subcontracting agreements were entered into for the purpose of restricting competition, it is likely that an error-

free trial in which such hearsay testimony was properly excluded would have resulted in a different outcome. *See Muhammad v. Kelly*, 575 F.3d 359, 375 (4th Cir. 2009) (prejudice warranting a new trial exists where absence of error complained of likely would have resulted in a different outcome).

Moreover, Relator Bunk, as a whistleblower, stands to benefit financially from a verdict against Defendants, and substantial evidence objectively undercutting his credibility was introduced at trial. *See, e.g.*, Bunk Tr. (Ex. C) at 302:5-20, 308:6-20 (Bunk engaged in criminal tax evasion in Germany); *id.* at 327:11-334:3, 390:22-392:3 (Bunk held shipments hostage); *id.* at 332:7-17, 333:6-334:3 (Bunk changed his story regarding requiring Gosselin to make check out to him personally to release shipments two weeks prior to his company declaring bankruptcy); *id.* at 322:13-324:4, 368:25-369:25 & Def. Ex. 582A (Ex. W, attached) (Bunk performed work under the DPM Europe contract for 10 months, accepted payment, and sought more money for his services – all while supposedly believing the contract was fraudulently obtained); *id.* at 325:9-326:23 & Def. Ex. 585 (Ex. X, attached), 334:12-335:15 & Def. Ex. 586 (Ex. Y, attached) (Bunk did not report his purported suspicions of fraud to the Government until the day Birkart terminated its relationship with his company and rejected his demands for more money and more control); *id.* at 292:19-293:5, 312:21-313:3, 313:21-314:5 (quality of shipments was unrelated to price, and as he made more money he increased his own quality of life).

In short, there was no evidence at trial that Defendants or anyone else knowingly agreed on subcontracting prices, capacities and territories for the purpose of restricting competition. No reasonable jury could have inferred such a purpose from the evidence presented in the case. Even assuming for argument's sake that the Weyand hearsay was admissible, the jury's verdict on the DPM claim is against the clear weight of the evidence and controlling law.

III.   **THE JURY'S FINDING AS TO THE NUMBER OF FALSE CLAIMS FOR THE CARTWRIGHT CHANNELS SHOULD BE SET ASIDE UNDER RULE 50.**

The jury's finding of 4,351 false claims in connection with the Cartwright channels should be set aside because the Government's proof of these claims was too speculative to sustain the jury's verdict, and because the Government was legally barred from asserting more than 577 false claims.   Further, the basis for the verdict, Government Exhibit 173, violated Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 1006.

A.   **The Government's Evidence of 4,351 False Claims Was Too Speculative to Sustain a Verdict.**

The Government failed to meet its burden of establishing falsity as to each claim submitted to the Government by any given carrier on the 12 channels at issue for IS02.   The Government did not present any evidence that any given carrier was part of the alleged conspiracy, and instead merely alleged a general framework within which allegedly fraudulent claims were submitted by carriers.   This general, non-particularized showing falls short of proving the requisite falsity.   *See* Doc. 737 at 16; Doc. 799 at 3-4.   Additionally, the Government's proof did not permit the jury to reasonably determine the number of false claims for the Cartwright channels in IS02 without engaging in impermissible "speculation and guesswork."   *United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988).   The Court should set the jury's verdict aside. *United States ex rel. Tyson v. Amerigroup Corp., Inc.*, 488 F. Supp. 2d 719, 740 (N.D. Ill. 2007) (*citing Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984)) ("In determining the number of false claims for which this statutory penalty should be assessed ... [i]t is not enough for this Court to rubber-stamp the number of false claims as determined by the jury...").

In *Amerigroup*, the court considered whether to disregard the jury's determination of the number of false claims. *Id.* at 740-41. Despite ultimately agreeing with the jury's number, the court noted that when the basis for the number of false claims is an expert's opinion that amounted to an "unsubstantiated guess," a court can disregard the jury's number and calculate its own. *See id.* (citing and distinguishing *Hays v. Hoffman*, 325 F.3d 982, 993-94 (8th Cir. 2003)). Similarly, in *Hays*, an FCA case for fraudulent Medicaid reimbursements, the Eighth Circuit disregarded the lower court's false claim number because its basis – the government expert's opinion – "was simply an unsubstantiated guess." *Hays*, 325 F.3d at 993. Of note, the court found troubling that the expert focused on the acts of the government, namely the government's payment of each of the defendant's reimbursement requests, rather than "the specific conduct of the person from whom the Government seeks to collect the statutory forfeiture." *Id.* at 993 (*quoting United States v. Bornstein*, 423 U.S. 303, 313 (1976)). "It is the conduct of the medical practitioner, not the disposition of the claims by the government, that creates FCA liability." *Id.* (quoting *United States v. Krizek*, 111 F. 3d 934, 940 (D.C. Cir. 1997)). The *Hays* court disregarded the previously determined number of false claims, 336, and found instead only eight instances where the defendant falsely and knowingly requested reimbursement fraudulently. The court thus assessed eight civil penalties. *Id.* at 993-94. As in *Hays*, here the Government did not contend that its payments or even the German agents' bills of lading constitute "claims" under the FCA. Rather, the Government argued that the carriers' submission of invoices (public vouchers) constituted the false claims.

It is simply impossible to determine the number of false claims from the trial evidence without pure speculation. For example, the evidence presented at trial did not permit the jury to determine which shipments in the 12 channels for which Cartwright cancelled the prime rate in

IS02 would have moved at prime but for Defendants' conduct.  For example, Mario Rizzo testified that "the consensus was that for Germany, that the Cartwright rates were too low to meet."  Mario Rizzo Trial Tr. at 738:25-739:1 (Ex. Z, attached).  Specifically, the rates were too low for Gateways to me-too and still cover its costs and make a profit.  *See id.* at 756:22-757:2 (Ex. Z) ("Q. By too low, do you mean noncompensatory?  A.  I mean I couldn't me-too them.  Q. You couldn't me-too them because you wouldn't able to cover your costs and make the profit you needed to make; is that a fair statement?  A. Yes."); *see also* Klaus Bungert Testimony Tr. (by video) (Def. Ex. 700) at 221:5-222:3 (Ex. AA, attached).

Although some witnesses testified carriers had to me-too the prime rate to get any tonnage, several other witnesses testified that certain amounts of tonnage in each cycle moved above the prime and even above the second low.  *See, e.g.*, Horst Labbus Trial Testimony. (by video) (Def. Ex. 703) at 106:7-15 (Ex. BB, attached) ("There are always some shipments moving on higher rates, they call it Me-3."); Jeff Coleman Trial Testimony. (by video) (Def. Ex. 707) at 248:24-249:7 (Ex. CC, attached); Jim Hahn Trial Testimony. (by video) (Def. Ex. 706) at 257:6-15 (Ex. DD, attached).  Thus, the jury still had to speculate about how much tonnage would have moved at the prime rate for the 12 cancelled Cartwright channels in IS02 but for the Defendants' conduct.[11]

Moreover, while the Government elicited testimony and repeatedly argued that there were no duplicate GBL numbers captured on its summary Exhibits 168 (for IS01) and 169 (for IS02), many of the GBLs were for very small amounts of money which could not possibly have

---

[11] In addition, Government Exhibit 173 simply indicates the number of moves in each of the 12 cancelled Cartwright channels in IS02 and a payment confirmation for those moves, in aggregate by channel. Indeed, Exhibit 173 contains even less detail than the summary exhibits from which Jana Haynie, the Government's witness from the Defense Finance and Accounting Service, testified (Exhibits 168 and 169), which themselves gave the jury no guidance for determining the number of false claims Gosselin caused to be submitted to the Government for payment.

been payment for an entire door-to-door move between the United States and Germany.  There was no way for the jury to determine from those summaries[12] – and even less ability to do so in Exhibit 173 (Ex. EE, attached) – which claims were not false or fraudulent because, for example, they were entirely for services unrelated to the ITGBL bidding process.  Jana Haynie Trial Testimony ("Haynie Tr.") at 666:8-13 (cannot determine which payments were for ocean freight only); 666:14-667:3 (cannot determine which payments were for bunker (ocean fuel) surcharges); 667:19-25 (cannot determine which payments were strictly for wharfage fees); 668:1-5 (cannot determine which payments are for fuel surcharges for linehaul (trucking)); 668:6-670:5 (cannot determine any U.S. costs in the move, *e.g.* U.S. port, linehaul, destination and origin charges); 670:6-11 (cannot determine which payments were for accessorial charges, *e.g.*, storage in transit) (all at Ex. FF, attached).  And, it would have been impossible for the jury to determine from Exhibit 173 which carriers submitted which GBLs for payment (*see id.* at 654:7-16) or to determine which German agents were used for a particular move (*id.* at 672:9-17).  Finally, when Ms. Haynie (who had only sampled 35 invoices) was asked whether a carrier could submit multiple GBLs on a single payment voucher, she acknowledged it was an option at the preference of the carrier, but she "generally understood" it was "rarely used."  *See* Haynie Tr. at 677:19-678:1 (Ex. FF).

In its closing, the Government essentially conceded that determining the number of claims in this case – much less *false* claims – was a matter of pure speculation.  For example, while it tried to distance itself from Ms. Haynie's testimony by asserting it was only "hypothetically possible" for carriers to submit more than one GBL on a single payment voucher (Trial Tr. at 1675:10-12 (Ex. A)), it could not escape Ms. Haynie's testimony implying that this practice underlined actually occurred, even if "rarely used."  The Government then argued it was "common

---

[12] Due to the large size of summary exhibit 169, Defendants have attached a one-page excerpt as Ex. GG.

sense" that "rare" means "not less than half," so the jury could simply decrease by half the

number of asserted false claims.

> …Now, if you're inclined to believe that it ever actually happened that more than
> one move was charged on a single voucher -- and, again, there is no evidence of
> that -- you can ask, What did Ms. Haynie mean? Now, ladies and gentlemen, we
> talked about your common sense. Rare means rare. For the claims, it's not less
> than half. It's rare. So you're permitted to use that common sense and your
> experience to determine what that means.
>
> Since we know it's not less than half, it's rare, you can conclude it's not less than
> half of the numbers on U.S. Exhibits 172 and 173. It's not less for IS01 than 1,198
> -- 91 – I'm sorry. That's half. And for IS02, 2,175. That's half. It can't be less
> than that.  It was rare. Remember, at the end of the day, every carrier that testified
> about vouchers in this courtroom said they did a separate voucher for each move.

Government's Closing Argument, Trial Tr. at 1675:23-1676:15 (Ex. A).

Neither Jana Haynie nor, apparently, anyone else, performed any analysis of which GBLs

were bundled together and submitted on a single public voucher.  And, although the Government

argued in closing that "every carrier" to testify about vouchers said they submitted GBLs on

separate invoices (Trial Tr. at 1676:12-13, 1762:25-1763:6 (Ex. A)), only three carriers out of

116 just for 1S02[13] actually testified at trial about this issue:  Jack Kagan (Great American

Forwarders) (testified live), Ken Selvey (Cartwright) (testified live) and Ray Ammons (Art

International, and one of the Relators) (testified by video).  The three other carriers who testified

at trial said nothing about this practice one way or the other:  Mario Rizzo (Allied Forwarders,

then Gateways International) (live), Jeff Coleman (Covan) (by video), Randal Groger (Airland

Forwarding) (by video).  Exhibit 173, which does not even break down which GBLs are

attributed to which carrier, certainly provides no information on this issue.  Exhibits 168 and

169, however, actually show multiple GBLs being paid by a single check.  Clearly, this could

suggest that those GBLs paid by a single check may have been submitted on a single public

---

[13] Government Exhibit 169 includes 116 separate SCAC (carrier identifier) codes for IS02.

voucher.  *See, e.g.*, excerpts of Gov. Exs. 168 & 169 sorted by check number and date (Ex. GG, attached).

The Government failed to submit evidence permitting the jury to determine the number of false claims "based on just and reasonable inferences."  *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421 (4th Cir. 1999).  Judgment as a matter of law is therefore appropriate as to the number of false claims for the Cartwright channels.

> **B.      The Government is Legally Barred From Asserting More Than 577 False Claims Were Submitted For the Cancelled Cartwright Channels in IS02.**

Because the Government is estopped from asserting more than 577 false claims in connection with the Cartwright channels, the jury's finding of 4,351 false claims, based on Government Exhibit 173, should be set aside for this reason, as well. *See* Civ. Pen. Mem. at 3-5.

> **C.      The Jury's Verdict Was Based Entirely on a Government Exhibit That Violated Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 1006.**

The jury's verdict should be set aside because the basis for the verdict, the Government's summary Exhibit 173, violated the rules of evidence and civil procedure.  When the Government produced, *inter alia*, Exhibit 173, it did not contemporaneously produce the documents that were referred to in those summary exhibits as required by Fed. R. Evid. 1006.  *See Jade Trading, LLC v. United States*, 67 Fed. Cl. 608, 615 n.12 (Fed. Cl. 2005) ("reference to such a document dump without specifying which documents were being summarized does not begin to satisfy Rule 1006's 'made available' requirement").  Defendants objected to these exhibits pre-trial, and have maintained their objections.  *See, e.g.*, 7/15/11 Hearing Tr. at 5-9, 33-47, 49-50, 58-59, and 63 (Ex. HH, attached).  At the conclusion of trial, the Court said it had "continuing concerns about the summaries, specifically exhibits 168 and 1690 [sic], since, based on the court's understanding, those were generated by databases that were neither in evidence nor specifically

made available to the defendants."  Trial Tr. at 1471:21-1472:5 (Ex. A).  The Court further stated:  "In any event, the court nevertheless concludes that the proper course at this point is to submit the issue and the number of false claims to the jury under the structured inquiries set forth in the distributed verdict form, and then, if necessary, further consider these issues, including the Rule 37 issues after the jury returns its verdict."  *Id*. at 1472:6-12 (Ex. A); *see also* Memorandum Opinion, 8/26/11 (Doc. 1072) at 2 n.1 ("Following the close of all the evidence, the Court again denied defendants' Rule 50 motion as to the DPM claims but again reserved as to the sufficiency of the evidence for a jury to determine the number of false claims that defendants caused to be filed, expressing substantial doubt as to the sufficiency of the evidence in that regard, including the sufficiency of the evidence with respect to certain summary charts and related exhibits, and the exclusion of those exhibits under Fed. R. Civ. P. 37 and otherwise.").

## CONCLUSION

For the reasons addressed herein and during any oral argument on these issues, and for any other reasons this Court deems just and proper, Defendants' Renewed Motion for Judgment as a Matter of Law as to Relator Bunk's DPM claim should be granted or in the alternative a partial new trial should be ordered as to the DPM claim.  Additionally, the Court should set aside the jury's finding of 4,351 false claims for the Cartwright channels.

Respectfully submitted,

_____/s/_____

Kerri L. Ruttenberg
Va. Bar No. 70274
Attorney for Defendants Gosselin
Worldwide Moving, N.V., Gosselin Group, N.V.
and Marc Smet
JONES DAY
51 Louisiana NW
Washington, D.C. 20001
(202) 879-5419 (Telephone)
(202) 626-1700 (Fax)
kruttenberg@jonesday.com

James R. Wyrsch, admitted *pro hac vice*
Keith E. Drill, admitted *pro hac vice*
Attorneys for Defendants Gosselin
Worldwide Moving, N.V., Gosselin Group, N.V.,
and Marc Smet
WYRSCH, HOBBS & MIRAKIAN, P.C.
1000 Walnut Street, Suite 1600
Kansas City, Missouri 64106
(816) 221-0080 (Telephone)
(816) 221-3280 (Fax)
jimwyrsch@whmlaw.net
kdrill@whmlaw.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the 29th day of August, 2011, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing to the following ECF participants:

Richard E. Greenberg, Esq.
John E. Petite, Esq.
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, MO 63102

Mark Hanna, Esq.
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006

Andrew A. Steinberg, Esq.
Jonathan A. Phillips. Esq.
U.S. Department of Justice, Civil Division
Commercial Litigation, Fraud Section
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Steven E. Gordon, Esq.
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314

William F. Coffield, Esq.
Coffield Law Group LLP
1330 Connecticut Ave., NW, Suite 220
Washington, D.C. 20036


_____/s/_____
Kerri L. Ruttenberg
Attorney for Defendants Gosselin Worldwide
Moving, N.V., Gosselin Group, N.V., and
Marc Smet