**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Kurt Bunk,<br><br>Plaintiffs/Relator,<br><br>v.<br><br>BIRKART GLOBISTICS GMBH & CO. LOGISTIK UND SERVICE KG, *et al.*,<br><br>Defendants. | No. 1:02cv1168(AJT/TRJ) |
| UNITED STATES OF AMERICA *ex rel.* Ray Ammons,<br><br>Plaintiffs/Relator,<br><br>v.<br><br>THE PASHA GROUP, *et al.*,<br><br>Defendants. | No. 1:07cv1198(AJT/TRJ) |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES AND RELATORS' MOTION FOR JUDGMENT AGAINST GOSSELIN DEFENDANTS FOR DAMAGES AND CIVIL PENALTIES**

## I. Background

On August 4, 2011, a jury found that defendants Gosselin Worldwide Moving N.V., Gosselin Group N.V., and Marc Smet, Gosselin's Managing Director, (collectively, Gosselin Defendants), caused to be submitted 4,351 false claims in connection with ITGBL contracts to transport United States military household goods in the twelve traffic channels from Germany to the United States that Cartwright cancelled during the IS02 rate cycle. Doc. No. 1069. Prior to

trial, on November 10, 2010, the Court determined that the Gosselin Defendants were estopped from challenging the admission in the criminal case that the United States sustained $865,000 in damages as a result of the Cartwright IS02 cancellation scheme. Doc. No. 737 at 17 ("[T]he Court concludes as a matter of law that (1) Gosselin and Smet are estopped from contesting the amount of the government's total loss for the purposes of calculating damages attributable to the conspiracies as to which the Court has entered liability, that loss amount being $865,000 . . . "). The jury also found that the Gosselin Defendants violated the False Claims Act (FCA) in connection with another scheme to rig bids for the Direct Procurement Method (DPM) contract for United States military moves entirely within Europe beginning in 2001. Doc. No. 1069. At trial, damages for the DPM contract bid rigging were not sought. However, shortly before trial, the relators and the Gosselin Defendants stipulated that Gosselin Worldwide Moving N.V. submitted directly to the United States 9,136 invoices for payment pursuant to the DPM contract. Rel. Trial Ex. 296 (attached as U.S. Ex. A); *see also* Aug. 2, 2011 Trial Tr. (portions attached as U.S. Ex. B) at 1623:6-7 ("The parties have stipulated as to the number of invoices submitted as part of the DPM contract . . . "). The United States and the relators respectfully request that the Court enter a judgment in favor of the United States, awarding damages consistent with the Court's November 10, 2010 opinion and civil penalties consistent with the jury's verdict and the evidence.

## II. The Court Should Enter Judgment Against the Gosselin Defendants for Damages Resulting from the Cartwright IS02 Cancellations.

The Gosselin Defendants conspired to cause Cartwright to cancel its IS02 prime rates in twelve traffic channels from Germany to the United States, and instructed other freight

forwarders to submit bids at the second low rate during the me-too round. This conspiracy inflated the rates that the United States paid to transport military household goods in the twelve traffic channels. As to this conduct, on January 25, 2010, the Court granted the United States' motion for partial summary judgment on liability. Doc. No. 557. The Court determined that the admissions set forth in the criminal Statement of Facts that accompanied the Gosselin plea agreement satisfied the elements of the FCA, specifically 31 U.S.C. § 3729(a)(3) (2008), *amended by* 31 U.S.C. 3729(a)(1)(C) (2009), and the United States' common law conspiracy to defraud claim. *Id.* On November 10, 2010, the Court determined that the United States' damages for this conduct were $865,000. Doc. No. 737 at 17. Thus, for the Cartwright IS02 cancellations, absent any setoff due from prior settlements, the United States would be entitled to an FCA judgment for treble damages in the amount of $2,595,000 ($865,000 x 3), minus the amount of paid restitution of $865,000, which equals $1,730,000. *See* 31 U.S.C. § 3729(a) (2008). The FCA judgment should indicate that each of the Gosselin Defendants is jointly and severally liable. *See United States v. O'Connell*, 890 F.2d 563, 565 (1st Cir. 1989) ("Under the False Claims Act, that [single damages] amount is tripled and each defendant is jointly and severally liable. 31 U.S.C. § 3729(a)."); *Miller v. Holtzmann*, 563 F. Supp. 2d 54, 113 (D.D.C. 2008) ("Joint and several liability applies equally in a FCA case.") (citation omitted), *aff'd in part, vacated in part on other grounds, and remanded by United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010).

As to the common law conspiracy to defraud claim, the United States is also entitled to a judgment of $865,000, and prejudgment interest dating at least to February 19, 2004, the date that the Gosselin criminal Statement of Facts was filed. Although the United States cannot

obtain a double recovery by collecting on both an FCA and a common law judgment for the same injury, the United States is entitled to a judgment that reflects both the amount of damages being awarded for the FCA claim and the common law conspiracy to defraud claim.

## III. The Court Should Also Enter Judgment Against the Gosselin Defendants for Civil Penalties Resulting from the Cartwright IS02 Scheme and the DPM Contract.

### A. The Court Should Impose One Civil Penalty For Each of the Gosselin Defendants' False Claims.

In addition to damages, the judgment against the Gosselin Defendants should include an award of civil penalties for the Cartwright IS02 cancellations because the jury determined that the Gosselin Defendants caused 4,351 false claims to be submitted. Doc. No. 1069. The absence of a jury award of DPM damages has no effect on the United States' entitlement to civil penalties associated with the DPM bid rigging. *See Toepleman v. United States*, 263 F.2d 697, 699 (4th Cir. 1959) ("to the Government a false claim . . . is always costly. Just as surely, against this loss the Government may protect itself, though the damage be not explicitly or nicely ascertainable"); *see also United States v. United Technologies Corp.*, 2008 WL 3007997 (S.D. Ohio 2008) (in defective pricing case with no damages, court awarded maximum $10,000 for each of 709 false claims). Thus, the judgment against the Gosselin Defendants should include an award of civil penalties for the DPM claims as well.

Under the FCA, the imposition of civil penalties is mandatory and the district court has no discretion whether to award penalties. *See United States v. Brown*, 274 F.2d 107, 108, 110 (4th Cir. 1960) (noting "mandatory" nature of civil penalties that Congress prescribed under FCA); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) ("The FCA establishes a mandatory statutory penalty. . . "); *United States v.*

*Rogan*, 459 F. Supp. 2d 692, 727 (N.D. Ill. 2006) (noting that "the imposition of civil penalties are mandatory. . . "). The legislative history of the 1986 amendments [to the FCA] makes clear that civil penalties are "automatic and mandatory for each claim which is false."[1] S.Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273.

**1. Procedural Background on Civil Penalties for Cartwright Channels.**

This Court previously declined to set the number of IS02 civil penalties because the Court found that the number of false claims caused to be submitted by the Gosselin Defendants was to be adjudicated by the jury. After summary judgment was granted as to Gosselin's liability for the twelve Cartwright channels, the United States filed on September 2, 2010, its Motion for Partial Summary Judgment on damages and civil penalties. Doc. Nos. 699, 700. At that time, the United States submitted 583 invoices for moves performed in the twelve Cartwright channels, and requested that one penalty be assessed for each invoice. In denying that request, the Court held that the Gosselin Defendants were not foreclosed by the criminal plea "from contesting the number of false claims for which they will be assessed a civil penalty . . . ." Doc. No. 737 at 15. However, the Court did provide instruction on how it would approach civil penalties in this case. First, the Court held that "Gosselin and Smet may be assessed more than one civil penalty for their conspiracy in violation of 31 U.S.C. § 3729(a)(3)." *Id.* The Court also observed that because Gosselin itself did not submit those claims for payment, it could not determine whether penalties necessarily should be assessed on every one of the false claims submitted. *Id.* At that

[1] The United States and relators anticipate that the Gosselin Defendants will raise an Eighth Amendment Excessive Fines argument, which the plaintiffs will address in further briefing. The plaintiffs will also address any arguments that the Gosselin Defendants raise as to the sufficiency of the evidence adduced at trial.

time, the Court did not have before it evidence of "what role Gosselin had played in the conspiracy or whether or to what extent its conduct 'caused' the freight forwarders to file false claims." *Id.* Accordingly, the Court concluded that "[w]hether these particular 583 invoices, in fact, substantiate 583 'false claims' remains subject to proof and adjudication." *Id.*

On March 8, 2011, the United States filed a Motion for Reconsideration of the portion of the Court's Order suggesting that the number of civil penalties could be less than all of the inflated invoices at the rigged second low rate in the Cartwright channels. Doc. Nos. 762, 763. The United States argued that because liability was predicated on an FCA conspiracy under 31 U.S.C. § 3729(a)(3), the Gosselin Defendants should be assessed one penalty for each invoice/claim submitted pursuant to their conspiracy to increase ITGBL rates in the twelve Cartwright channels. In denying the Motion, the Court reiterated that "Defendants were not foreclosed by the criminal proceedings . . . from contesting the number of false claims for the purposes of calculating civil penalties." Doc. No. 799 at 2-3. In response to the United States' claim that Gosselin could be assessed one penalty for each claim based on its conspiracy conviction, the Court said that it could not determine from the record whether each submitting freight forwarder was part of the conspiracy. *Id.* As discussed below, however, the Court need not make such a determination at this point. The jury has determined both the number of false claims and the number of false claims caused by the Gosselin Defendants' conduct.

### 2. The Jury Verdict Calls for the Post-Trial Imposition of 4,351 Civil Penalties

The FCA authorizes one civil penalty for each violation of the statute. 31 U.S.C. § 3729. In turn, "the number of violations of the False Claims Act depends on the number of false or

fraudulent claims or other requests for payment that defendant caused to be submitted." *Rogan*, 459 F. Supp. 2d at 720 (citing *United States v. Bornstein*, 423 U.S. 303, 313 (1976)). At trial, the jury found that the Gosselin Defendants caused 4,351 false claims to be submitted. Because the submission of each of these false claims is a separate violation of the statute, the Gosselin Defendants are accordingly liable for 4,351 civil penalties.

Under *Bornstein*, the focus is on the specific person from whom the government seeks to collect the statutory forfeitures. 423 U.S. at 309-13. By focusing on the specific conduct of the defendant from whom the government seeks to collect the statutory forfeitures, the court ensures that that defendant is penalized for only those false claims for which it is responsible. *See id.*; *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 2009 WL 3756343, at *1 (E.D. Va. Oct. 14, 2009); *see also United States v. Ehrlich*, 643 F.2d 634, 637-38 (9th Cir. 1981). In *Custer Battles*, for example, the jury was tasked with determining how many of the total thirty-six statutory violations each of the seven defendants was "responsible" for. 2009 WL 3756343, at *1. After the jury made that separate determination – finding the defendants responsible for anywhere from three to thirty-five violations each – Judge Ellis imposed one civil penalty for each of the violations for which each defendant was responsible. *Id.* Imposing one penalty for every statutory violation for which a defendant is responsible applies with equal, if not greater, force in the context of an FCA conspiracy, as the well-settled law of conspiracy instructs that defendants should be held responsible for the conduct in furtherance of the conspiracy and any foreseeable results of that conduct. *See, e.g.*, *Miller*, 608 F.3d at 904 (holding that after liability was established under section 3729(a)(3), it was unnecessary to reach defendant's arguments regarding jury findings under sections 3729(a)(1) and 3729(a)(2) because defendant was liable

for acts of its co-conspirators, and thus, liable for all false claims submitted on contract at issue); *United States v. Bd. of Educ. of City of Union City*, 697 F. Supp. 167, 177 (D.N.J. 1988) ("Once liability for a conspiracy under the False Claims Act is established, each defendant conspirator is liable for a penalty and [thrice] the government's damages for each false claim submitted pursuant to the conspiracy even if he did not personally submit or cause the claim to be submitted."); *United States v. Cripps*, 460 F. Supp. 969, 975 (E.D. Mich. 1978) ("Once the liability for conspiracy under the False Claims Act is established, each conspirator is liable for each of the overt acts committed pursuant to the conspiracy irrespective of the fact that he did not personally commit the act."); *see also Ehrlich*, 643 F.2d at 638 ("It would defeat the purposes of the Act to impose multiple forfeitures on a person submitting false claims, but limit the liability of coconspirators who caused the claims to be submitted.").

In keeping with these statutory principles, this Court instructed the jury to find the total number of false claims submitted in the Cartwright channels – in other words, the total number of statutory violations – and then to focus on the specific conduct of the Gosselin Defendants in determining the number of false claims they caused to be submitted. *See* Ex. B at 1626:4-6 ("If you find that you can determine the number of false claims, you must then decide if you can determine how many false claims the defendants caused to be submitted."). The jury received instructions detailing how to determine the number of false claims the Gosselin Defendants caused to be submitted in the cancelled Cartwright channels. For example, in Instruction Number 42, the jury was told that they would "need to determine the number of false claims that the defendants' conduct caused to be submitted as to the Cartwright channels." *Id.* at 1625:15-17. The jury was later directed, in Instruction Number 45, that "[t]he next step is for you to

determine the number of false claims that defendants submitted or caused to be submitted." *Id.* at 1627:20-22. To make that determination, the jury was instructed to determine whether the Gosselin Defendants' "conduct was a substantial factor in producing the harm and that the outcome was foreseeable." *Id.* at 1628:8-10. This Court also instructed the jury that, "in evaluating causation in this case, it is the knowledge and *conduct* of the Gosselin Defendants that matters and not the actual submitter of the claims, here, the U.S. carriers." *Id.* at 1628:18-20 (emphasis added).

The jury received all of these instructions, among others, and concluded that the Gosselin Defendants caused the submission of 4,351 false claims. Doc. No. 1069. In so doing, the jury ensured that the number of false claims submitted – and thus the number of violations of the FCA – was based on the *Gosselin Defendants'* conduct, and not the conduct of the freight forwarders that actually submitted each inflated claim for payment. For this reason, it is irrelevant whether the freight forwarders that submitted the 4,351 false claims were Gosselin's co-conspirators. Undoubtedly, most, if not all, of them were co-conspirators. The 4,351 false claims the jury determined to have been submitted by freight forwarders due to the Gosselin Defendants was also not "completely fortuitous," as the thirty-five claims in *Bornstein* were, because the jury specifically had to determine that those claims were foreseeable and that the Gosselin Defendants' conduct was a substantial factor in the submission of those false claims. In sum, because the 4,351 false claims specifically reflect the Gosselin Defendants' conduct, one civil penalty should be assessed for each of those claims.

**B. The Maximum Amount of Civil Penalties Is Justified Due to the Seriousness of the Gosselin Defendants' Conduct.**

The 1986 amendments to the FCA provide for the award of one civil penalty in the amount of $5,000 to $10,000 for each false claim. 31 U.S.C. § 3729(a) (2008). The amount of each civil penalty was subsequently adjusted upward to $5,500 to $11,000 for each false claim occurring on or after September 29, 1999. 28 C.F.R. § 85.3(a)(9) (2010). The district court has the discretion to determine the amount of each civil penalty within that range. *See Miller*, 501 F. Supp. 2d at 56; *United States v. Bottini*, 19 F. Supp. 2d 632, 641 (W.D. La. 1997), *aff'd*, 159 F.3d 1357 (5th Cir. 1998). When assessing the amount of each civil penalty to award, the district court should be guided by "the totality of the circumstances, including such factors as the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct. . . . " *Miller*, 501 F. Supp. 2d at 56; *Custer Battles, LLC*, 2009 WL 3756343, at *1 (relying on *Miller* factors as "most appropriate" when assessing amount of civil penalties); *see also Hays v. Hoffman*, 325 F.3d 982, 984 (8th Cir. 2003) (factoring seriousness of misconduct and harm caused into calculation of civil penalties); *Rogan*, 459 F. Supp. 2d at 727 (same); *United States v. Peters*, 927 F. Supp. 363, 369 (D. Neb. 1996) (noting seven factors to consider), *aff'd*, 110 F.3d 616 (8th Cir. 1997)).

Based on the totality of the circumstances, the maximum amount of civil penalties is justified. As to the Cartwright cancellation scheme, Marc Smet, on behalf of Gosselin, orchestrated the underlying misconduct, which involved extensive planning and coordination as described in the criminal Statement of Facts. He acted with sufficient intent to sustain a criminal conviction for conspiring to defraud the United States in violation of 18 U.S.C. § 371. There is a

need to deter such egregious misconduct by contractors and subcontractors, particularly those that the United States relies on to support its military around the world. *See Miller*, 501 F. Supp 2d at 57 (awarding maximum amount of civil penalties for bid-rigging conspiracy and noting that "the Court would be remiss if it did not consider the nature of these penalties as deterrents to future conduct from entities in similar situations to the defendants in this case."). The bid rigging of federal contracts seriously harms the United States' procurement efforts and warrants the maximum penalty, especially for repeat offenders such as Marc Smet and the Gosselin entities. *See United States v. Murphy*, 937 F.2d 1032, 1036 (6th Cir. 1991) (awarding maximum amount of civil penalties in FCA bid-rigging case due to "the defendants' prior involvement in bid rigging").

Deterrence of subcontractors like Gosselin is particularly important in a case such as this where the subcontractors wielded significant power over the prime contractors and threatened to bring down an entire military program by their fraud. This trial showed an organized and ultimately successful effort by German and Belgian companies to significantly increase their rates and force that increase on U.S. carriers by threatening to boycott them if their bids did not include the agents' rate increase. This elaborate plan – which was memorialized in a written conspiracy agreement by thirteen different competitor agents – threatened to bring U.S. ITGBL carriers to their knees and halt global troop movement if the agents' demands were not met. Gosselin and its co-conspirator German agents showed no reservations whatsoever about resorting to anticompetitive threats and coercion to make more money on a program they knew was paid for by the Department of Defense and, ultimately, the U.S. taxpayers.

Indeed, the seriousness of the Gosselin Defendants' wrongdoing and the magnitude of the

resulting harm is evident. As to the Cartwright cancellations, they engaged in egregious and calculated criminal activity to advance their own individual and corporate financial interests. Although there was significant financial harm, the resulting harm "extends beyond the money paid out of the treasury" to the intangible effects that fraud has on the "administration and integrity" of the victimized federal program. *United States v. Mackby*, 339 F.3d 1013, 1018-19 (9th Cir. 2003). Many federal programs rely on a fair and competitive bidding process as the basis for the award of contracts. When Congress amended the FCA in 1986, its motivation was to deter "costly" and "pervasive" fraud that "erodes public confidence in the Government's ability to efficiently and effectively manage its programs." S. Rep. No. 99-345 at 2-3.

The Court should also take into consideration the fact that Marc Smet, on behalf of Gosselin, has been found liable for bid-rigging schemes other than the Cartwright cancellations during the IS02 rate cycle, including the DPM contract beginning in 2001, and the European Commission's findings that for seven years Gosselin Group N.V. engaged in bid rigging in connection with Belgian moving contracts. The European Commission's liability findings against Gosselin Group N.V. were upheld on appeal just one month before the trial of this case began. Judgment of the European Union General Court dated June 16, 2011 (attached as U.S. Ex. C). Simply put, Marc Smet's regular practice of bid rigging is a menace to free and competitive markets and has undermined the United States' ability to ensure that transportation contracts are awarded in a fair and competitive manner. The maximum amount of civil penalties would also serve to deter the entire moving industry from bid rigging. In addition to Gosselin being convicted as to the Cartwright IS02 cancellation scheme, The Pasha Group and Cartwright were also convicted for the same conduct.

The maximum amount of civil penalties is also warranted in light of the extensive government resources that have been expended investigating and prosecuting this complex international civil case. *See Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 125-26 (Fed. Cl. 2007) (noting that lengthy government investigation and prosecution was a factor in decision to award maximum amount of FCA civil penalties). The fraud here has forced the United States to expend extensive resources – hours, costs, and expenses – over the past eight years investigating the numerous allegations in the two underlying *qui tam* actions, resources that multiplied since 2008 in prosecuting the matter, which culminated in a twelve-day jury trial. *See United States. v. Kruse*, 101 F. Supp. 2d 410, 414 (E.D. Va. 2000) (noting that "the government must incur additional investigative and enforcement costs to ferret out and stop these abusive schemes. . . ").

Although at the summary judgment stage the Court left open the question of the relevance of "government knowledge" in determining the appropriate civil penalty amount, Doc. No. 737 at 17 n.14, this consideration should be afforded no weight based both on Fourth Circuit case law and the complete lack of evidence at trial of any knowledge by the government of the Gosselin Defendants' fraud. There is no obligation for the United States to mitigate its damages in fraud cases, including actions under the FCA. *See Toepleman*, 263 F.2d at 700 ("Having by his fraud thrust his burden on the United States, the [defendant] cannot be exonerated by the failure of the government to cast it off at the most propitious time."); *see also United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, 2009 WL 4576097, at *8 (D.N.J. Dec. 1, 2009) ("The Government has no duty to mitigate damages in fraud actions, including those under the FCA."); *United States ex rel. Dye v. ATK Launch Syst., Inc.*, 2008 WL 4642164, at *4 (D. Utah Oct. 16,

2008) (finding that "defense of failure to mitigate damages is an improper defense to False Claims Act claims").

This is so because in carrying out essential procurement activities, the United States cannot be held to owe a "duty" to these wrongdoers who could have stopped the submission of false claims for payment at any time during and after the IS02 rate cycle. Furthermore, the Fourth Circuit and other courts have expressly stated that the fact that the government paid false claims *even after* payment officials learned of the falsity of those claims does not preclude an FCA recovery. *Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003); *see also Ehrlich*, 643 F.2d at 639 (finding that co-conspirators were liable for full extent of government payments related to their wrongdoing, even though HUD was aware "early on" that submitted cost reports were inflated); *United States v. Village of Island Park*, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("If the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims."). Under the FCA, the Court must award a minimum penalty of $5,500 per claim. Based on the totality of the circumstances, the maximum statutory penalty amount is justified here.

## IV. The Court Should Limit Any Setoff to Common Damages for the Cartwright Cancellation Channels.

The Gosselin Defendants are liable for the full amount of the $865,000 in damages attributable to the Cartwright cancellation scheme, as trebled under the FCA ($2,595,000). As this Court has observed, damages under the FCA are compensatory in nature and the Gosselin Defendants are jointly and severally liable among themselves and with co-conspirators for

damages arising from the Cartwright cancellation scheme. Doc. No. 737 at 13; *see Bornstein*, 423 U.S. at 316 (noting that double damages under the FCA are compensatory in nature). Likewise, to the extent the United States settled with co-conspirators, the Gosselin Defendants, as non-settling defendants, are entitled to a credit of the settlement amount against a damages judgment as long as the settlement amount and the judgment represent "common damages." Doc. No. 737 at 13.

In *Bornstein*, the Supreme Court held that any settlements with other joint tortfeasors must be deducted from the trebled amount of damages due from the defendants in order to make the Government whole from its actual loss. *Id.* at 316. Thus, *Bornstein* has been universally applied to require a court to treble the United States' damages first before subtracting any settlements with joint tortfeasors. *See*, *e.g., United States v. Eghbal*, 548 F.3d 1281 (9th Cir. 2008) (FCA damages must be multiplied and then reduced by the amount of any previous compensatory payments received by the government from any source); *United States v. Thomas*, 709 F.2d 968 (5th Cir. 1983); *Miller*, 501 F. Supp. 2d at 53 (D.D.C. 2007), *judgment amended in part on other grounds*, 563 F. Supp.2d 54; *United States v. Zan Mach. Co.*, 803 F. Supp. 620 (E.D.N.Y. 1992). The common damages concept, which stems from the "one satisfaction rule," limits the plaintiff to one recovery for the same harm, and thus necessarily only provides for an offset to compensatory damages; no setoff is permitted against penalties. That is because statutory penalties serve as a deterrent, are tied to the conduct of the individual defendant, and are not simply remedial in nature. *See Bornstein,* 423 U.S. at 312 (holding that statutory penalties are tied to a defendant's causative acts, because "the Act, in short, penalizes a person for his own acts, not for the acts of someone else.").

In this case, then, the question is what portion, if any, of the United States' prior settlements with co-conspirators amounts to "common damages" such that the Gosselin Defendants are entitled to an offset. The term "common damages" generally refers to a singular harm caused by different parties. Thus, when a prior settlement is entirely co-extensive with a judgment against a joint tortfeasor, the non-settling defendant should receive an offset for compensatory damages in the amount of the settlement. However, when, as is the case here, the prior settlement encompasses more claims than the ones subject to the judgment, the court must determine what portion, if any, of the prior settlements represent common damages. The court must make this determination even if the prior settlement agreements themselves do not allocate the amount corresponding to each claim. *See Grant Thornton v. FDIC*, 2011 WL 2420264, at *12 (4th Cir. 2011) (upholding district court's determination to allocate prior settlement amounts to offset against a later judgment, when such an allocation was not in the settlement agreement itself); *Miller*, 563 F. Supp. 2d at 144-45 (applying this principle in FCA case). In *Grant Thornton*, the Fourth Circuit expressly held that, in such a situation, applying a setoff using the entire settlement amount would be "simple, neat, and wrong." *Grant Thornton*, 2011 WL 2420264, at *13.

The *Miller* case is particularly instructive in this regard. In that case, the United States reached settlements with a number of co-conspirators in a bid-rigging case prior to the trial against the remaining defendants. As is the case here, the settlement agreements in *Miller* did not allocate the payments within the settlement agreements among the three contracts that were compromised by the settlements, but rather were structured as undivided lump sum payments to the United States. 563 F. Supp.2d at 144. The court held that, because those settlements covered

three contracts, but certain defendants shared joint and several liability as to only two or one of the contracts that had been the subject of the prior settlements, the non-settling defendants were not entitled to credits in the full amount of the prior settlements. *Id.* Rather, the court allocated the prior settlement amounts for offset purposes in the manner in which the jury apportioned liability across the three contracts. *Id.* at 145. Thus, the court concluded that the three contracts accounted for 87.11%, 9.899%, and 2.987% of the jury's award, respectively, and thus allocated those percentages to determine the pro rata amount of each of the three contracts in the prior settlements. The court then used those amounts to determine the amount to set off against the judgment. *Id.* A similar analysis should be applied here based on the damages that the Government adduced at trial.

In this case, the Gosselin Defendants have been found liable for $865,000 in damages for the IS02 Cartwright cancellation scheme. Doc. No. 737 at 17. The United States settled with defendant Cartwright in connection with the Cartwright cancellation scheme for $255,049.04. That amount thus is common damages with the judgment here. As to the other settling defendants, however, the scope of the release and corresponding settlement amounts with them covered conduct beyond the Cartwright cancellation scheme. Those other settlements covered the landed rate conspiracy and the Covan cancellation scheme for a total, combined recovery of $14,654,040.85. *See, e.g.,* Pasha Settlement Agreement (attached as U.S. Ex. D). Because the settlements only partially overlap with the Gosselin Defendants' judgment of Cartwright damages, a setoff in the entire amount of those settlements would be "simple, neat, and wrong." *Grant Thornton*, 2011 WL 2420264, at *12. The Gosselin Defendants are entitled to a setoff only as to the portion of the settlements that constitute common damages.

Thus, the Court must determine what percentage of those settlement agreements relates to the Cartwright cancellation channels and apply that amount as a setoff to the Gosselin Defendants' liability for Cartwright damages. In order to make this calculation, the Court should first consider the entire universe of damages for the claims for which the co-conspirators settled. At trial, the United States presented evidence of its total damages for the landed rate conspiracy and the Covan cancellation scheme, which were claims that were compromised in the co-conspirators' settlement agreements. The United States' damages expert, Prof. Robert Marshall, calculated that the United States' total damages for the landed rate conspiracy amounted to $41,691,000 (total damages of $42,946,000 – Covan damages of $1,255,000), and the damages connected to the Covan cancellation scheme were $1,255,000. *See* Prof. Marshall Demonstrative Fig. 6 (attached as U.S. Ex. E).[2] The Cartwright damages were set by this Court as $865,000. Thus, the total damages associated with all three of the United States' claims amounted to $43,811,000 ($41,691,000 + $1,255,000 + $865,000). The Cartwright cancellation damages make up approximately two percent (2%) of the overall damages to the United States from the three schemes that were covered in the prior settlements ($865,000/$43,811,000). Because the settlement agreements themselves do not allocate the amount paid for each claim, this proportion

[2] Although the Court ultimately struck Prof. Marshall's testimony, it nonetheless provides a reliable tool for the exercise of apportioning the prior settlements across the three schemes that were at issue in this matter. The basis for striking Prof. Marshall's testimony as to the landed rate conspiracy rested entirely on the Court's determination that the Gosselin Defendants' conduct was immune under the antitrust laws, and thus, the ruling was unrelated to the methodology that was used to calculate potential damages from that conduct. On the Covan cancellation scheme, although the Court did strike Prof. Marshall's damages calculations, the question of the reliability of Prof. Marshall's figure was based, in part, on a mistaken belief that the calculation failed to deduct tonnage that shipped at the prime rate. As set forth in Prof. Marshall's expert reports, his figures did, in fact, deduct such tonnage from the damages calculations, and thus, were not overstated.

of the United States' damages for the Cartwright channels in relation to all of the claims for which it settled is the most appropriate percentage to apply to as a setoff in favor of the Gosselin Defendants' damages. *See Grant Thornton*, 2011 WL 2420264, at *13; *Miller*, 563 F. Supp. 2d at 144-145. Applying the two percent figure to the $14,654,040.85 in settlements results in a setoff of $293,080.82 ($14,654,040.85 x 0.02). Under *Bornstein*, a setoff would only be applied after the $865,000 had been trebled pursuant to the statute. *Bornstein*, 423 U.S. at 316. Thus, after applying a setoff and the paid restitution, the total damages amount for which the Court should enter judgment against the Gosselin Defendants for the Cartwright cancellation scheme is $1,181,870.14 ($865,000 x 3 - $865,000 - $255,049.04 - $293,080.82).

## V. Conclusion

For the foregoing reasons, the Court should grant the United States and the relators' motion for entry of judgment for damages and civil penalties.

Respectfully submitted,

TONY WEST
Assistant Attorney General

NEIL H. MACBRIDE
United States Attorney

STEVEN GORDON
Assistant United States Attorney

JOYCE R. BRANDA
JAMIE ANN YAVELBERG
ANDREW A. STEINBERG
JONATHAN M. PHILLIPS

/s/

MEREDITH L. TOOLE
Va. Bar. No. 81022
Attorneys, Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-3165
Fax: (202) 514-0280
Email: meredith.l.toole@usdoj.gov

Dated: August 29, 2011

/s/

MARK HANNA
Va. Bar. No. 45442
Murphy Anderson PLLC
1701 K St. NW, Suite 210
Washington, DC 20006
Tel: (202) 223-2620
Fax: (202) 223-8651
Email: mhanna@murphypllc.com
Counsel for Relators

Dated: August 29, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of August, 2011, a copy of the United States and Relators' Motion for Judgment Against Gosselin Defendants for Damages and Civil Penalties, the supporting memorandum of law, exhibits, and proposed order were electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following recipients:

William F. Coffield, Esq.
Coffield Law Group LLP
1330 Connecticut Ave. NW
Suite 220
Washington, DC 20036

Kerri L. Ruttenberg, Esq.
Jones Day
51 Louisiana Ave. NW
Washington, DC 20001

James R. Wyrsch, Esq.
Keith E. Drill, Esq.
Wyrsch, Hobbs & Mirakian, P.C.
1000 Walnut St.
Suite 1600
Kansas City, MO 64106

/s/

MEREDITH L. TOOLE
Va. Bar. No. 81022
Attorneys, Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-3165
Fax: (202) 514-0280
Email: meredith.l.toole@usdoj.gov