## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES, ex rel. KURT BUNK, | ) | |
| | ) | No. 1:02cv1168 (AJT/TRJ) |
| Plaintiff/Relator, | ) | |
| | ) | Judge Anthony J. Trenga |
| v. | ) | Magistrate T. Rawles Jones, Jr. |
| | ) | |
| BIRKART GLOBISTICS GmbH & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES, ex rel. RAY | ) | |
| AMMONS, | ) | |
| | ) | |
| Plaintiff/Relator, | ) | No. 1:07cv1198 (AJT-TRJ) |
| | ) | |
| v. | ) | |
| | ) | |
| THE PASHA GROUP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## RELATORS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR PARTIAL NEW TRIAL

### PRELIMINARY STATEMENT

In moving for relief on the DPM verdict under Rules 50 and 59, Fed. R. Civ. P., the Gosselin Defendants assert that the jury was required to accept that the Gosselin Defendants' conduct was either "promoting competition" or, somewhat inconsistently, "not knowing."[1]   The Gosselin Defendants also assert that aspects of Kurt Bunk's testimony constituted inadmissible hearsay even though Marc Smet confirmed that Erwin Weyand of Birkart was a participant in the key meetings

---

[1] Defendants' Memorandum in Support of Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial ("Goss. Mem.") at 5-18.

1297586.3

where the competing bidders fixed prices for their services.

Were it this easy to overturn a jury verdict, there would be little reason for jury trials.  The jury rejected the Gosselin Defendants' claim that this was just "simple subcontracting" in light of the undisputed evidence that the competing bidders collectively agreed on what they would pay each other to provide services under the 2001 DPM Contract, DAJA 16-01-D-0018 (the "DPM Contract") in violation of the Certificate of Independent Pricing Determination ("CIPD").[2]  The jury also found the conduct to be knowing given Marc Smet's testimony that he was fully aware of the requirements of the CIPD and nonetheless engaged in the prohibited conduct.

Stripped to its essence, the Gosselin Defendants' arguments ask the Court to overrule the jury by finding that the inferences from the undisputed evidence compelled the jury to accept the Gosselin Defendants' self-serving characterizations and spin.  This is anathema to the jury system and totally

---

[2] This issue was flagged by the Court in the argument on Rule 50:

> THE COURT:  That's a different situation.  Obviously, talking with a subcontractor about what his price is going to be for the purpose of bidding is different than all the subcontractors getting in one room and agreeing that they are all going to charge the same price.

> MS. RUTTENBERG:  The same -- if what your Honor is referring to is the same price on the contract that is submitted, that is not what the evidence is.  There is no evidence, and Mr. Bunk certainly didn't testify to this, that they all got into a room and decided here is what we are going to submit as our offer on this DPM contract.

> THE COURT:  No.  But they, I think Mr. Graf testified that they all got in the room and they said, no matter who gets the contract, this is the price that we will work for as subcontractor.

> MS. RUTTENBERG:  As a subcontractor, your Honor.

> THE COURT:  Yes.

> MS. RUTTENBERG:  And it is an exceptional distinction.

> THE COURT:  Isn't that just as anti-competitive as agreeing to what the prime contract price is going to be?

Transcript at 994.

1297586.3

2

unwarranted where, as here, there is ample evidence -- largely undisputed evidence -- to fully support the jury verdict.

## BACKGROUND STATEMENT

Most, if not all, of the evidence on the DPM claim is undisputed and, contrary to the Gosselin Defendants' claims (Goss. Mem. at 3-5), does not turn on the testimony of Kurt Bunk.

**First**, the DPM solicitation contained a requirement that the bidders comply with the Certificate of Independent Pricing Determination and submission of a bid constituted a certification of such compliance.  Exhibit RE 181; *see also* Defendants' Exhibit 345 at pages 254-55.

**Second**, Marc Smet and the Gosselin Defendants were aware of the requirements of the CIPD.  Testimony of Marc Smet; Transcript at 1183 and Exhibit RE 181.

**Third**, competing bidders on the DPM Contract included Gosselin, represented by Marc Smet, Viktoria represented by Kurt Schaefer, and ITO represented by Jurgen Graf in a joint venture with Birkart, represented by Erwin Weyand.  Testimony of Marc Smet; Transcript at 1186-1188; 1336-37.  Christ, represented by Horst Baur, may also have bid on the contract.  *Id.*

**Fourth**, on February 15, 2001, at Grafenwoehr in Germany, the representatives of the competing bidders (Smet, Schaefer, Graf, Weyand and Baur) met together privately after a briefing by the United States on the 2001 DPM contract.  Testimony of Marc Smet; Transcript at 1188-89. Testimony of Jurgen Graf; Video Transcript at 24-25.3

**Fifth**, the representatives of the competing bidders collectively agreed on what each would charge the others on four or five line items of the DPM Contract regardless of who won the bid. Testimony of Marc Smet; Transcript at 1192-94; Testimony of Jurgen Graf; Video Transcript at 25; Exhibit RE 180.  The competing bidders also agreed as to who would service what territory.  *Id.*

Marc Smet also advised Jurgen Graf of ITO that Gosselin was going to make a "high priced offer" in bidding on the DPM Contract.  Video Testimony of Jurgen Graf at 24; Testimony of Marc Smet, Trial Transcript at 1205 ("I might have indicated to him that I was going to bid a high price.").

**Sixth**, one of the "important" or "critical" items to the 2001 DPM Contract was packing services.  Testimony of Marc Smet; Transcript at 1194, 1196.

**Seventh**,  the competing bidders agreed that they would collectively pay each other €35  for the critical packing service.  Testimony of Marc Smet; Transcript at 1197; Exhibit RE 180.

**Eighth**, by email dated May 2, 2001, Jurgen Graf of ITO wrote confirming the €35 price for the packing service, coded 1AA, reached at the prior meetings with the competing bidders prior to the award of the contract, and noted that the prior pricing agreements were documented in "meeting minutes."  Testimony of Jurgen Graf; Video Transcript at 25 and Exhibit RE 180; Testimony of Marc Smet at 1201 ("Q.  So this confirms, again, prior to the award of the contract there was an agreement reached between you and others as to the payment of 35 Euros to provide this important service?  A.  That's correct.").

**Ninth**, the Graf email also documented prior agreements by the competing bidders  on pricing for other services such as Euro outbound unaccompanied baggage (3AC), Euro inbound household HHG (12AA); Euro inbound unaccompanied baggage (14AA) and Euro container 205 CFT (8AA).  Testimony of Jurgen Graf, Video Transcript at 25; Exhibit RE 180.

**Tenth**, Marc Smet never testified that he disclosed the agreements reached with the competing bidders to the United States.  Testimony of Marc Smet; Transcript at 1083-1383.

---

[3] The Graf Video Transcript performed for the jury is attached as Exhibit A.

**ARGUMENT**

I.     **NO RELIEF IS WARRANTED FOR THE GOSSELIN DEFENDANTS.**

    A.     **Relief Under Rules 50 and 59 Is Proscribed.**

Relief under Rules 50 and 59, Fed. R. Civ. P., is extremely rare and warranted only in very limited circumstances.

First, under Rule 50, to prevail on a renewed motion for judgment as a matter of law, a defendant bears a "hefty burden" in establishing that the evidence is insufficient to uphold the jury's verdict. *Price v. City of Charlotte,* 93 F.3d 1241, 1249 (4th Cir. 1996). A Rule 50 motion may only be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149 (2000) (citations omitted); *see also Bonner v. Dawson,* 404 F.3d 290, 295 (4th Cir. 2005). Thus, Rule 50 motions are granted sparingly because they deprive the non-moving party of a determination of the facts by a jury. *See* 9A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 2524, at 252 (3d ed.). All favorable inferences are to be drawn in favor of the non-moving party. *Reeves,* 530 U.S. at 150. A renewed motion for judgment as a matter of law is not a means by which a moving party may seek to "usurp the jury's authority" in favor of judicial review. *Thompson v. Direct Impact Co.,* 63 F. Supp. 2d 721, 723 (E.D. Va. 1998), *aff'd,* 188 F.3d 503 (4th Cir. 1999) (*citing Taylor v. Home Insurance Company,* 777 F.2d 849, 854 (4th Cir. 1985)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves,* 530 U.S. at 150 (citations omitted).

Nor is Rule 59, Fed. R. Civ. P., a simple means to end run the requirements of Rule 50. The burden of demonstrating harmful error warranting a new trial falls on the party seeking the relief.

*Johnson v. Verisign, Inc.*, Civ. A. 01-765-A, 2002 WL 1887527, *12 (E.D. Va. Aug. 15, 2002) (citations omitted). A new trial will be granted if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citations omitted); *see also Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). However, only errors that cause substantial harm to the moving party justify a new trial; errors that are not prejudicial are to be disregarded. *Bennett v. R & L Carriers Shared Services, LLC*, 744 F. Supp. 2d 494, 539 (E.D. Va. 2010) (*citing Ingram Coal Co. v. Mower, L.P.*, 892 F.2d 363, 366 (4th Cir. 1989) ("[A] court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

Here, the Gosselin Defendants assert that relief is warranted because the verdict is against the "substantial weight of the evidence," or was "against the clear weight of the evidence and was based on erroneously admitted hearsay testimony." Goss. Mem. at 3, 21. As shown below, there was ample evidence to support the jury's verdict. The Gosselin Defendants' arguments assert no more than that the jury was mistaken by failing to adopt in whole cloth the self-serving testimony of Marc Smet.

### B.    Ample Evidence Supports The Jury Finding That Price Fixing Was For The Purpose Of Restricting Competition.

The Gosselin Defendants assert that their conduct necessarily was promoting competition as opposed to restricting competition in violation of the CIPD. To this end, the Gosselin Defendants assert that (1) Kurt Bunk's testimony was not credible; (2) the DPM Contract authorized subcontracting; (3) the DPM Contract was complex and required much capacity; (4) the Gosselin

Defendants were at risk if they violated the terms of the DPM Contract; (5) the Gosselin Defendants did not rig the bids for the DPM Contract (only the servicing of the contract); and (6) the Gosselin Defendants identified their subcontractors. Goss. Mem. at 3-7. This "evidence" is largely, if not totally, beside the point.

What is important is the undisputed evidence that Gosselin and the other competing bidders – all of whom are admittedly horizontal competitors regardless of any subcontracting – privately agreed on what they would collectively charge each other for some of the most important services of the DPM Contract and agreed as to who would service which territory. This evidence was supplied not by Kurt Bunk but by Marc Smet and Jurgen Graf and corroborated by documents admitted in evidence. These agreements were reached during the DPM solicitation and before the DPM Contract was awarded. Indeed, the competing bidders went so far as to prepare meeting minutes to document their agreement. This was hardly "standard subcontracting" where, as here, most, if not all, of the competing bidders met and agreed on the servicing prices and territories.

The evidence presented at trial allowed the jury to reasonably infer and conclude that Gosselin met with the other bidders before submitting bids and agreed that (1) the competing bidders would service the DPM Contract at agreed upon prices; and (2) that Jurgen Graf and Marc Smet discussed pricing of their bids, and the reference to "bid high" likely referred to an amount above the price the competing bidders agreed to service major aspects of the DPM contract. By the competing bidders agreeing on the prices to service the DPM Contract, Gosselin and the other DPM bidders created *de facto* minimum bids or a floor for their bids. After all, if the agreed upon subcontractor prices for the critical 1AA services would be €35, then each of the bidders would have to submit a bid to the United States for those services at a price of at least €35 to cover the cost to pay the competing bidders to service the DPM Contract. Indeed, the testimony shows that Gosselin, which

1297586.3

7

was awarded the DPM Contract, bid €36 for 1AA services.

The Gosselin Defendants make much of the absence of any proof that the bidders agreed on "total offer prices" that they would bid and purported evidence that the bidders all tried to "win" the DPM Contract. Goss. Mem. at 7-8. The jury was well within its prerogative as fact finder to reject this "evidence." After all, the bidders had agreed to service prices that would necessarily serve as a floor for their bids, such that it cannot be said that they submitted "competitive offers" because each of the bidders had agreed in advance to use the others as subcontractor at the inflated service prices. Courts have recognized that agreements among horizontal competitors to share the fruits of a contract award violates the antitrust laws. *See United States v. Brinkley & Son Constr. Co., Inc.*, 783 F.2d 1157, 1158 (4th Cir. 1986) (agreement among bidders prior to bidding to share project through subcontract work is anticompetitive). Accordingly, this contention, like the Gosselin Defendants' argument that Smet's saying "he would bid a high price would **encourage, not discourage**, others to undercut him, thereby **promoting** competition" (*id.* at 7), is self-evidently preposterous.

The Gosselin Defendants assert that the competing bidders' agreements on servicing the DPM Contract amount to no more than "teaming agreements" and that decisions of the Comptroller General or the General Accounting Office ("GAO") should persuade the Court to overrule the jury finding.[4] Goss. Mem. at 9-12. Of course, none of these reference sources were provided as evidence

---

[4] The Gosselin Defendants assert that the Comptroller General and General Accounting Office opinions on bid rigging demonstrate that collusive bidding is permitted if it does not result in restricting bids from third parties. Goss. Mem. at 11-12. However, the jurisdiction of the Comptroller General and the General Accounting Office is extremely limited and the opinions on their face indicate that the review is necessarily circumscribed. For example, in *Columbus Marble Works, Inc.,* B-193754, 79-2 CPDP 138, 1979 WL 12140 (Comp. General) at *2 (Exhibit P to the Gosselin Memorandum), simply provides that "evidence of collusive bidding in advertised procurement should be referred to the Attorney General by the procuring activity," and, further, was a matter reviewed by the VA General Counsel who determined there was insufficient satisfactory evidence to establish collusion. Further, in *American Printing House for the Blind, Inc.,* B-298011, 2006 CPDP 83, 2006 WL 1518965, at *1 (Comp. Gen. May 15, 2006) (Exhibit T to the Gosselin Memorandum), the Comptroller General essentially refused to review the issue, finding that it was "a matter for

to the jury during the trial or even argued to the Court.  Nor do the Federal Rules of Civil Procedure provide that the role of the jury is to be superseded by the Comptroller General or the GAO.  Most importantly, none of the cited authorities involved a situation where, as here, most, if not all, of the competing bidders were members of the only "team" in the league bidding on the DPM Contract.

More to the point, slapping a label of "teaming arrangement" or "joint venture" on collusive conduct by competing bidders is hardly dispositive.   The potential propriety of teaming arrangements, moreover, rests in part on their compliance with the Federal Acquisition Regulations (FAR).   The Gosselin Defendants conveniently fail to mention the standard "Competition In Subcontracting" clause, FAR § 52.244-5 (codified at 48 C.F.R.), which provides that "The contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract."[5]   There is ample evidence from which the jury could and did reasonably conclude that the "competing" bidders for the DPM Contract did not select subcontractors on a competitive basis.   Similarly, teaming arrangements must be used to decrease the cost of the government contract, *see* FAR 9.602 ("Contractor team arrangements may be desirable . . . to enable the companies involved to . . . offer the Government the best combination of performance, cost, and delivery for the system or product being acquired."),

_____

the contracting officer to consider in determining bidder responsibility" and deferred to the contracting officer.

In short, a simple reading of the Comptroller General opinions shows that they do not purport to rule on any disputed question – they merely rubber-stamp the averments of the certification on their face and leave any further investigation of whether there was actual collusion to the Department of Justice: "It is our position that FPR sec. 1-1.901 (1964 ed. Circ. 1), which governs the reporting of possible antitrust violations, requires that evidence of collusive bidding in advertised procurements should be referred to the Attorney General by the procuring activity .... [I]t is not within our jurisdiction to determine what constitutes a violation of a criminal statute, but within the jurisdiction of the Attorney General and the federal courts."  *Columbus Marble Works* (Ex. P to Gosselin Motion, Dkt. 1077-16), B-193754, 1979 WL 12140 (Comp. Gen. 1979); *see also* Exhibits. Q-T (same disclaimer).

[5] *See also Tekton, Inc. v. Paulsen Construction Co.*, 676 F.2d 1352, 1353-1355 (10th Cir. 1982) (noting that competition among subcontractors is critical to the object of competitive bidding, because "general contractors are [thus] able to offer lower prime bids to the awarding authority.  The awarding authority, the taxpayers in the case of public projects . . .are the true beneficiaries.  To obtain the lowest bid is the object of competitive bidding.").

something that the bid-rigging cartel, with its agreement to inflate subcontractor prices, and its resulting increase in the government's costs, clearly did not accomplish.

Similarly, labeling conduct a "joint venture" does not preclude a jury from finding otherwise. Indeed, in *United States v. Nusbaum*, Crim. No. JFM-09-0328, 2009 U.S. Dist. LEXIS 112744 (D.Md. December 4, 2009), the court rejected an argument materially identical to the one the Gosselin Defendants make here; i.e., the bid-rigging conspiracy was a mere joint venture:

> A bid-rigging cartel may well constitute a joint venture under state law but that does not mean that the venture constitutes a single entity so as to provide a defense to a bid-rigging charge under federal antitrust law. *See Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 50 n.2 (1st Cir. 1998) ("The phrase 'joint venture' is often used to describe a venture, other than one engaged in naked per se violations (like a price fixing cartel), that represents a collaborative effort between companies . . .") (emphasis added). To constitute a single entity under federal antitrust law, a joint venture must have an existence and purpose extrinsic to price fixing. *See, e.g., Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006) (joint venture's purpose was to refine and sell gasoline). Here, the evidence proffered by defendants would merely establish that defendants were engaging in collaborative activity intrinsic to their horizontal price fixing, i.e., bid-rigging at tax auction sales. In effect, their argument is tautological: bid-rigging constitutes a joint venture and therefore we can defend against a charge of bid-rigging on the ground that we were participating in a joint venture. This argument makes no sense and flies in the face of the well established principle that price-fixing cartels are *per se* illegal. *See, e.g., United States v. Rose*, 449 F.3d 627, 630 (5th Cir. 2006); *United States v. W.F. Brinkley & Son Constr. Co., Inc.*, 783 F.2d 1157, 1160-62 (4th Cir. 1986).

*Id.* at * 4-5. The supposed "teaming arrangement" or "joint venture" among the DPM Contract bidders was intrinsic to their price-fixing, territory allocation and bid rigging, and had no other purpose.[6]

---

[6] Gosselin and the other firms are no different than the 32 National Football League franchises that formed a "joint venture" to deal with clothing manufacturers. Last Term, the Court held that this oligopoly could not avoid Sherman Act scrutiny just by calling itself a "joint venture": "If the fact that potential competitors shared in profits or losses from a

Here, counsel for Relators and counsel for the Gosselin Defendants argued at length to the jury the appropriate inferences to be drawn from the evidence whether the agreements by the competing bidders restricted competition or promoted competition.   Counsel for the Gosselin Defendants repeatedly argued that the collusion was just simple subcontracting and essential for the Gosselin Defendants to bid on the DPM contract.  Trial Transcript at 1719-1728.  At the same time, counsel for the Relators argued that collectively fixing prices and territories was evidence of restricting competition.

It was for the jury and not the Gosselin Defendants to decide whether such obviously anti-competitive conduct among all or almost all of the competing bidders was intended to restrict or promote competition.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reese v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000) (citations omitted).  As the Fourth Circuit has further explained:

> Distilling the essential truth from a raw mixture of circumstances is the fact finder's function, and the jury is the instrument our system provides for this purpose.  If there is any room for rational choice between conflicting facts and competing inferences, function is for the jury.

*Atlantic Coast Line Railroad v. Truett,* 249 F.2d 215, 217 (4th Cir. 1957).  Conspicuously absent from the Gosselin Defendants' claims and argument is any rational justification why competing bidders may collectively collude on key pricing for certain services when the CIPD specifically prohibited bidders, for the purpose of restricting competition, from colluding on "the methods [of]

---

venture meant that the venture was immune from § 1, then any cartel could evade the antitrust law simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." *American Needle, Inc. v. National Football League,* ___ U.S. ___, 130 S.Ct. 2201, 2215-16 (2010) (citations omitted).  The Court held that such a joint venture might exist, but could not be a vehicle for price-fixing.

1297586.3                                        11

[sic] factors used to calculate the prices offered." Exhibit RE 181. Instead, the Gosselin Defendants offered simple half-truths such as "subcontracting was permitted" and "subcontracting was disclosed" as opposed to addressing the heart of the conduct at issue. These half-truths did not fool the jury although they were certainly argued at length to the jury, and should not persuade the Court.

### C.   There Is Ample Evidence To Support The Jury's Finding Of Knowing Conduct.

The Gosselin Defendants next assert that, as Marc Smet testified that colluding on pricing for services by competing bidders was pro-competitive, the Gosselin Defendants did not knowingly violate the CIPD or act with reckless disregard of the obligation. Goss. Mem. at 14-17. Further, regardless of the conduct, the conduct was not knowing where the Government purportedly ratified the action by extending the contract and paying the Gosselin Defendants' invoices. *Id.* at 17-19.

In so arguing, the Gosselin Defendants ignore the actual evidence and convert the requirement of knowing conduct into a requirement of specific intent that is simply not required under the False Claims Act. *See* 31 U.S.C. § 3729(b)(1)(B) (the terms "knowing" and "knowingly" "require no proof of specific intent to defraud").[7]

---

[7] Indeed, in amending the False Claims Act in 1986, Congress explained that "specific intent to defraud would no longer be required to satisfy the scienter element of the Act," explaining that:

> its purpose in lowering that threshold was to impose upon individuals and contractors receiving public funds "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek," and to "preclude 'ostrich' type situations where an individual [or contractor] has 'buried his head in the sand' and failed to make any inquiry that would have revealed the false claim."

*United States ex rel. Mikes v. Straus*, 84 F. Supp. 2d 427, 438 (S.D.N.Y. 1999) (quoting S. Rep. No. 99-345 at 20–21, reprinted in 1986 U.S.C.C.A.N. 5266, 5285); *see also United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008).

To be liable under the False Claims Act, a defendant has to act "knowingly."  As stated by

the United States Supreme Court, "the knowledge requisite to [a] knowing violation of a statute is

factual knowledge as distinguished from knowledge of the law." *Bryan v. United States*, 524 U.S.

184, 192 (1998). "Thus, unless the text of the statute dictates a different result, the term 'knowingly'

merely requires proof of knowledge of the facts that constitute the offense." *Id.* at 193 (footnote

omitted).

> Under the FCA, a person "knowingly" submits false information if he
> or she "(i) has actual knowledge of the information; (ii) acts in
> deliberate ignorance of the truth or falsity of the information; or (iii)
> acts in reckless disregard of the truth or falsity of the information."
> Although defendant cannot be held liable for an "[i]nnocent mistake,
> or mere negligence, no proof of the intent to defraud" is required.  As
> this Court has previously noted, "what constitutes the offense is not
> intent to deceive" but rather "the knowing presentation of what is
> known to be false."

*United States v. Eugene Chen,* 402 F. Appx. 185, 187 (9th Cir. 2010) (citations omitted). *See also*

*United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 59-60 (8th Cir. 1973)

(distinguishing specific intent from knowledge).

Here, Marc Smet's own testimony provided substantial evidence of a knowing violation.  He

testified that he was aware of the CIPD and its requirements and he therefore knew that competing

bidders could not collude in violation of the CIPD.  Instead of separately obtaining subcontractor

prices in the normal course, Smet arranged with the other competing bidders to together set prices

and territories for the essential services under the DPM Contract.  Although Smet testified that he

met with the Government both before and after the Grafenwoehr private meeting with the competing

bidders, at no time was there any testimony that he disclosed to the Government that the competing

bidders had reached agreement on prices for servicing the DPM Contract.  Moreover, given Smet's

admitted knowledge of the CIPD, the jury could also have found, under the applicable instructions,

that Smet's conduct was a function of reckless disregard or deliberate ignorance. Indeed, the jury was specifically charged that good faith could be a defense to "knowing" conduct but apparently found that Smet's claimed good faith did not rebut Smet's knowing conduct.

Knowledge of general unlawfulness is unnecessary when wrongfulness is obvious from the surrounding context or other sources provide effective notice of the impropriety of the conduct. *See United States v. George*, 386 F.3d 383, 393-95 (2d Cir. 2004) (Sotomayor, J.). "Indeed such knowledge is unnecessary where the behavior proscribed is wrongful in and of itself, because in such instances, the defendant is on notice that, in intentionally engaging in that behavior, he or she probably broke the law." *United States v. Danielczyk*, --- F. Supp. 2d ---, 2011 WL 2161794, at *13 (E.D. Va. May 26, 2011). Here, Smet's conduct of colluding with the competing bidders and failing to inform the Government of these meetings and agreements evidences a knowing violation of the CIPD. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (finding that collusive bidding constituted conduct proscribed by the FCA); *Murray & Sorrenson v. United States*, 207 F.2d 119, 123 (2d Cir. 1953) (noting that the tendency and character of defendant's understanding with the purchasing agent "is just as mischievous to the public, for it, like a secret agreement between bidders, has the necessary effect of increasing price which the government eventually has to pay").

Every citizen is presumed to know the law, *see Bryan*, 524 U.S. at 193, and ignorance of the law is generally not an excuse. *See United States v. Dee,* 912 F.2d 741, 745 (4th Cir. 1990), *cert. den'd,* 499 U.S. 919 (1991), *citing United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 563 (1971). Here, the Gosselin Defendants are not asserting ignorance of the law as Smet testified he was fully aware of the CIPD in bidding on the DPM Contract. Rather, the Gosselin Defendants argue that Smet must have "misapplied" the law when he decided he could meet with the competing bidders and decide collectively on the prices and territories for services. However, no

evidence was adduced to show that this "misapplication" was reasonable and, in any event, the jury

decided that Smet acted knowingly and did not have to accept Smet's self-serving claims.

The Gosselin Defendants would have this Court believe that the jury could not reasonably

conclude that the Gosselin Defendants "knowingly" made a false statement because Smet denied that

Gosselin agreed with the other bidders on subcontractor pricing "for the purpose of restricting

competition." To hold as much would require relators in FCA cases to secure an admission or have

like evidence on this score to prevail on their claims. But "direct evidence of an actor's mental state

is rare, and … fact-finders generally rely on circumstantial evidence and reasonable inferences in

False Claims Act cases" to determine whether the defendant "knowingly submitted false claims to

the Government for payment." *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 761 F.

Supp. 2d 442, 456-57 (W.D. Tex. 2010). The jury clearly did not credit Smet's denials, as it was

entitled to do, and could easily decide that Smet acted knowingly as he admitted he had knowledge

of the CIPD and then engaged in the collusive conduct nonetheless.

Moreover, the alleged "ratification" is inapplicable here to undermine that Smet's conduct

was knowing. Goss. Mem. at 17-19. Government knowledge, now recast by the Gosselin

Defendants as "ratification," may be a defense to "knowingly submitting a false claim where a

contractor has engaged in a dialogue with the Government, fully disclosed the falsity of the claims at

issue, and Government affirmatively approved submission of those claims." *See, e.g., United States*

*ex rel. Becker v. Westinghouse Savannah River Co.,* 305 F.3d 284, 288-89 (4th Cir. 2002) (finding

that defendant did not "knowingly" present a false claim because it was "following the government's

explicit directions,"), *States ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908,

920 n.14 (4th Cir. 2003) (confirming that for Government knowledge to negate scienter, the relevant

agency must have "full knowledge of the material facts" and actually direct the defendant to engage

in the conduct at issue.).  Here, however, no evidence was adduced to show that the Gosselin Defendants disclosed the collusive conduct by the competing bidders to the United States.

As the foregoing shows, there was ample evidence for the jury to find that either Smet knew that he violated the CIPD or acted recklessly or with deliberate ignorance.  Knowledge, like one's intent, "is not measured by a psychic reading of [the defendant's] mind by but the surrounding facts and circumstances; i.e., circumstantial evidence."  *United States v. Bolden,* 325 F.3d 471, 494 (4th Cir. 2003), *quoting United States v. Larsen,* 581 F.2d 654, 667 (7th Cir. 1978).  Defenses to evidence of false claims based on "simply mistakes, due to poor bookkeeping and accounting practice" are issues for the jury which were rejected here.  *Id.* at 495.  In the end, whether "the Gosselin Defendants acted recklessly, knowingly or intentionally," are questions for the jury, *Atlas Food Sys. & Servs.,* 99 F.3d at 598, and their resolution of the credibility issues and weighing of the circumstantial evidence against the Gosselin Defendants should not be disturbed.

### D.   Bunks' Testimony Was Admissible And There Was No Instructional Error.

In their motion for relief, the Gosselin Defendants assert that "[t]he only evidence Mr. Bunk relied on for his DPM claims was Mr. Weyand's purported hearsay statements about agreements."  Goss. Mem. at 19.  In fact, as outlined previously, the DPM evidence was based upon the testimony of Kurt Bunk, Jurgen Graf and Marc Smet as well as the corroborating documents.  *See* Background Statement, *supra.*  In fact, most of the relevant testimony regarding the DPM claim was undisputed.

Nonetheless, in a distorted view of the evidence, the Gosselin Defendants assert that Bunk's testimony regarding statements by Weyand constituted inadmissible hearsay.  The relevant testimony was that UTD was interested in providing work on the DPM Contract but "Mr. Weyand was strictly against this, and he also said that Birkart is not allowing that kind of bidding because the different

companies that followed the new rules are the ones who are going to do this kind of work."

Transcript at 297-298.  Bunk then testified that Weyand explained that "prices were already fixed,

that they agreed on the pricing and the regions were already divided and defined."  *Id.*  Finally, Bunk

testified that Weyand told him that the price for primary packing service for 1AA under DPM had

been agreed among the colluding bidders at €35.   Transcript at 1299.   This was the price

corroborated by Graf in Exhibit 180 as one of the five line items agreed to by the colluding bidders.

This was plainly not inadmissible hearsay under Rule 801(d)(2)(E), Fed. R. Evid.  The

statements were made in the course of and in furtherance of the common objectives of a conspiracy

by the colluding bidders in violation of the CIPD.[8]  "A statement is 'in furtherance of' a conspiracy if

it is intended to promote the objectives of the conspiracy... [and] need not actually advance the

conspiracy to be admissible."  *United States v. Conrad,* 507 F.3d 424, 430 (6th Cir. 2007).

Statements in furtherance include the following:

> Statements in furtherance of a conspiracy include statements made to
> induce enlistment, induce further participation, prompt further action,
> reassure members, allay concerns or fears, keep conspirators abreast
> of ongoing activities, avoid detection, identify names and roles of
> conspiracy members while mere conversations or mere declarations
> of past events are not in furtherance of the conspiracy.

M. Graham, *Federal Practice & Procedure: Evidence* § 7025 at 302 (2006).

This standard is satisfied by Bunk's testimony as to Weyand's statements.  The statements

attributed to Weyand can be characterized as statements to induce enlistment, induce participation,

allay concerns or fears or avoid detection.  The conspiracy was ongoing at that time as the statements

were made to prevent Bunk from competing with the co-conspirators.

---

[8] Contrary to the implication repeatedly expressed in the Gosselin Defendants' Memorandum, a conspiracy charge is not essential to submit evidence under the co-conspirator hearsay exception. *United States v. Moon,* 512 F.3d 359, 363 (7th Cir. 2008), ("[t]his rule of evidence depends on the principal of agency, so it applies . . . whether or not the indictment has a conspiracy count").

Rulings concerning the admissibility of evidence are generally not appropriate grounds for a new trial because "[i]n ruling on the admissibility or exclusion of evidence, the district court has broad latitude." *Jones v. Ford Motor Co.,* 204 Fed. Appx. 280, 282 (4th Cir. 2006) (citations omitted). As the Fourth Circuit has held, "'no error in admitting or excluding evidence is ground for granting a new trial' unless the error 'affect[s] a [] party's substantial rights.'" *Bennett,* 744 F. Supp. 2d at 539 (quoting Fed. R. Civ. P. 61).

There is also no merit to the Gosselin Defendants' claims of instructional error that are set forth as pot shots at various points throughout their memorandum. The instructions on the DPM Contract claim given by the Court were properly supported by authorities and clearly present a considered and reasonable choice among competing instructions in a challenging case. Whether read separately or read together, the instructions presented a fair basis to inform the jury of the applicable rules of law.[9]

To determine whether assumed evidentiary errors or judicial rulings did not affect substantial rights, and therefore were harmless, the Court "need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors. This test appropriately focuses upon whether the error itself had substantial influence." *Taylor v. Virginia Union Univ.,* 193 F.3d 219, 234-35 (4th Cir. 1999), (*en banc*) (citations omitted). Thus, even in instances where a district court may have erred, the Fourth Circuit has frequently concluded that the error was harmless and does not warrant a new trial. *See., e.g., Brinkley-Obu v. Hughes Training, Inc.,* 36 F.3d 336, 355-56 (4th Cir. 1994).

---

[9] Moreover, the Gosselin Defendants' failure to object to certain instructions precludes the claim. At no time did the Gosselin Defendants ask for an instruction on the meaning of "competition" as conceded by the Gosselin Defendants. Goss. Mem. at 11, n.5. In addition, their contention that the final jury instruction had a duty to investigate instruction (Goss. Mem. at 14, n.8), is simply inaccurate. No such instruction given. *See* Tr. 1570-71.

Although the Gosselin Defendants repeatedly question the jury's judgment in finding that their conduct was for the purpose of restricting competition, the jury need not accept the self-serving labels for the conduct testified by Smet and Graf but can instead evaluate the actual conduct and reach an independent conclusion. Here, in accordance with the instructions, the jury reasonably found that the evidence that the competing bidders gathered together and collectively determined the prices and territories for the services under the DPM Contract was in violation of the CIPD and was done to restrict competition. The judgment is amply supported by evidence, and therefore, it should not be overturned.

## CONCLUSION

For the foregoing reasons, the Gosselin Defendants' Motions for Relief should be denied.

Dated:  September 12, 2011                         Respectfully submitted,

                                        _____/s/_____
                                        MARK HANNA
                                        Va. Bar Number 45442
                                        Murphy Anderson PLLC
                                        1701 K St., N.W., Suite 210
                                        Washington, DC  20006
                                        Tel:  (202) 223-2620
                                        Fax:  (202) 223-8651
                                        Email:  mhanna@murphypllc.com
                                        Counsel for Relators

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of September, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

Kerri L. Ruttenberg, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

James R. Wyrsch, Esq.
Keith E. Drill, Esq.
Wyrsch, Hobbs & Mirakian, P.C.
1000 Walnut Street, Suite 1600
Kansas City, Missouri 64106

William F. Coffield, Esq.
Coffield Law Group LLP
1330 Connecticut Ave., NW, Suite 220
Washington, D.C. 20036

_____/s/_____
Mark Hanna