**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel*. Kurt Bunk and Daniel Heuser, | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | Civil No. 1:02cv1168 |
| | ) | |
| Birkart Globistics GmbH & Co., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| *ex rel*. Ray Ammons, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Civil No. 1:07cv1198 |
| | ) | |
| The Pasha Group, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO UNITED STATES' AND
RELATORS' MOTION FOR JUDGMENT AGAINST GOSSELIN DEFENDANTS
FOR DAMAGES AND CIVIL PENALTIES**

Defendants Gosselin Worldwide Moving, N.V., Gosselin Group N.V. and Marc Smet

("Defendants"), through counsel, hereby file this opposition to the United States and Relators'

Motion for Judgment Against Gosselin Defendants for Damages and Civil Penalties (Doc. 1076).

**ARGUMENT**

**I.      The Court Expressly Recognized that Determining the Number of False Claims
         Defendants Caused to be Submitted In Connection with the Twelve Cancelled
         Cartwright Channels in IS02 Likely Requires Impermissible Speculation.**

At the close of the Government's case at trial, Defendants moved for judgment pursuant

to Rule 50 as to the number of false claims attributable to the Cartwright channels.  Trial Tr. at

947:19-21 (Ex. A).  Defendants argued, *inter alia*, that the jury could not determine the number

of claims – much less false claims – Defendants caused carriers to submit without improperly speculating. *Id*. at 952:5-25; *see also United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988). The Government offered no substantive response and instead simply said, "if they believe that there were less false claims than the number that is set forth in Ms. Haynie's, in her summary exhibit, they are entitled to reduce that number by the amount that they believe is appropriate." Trial Tr. at 983:4-7 (Ex. A). Relators' counsel offered little more guidance: "[T]he word 'rare' has got to mean less than a majority. So, when I heard [Jana Haynie's testimony], I said, well, okay, now we are dealing with majority. And frankly, in this case, given the numbers involved, the majority should be reasonable. That's what I would argue, that that's enough to go to the jury." *Id*. at 988:6-11 (Ex. A).

The next day, the Court in detailed comments expressed several significant concerns about the jury's likely need to speculate to determine the number of false claims Defendants caused the carriers to submit. *Id*. at 1060:11-1063:14 (Ex. A). The Court explained there is no direct evidence as to the total number of public vouchers the carriers actually filed, and thus no evidence of the actual number of claims. *Id*. at 1060:23-1061:5 (Ex. A). The Court specifically noted two significant concerns: (1) the jury could not determine the number of claims (or false claims) Defendants caused carriers to submit if the jury did not know the number of invoices (claims for payment) actually submitted to the military; and (2) the jury could not determine the number of false claims if they did not know whether carriers submitted bids at rates they would not otherwise have submitted absent Defendants' alleged conduct. *Id*. at 1062:9-14 (Ex. A) ("If [a] GBL were included with other GBLs on the voucher, then by counting the GBL as a separate claim, the number of claims could be overstated. Depending on how many GBLs were included together on how many vouchers, attributing a claim to a GBL could overstate the number of

claims by many multiples of what it actually is."); 1063:1-9 ("a particular GBL would be the basis for . . . a false claim . . . only if the jury determined that the rate used in computing the GBL was the result of a fraudulent course of conduct. . . . [T]hat would require the jury to decide whether the carrier submitting the GBL bid a rate he otherwise would not have bid absent the fraudulent course of conduct.").  Nonetheless, despite its "substantial concerns whether the jury could make [these determinations] without necessarily speculating," the Court reserved ruling and said it would "revisit the issue."  *Id.* at 1063:15-19 (Ex. A).

The Court earlier raised another problem the jury would have in determining false claims without speculating:

> Among other inadequacies, the summary judgment record does not establish that all of the relied upon invoices were, in fact, submitted by members of the alleged conspiracy pursuant to the conspiracy or contained pricing that was part of the alleged conspiracy. Rather, the record simply contains the relied upon invoices, which reflect the names of a large number of freight forwarders about whom there is little or no other information, including what contact, if any, they had with Gosselin, Smet or any other alleged coconspirators or whether they submitted each relied upon invoice as part of the alleged conspiracy.

Order on United States' Mot. For Recons. (Doc. 799) at 3-4.

During the summary judgment proceedings, the Government submitted 583 (reduced to 577) invoices to support its $865,000 damage figure for the Cartwright channels.  The Government originally included these invoices on its trial exhibit list as Gov. Ex. 134, but withdrew this exhibit from the jury's consideration at the end of trial.  Instead, the Government referred the jury to its summary exhibits reflecting GBLs and payment information.  *See* Final Gov. Ex. 134 (Ex. B, attached).  In its closing argument, the Government told the jurors they would not have the actual invoices and merely said, "It's going to be more comfortable that way." Trial Tr. at 1673:11-13 (Ex. A).

The Government failed to submit evidence permitting the jury to determine the number of false claims for the Cartwright channels "based on just and reasonable inferences." *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421 (4th Cir. 1999). As the Court foresaw, it was simply impossible for the jury to have determined the number of false claims from the trial evidence without guesswork. Indeed, the jury's verdict reflexively finding the maximum possible number of false claims on the Government's summary exhibit in the face of woefully insufficient evidence proves the jury, in fact, did not even attempt to determine the actual number of false claims Defendants caused to be submitted.

## II.     The Government Essentially Asked the Jury to Speculate as to the Number of False Claims for the Cartwright Channels.

Despite the Court's repeated expressions of concern that the jury may not be able to determine the number of false claims at issue without speculating, and despite the Court's instruction to the jury that speculation is impermissible, the Government nevertheless asked the jury during its closing argument to do just that. Although the Government spun its argument as "common sense," in reality it asked the jury to guess the number of false claims with no supporting evidence in the record and no substantive guidance. The Government's arguments reveal its own implicit recognition that determining the number of false claims for the Cartwright channels simply cannot be done with the evidence in the record without wholesale speculation.

Jana Haynie, the Government's witness from the Defense Finance and Accounting Service (which paid carriers for ITGBL moves), testified that a carrier could submit multiple GBLs on a single payment voucher at the preference of the carrier, but that she "generally understood" that option was "rarely used." Haynie Trial Testimony at 677:19-678:1 (Ex. C). With no foundational evidence in the record to corroborate or quantify Ms. Haynie's testimony or otherwise guide the jury regarding how to apply it, the Government argued in its closing that it

4

was "common sense" that "rare" means "not less than half."  Trial Tr. at 1676:1-6 (Ex. A).  With that "common sense" definition, the Government then told the jurors they could simply decrease by half the number of asserted false claims.  *Id*. at 1676:7-11.  The Government did not provide the jury with the actual invoices constituting the alleged false claims, and instead brazenly dismissed the importance of that evidence.  *Id*. at 1673:11-13.  Instead, the Government expressly relied on Ms. Haynie's testimony and the objected-to summary Exhibit 173 (Ex. D, attached) as evidence of its alleged 4,351 false claims for the Cartwright channels.[1]

Additionally, the Government advocated that the jury speculate about the number of false claims <u>Defendants caused</u> to be submitted.  The Government acknowledged "you've also heard that some of the moves at the second-low rate may have happened even if Marc Smet hadn't put this scheme in motion."  Trial Tr. at 1677:3-5 (Ex. A).  The Government then invited speculation on how many false claims Defendants caused carriers to submit:  "You are, of course, permitted to consider whether <u>some portion</u> of those claims were not caused by the defendants.  But based on the overwhelming evidence of the full-court press of the German agents and Gosselin, <u>we submit to you</u> that <u>that number is certainly not zero.</u>  It's more likely than not preponderance of the evidence.  <u>It's not less than half.</u>"  *Id*. at 1677:5-12 (emphasis added).

Now, the Government asserts that the "jury received instructions <u>detailing how to determine</u> the number of false claims the Gosselin Defendants caused to be submitted in the

---

[1] *See, e.g.*, Trial Tr. at 1672:19-25 (Ex. A) ("It's going to be your job also to determine the number of false or fraudulent claims and whether they were caused by the Gosselin defendants' conduct in the Covan channels.  That number is laid out for you in U.S. Exhibits 172 and 173."); *Id*. at 1673:6-8 ("With the work that Ms. Haynie did and the summaries that you have, you have all the tools you need" to determine the number of false claims for the Covan and Cartwright channels.); *Id*. at 1674:18-20 ("[Y]ou have the number of false claims caused by the Gosselin defendants.  It's right there in the summary."). Gov. Ex. 173 (Ex. D) purports to set forth the number of moves in each of the 12 cancelled Cartwright channels in IS02 and payment confirmation for those moves in aggregate by channel.

cancelled Cartwright channels."  Pls.' Mem. in Supp. of Mot. for J. Against Gosselin Defs. for Damages and Civil Penalties ("Pls.' Mem.") (Doc. 1078) at 8 (emphasis added).  Plaintiffs contend that those detailed charges are found in Jury Instructions 42 and 45.  (Ex. E.)  But, those instructions provide no guidance whatsoever on how to determine the number of claims Defendants caused to be submitted.  Both instructions merely tell the jury to determine the number without speculating.  Instruction 45 also tells jurors to determine whether Defendants' conduct was a substantial factor in producing the harm, and whether the outcome was foreseeable.  Neither instruction tells the jury how to do this, or how to determine the number of false claims.  The jury could not make these findings without the underlying data.

### III.   As Predicted By the Court and Urged by the Government, The Jury Must Have Impermissibly Speculated to Determine the Number of False Claims Defendants Caused to be Submitted.

Defendants discussed at length in their Memorandum in Support of their Motion for Judgment ("Defs.' Mtn. for Jgmt.") why the Government's purported evidence of 4,351 false claims – set forth in summary Exhibit 173 – was too speculative to sustain a verdict.[2]  (Doc. 1077 at 24-29.)  For example, the jury could not have determined from the evidence presented at trial: (1) which shipments in the 12 cancelled Cartwright channels in IS02 would have moved at the prime rate but for Defendants' conduct;[3] (2) which GBLs on the Government's summary

---

[2] The Government is legally barred from seeking more than 577 civil penalties for the Cartwright channels, and even the 577 invoices the Government previously relied on over-account for the number of potential false claims in this case.  See Defs.' Civ. Pen. Mem. (Doc. 1080) at 3-10; Doc. 737 at 11 n.9.

[3] In ruling on Defendants' Motion for Judgment at the close of the Government's case, the Court noted "there is insufficient evidence from which the jury could conclude whether or to what extent the government would have shipped the entire tonnage in the 14 Covan channels at the Covan prime had the defendants not engaged in the alleged misconduct."  Trial Tr. at 1054:12-16 (Ex. A).  The same is true for the Cartwright channels.   The Government conceded in closing that "You heard carrier after carrier tell you that after they hear of that plan [to boycott carriers that bid below a certain rate], they factored that into their rate filing decision."  Id. at 1664:16-18 (emphasis added).  Thus, even the Government did not contend that but for Defendants' conduct, any particular carrier would have filed a different rate.

exhibits (particularly those for very small amounts of money) were for charges unrelated to the ITGBL bidding process and thus could not have been false or fraudulent in the context of this case; and (3) how many separate invoices (claims for payment) the carriers actually submitted (as opposed to the number of payments the Government made for a certain number of moves). *Id.*

When the basis for the jury's number of false claims is an unsubstantiated guess, the Court should set aside the verdict. *See, e.g.*, *Hays v. Hoffman*, 325 F.3d 982, 993-94 (8th Cir. 2003) (Eighth Circuit disregarded trial court's false claim number because it was based on an expert opinion that was "simply an unsubstantiated guess"); *United States ex rel. Tyson v. Amerigroup Corp., Inc.*, 488 F. Supp. 2d 719, 740 (N.D. Ill. 2007) (*citing Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984)) ("In determining the number of false claims for which this statutory penalty should be assessed ... [i]t is not enough for this Court to rubber-stamp the number of false claims as determined by the jury...").

## IV.     Defendants Can Only Be Liable for False Claims They Caused to be Submitted.

It is clear that "[w]hether a defendant has made one false claim or many is a fact-bound inquiry that focuses on the specific conduct of the defendant." *United States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997); *see also United States v. Bornstein*, 423 U.S. 303, 313 (1976) ("The focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures."); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 552 (1943) (government was entitled to a forfeiture for each project for which a collusive bid was entered even though the bids included additional false forms); *United States v. Grannis*, 172 F.2d 507, 515 (4th Cir. 1949) (assessing ten forfeitures against defendant for each of ten fraudulent vouchers even though the vouchers listed 130 items); *United States ex rel. Smith v.*

*Gilbert Realty Co.*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993) (court based civil penalty determination on defendant's conduct and concluded the actionable false claims were 7 certifications to the housing authority, not 51 instances of cashing rent checks).

To prove the number of claims Defendants caused to be submitted, the Government relied on summary charts of <u>the Government's payments</u>. This approach improperly focuses on the Government's conduct in paying for moves, not Defendants' conduct in causing the submission of invoices. *See, e.g.*, *Bornstein*, 423 U.S. at 313 (imposing three penalties on subcontractor because it "committed three acts which caused [the prime contractor] to submit false claims to the Government – the three separately invoiced shipments to [the prime contractor]"); *Krizek*, 111 F.3d at 940 (question of civil penalties turns "not on how the government chooses to process the claim, but on how many times the defendants made a 'request or demand;'" court also noted "It is the conduct of the [defendant], not the disposition of the claims by the government, that creates FCA liability."); *Alsco-Harvard Fraud Litig.*, 523 F. Supp. 790, 811 (D.D.C. 1981) (summary judgment denied due to insufficient evidence to determine if invoices were presented for payment at one time or separately).

Indeed, Defendants' conduct has no bearing on the <u>particular number</u> of claims actually submitted by the carriers, and Defendants would have no way of knowing that number in advance (or even after the fact).  As the Court explained in *Bornstein*, 423 U.S. at 312,

> The Government's claim that United "caused" Model to submit 35 false claims is simply not accurate.  While United committed certain acts which caused Model to submit false claims, it did not cause Model to submit any particular number of false claims.  The fact that Model chose to submit 35 false claims instead of some other number was, so far as United was concerned, wholly irrelevant[,] completely fortuitous and beyond United's knowledge or control.   The Government suggests that United assumed the risk that Model might send 35 invoices when United sent the falsely branded tubes to Model.  The statute, however, does not penalize United for what Model did.  It penalizes United for what it did.

Plaintiffs' argument on this issue is completely circular: "The 4,351 false claims the jury determined to have been submitted by freight forwarders due to the Gosselin Defendants was also not 'completely fortuitous,' . . . because the jury specifically had to determine that those claims were foreseeable and that the Gosselin Defendants' conduct was a substantial factor in the submission of those claims." Pls.' Mem. (Doc. 1078) at 9. The Court should reject this illogical reasoning. No trial evidence even suggested that Defendants would know how many invoices any particular carrier would submit to the Government for payment.

## V. Defendants' Conspiracy Liability Does Not Relieve the Government of its Burden to Prove Which Claims Were Submitted Pursuant to the Conspiracy.

The Government contends that because liability for the Cartwright channels was based on a conspiracy, it is entitled to one civil penalty for each claim submitted pursuant to that conspiracy. *See* 10/29/10 Hr'g. Tr. at 48:16-17 (Ex. F) ("the claims are *per se* false because they were submitted pursuant to a bid-rigging conspiracy"); *id*. at 50:20-21 ("Everything that is submitted pursuant to a bid-rigging conspiracy is tainted."); Trial Tr. at 1676:24-1677:2 (Ex. A) ("Every one of the claims for moves at the second-low that resulted from that scheme are the false claims regardless of which carrier submitted the claim.") (emphasis added). Even if this assertion were correct, the Government still had to prove which claims were submitted pursuant to the alleged conspiracy. The Government failed to meet its burden.

Before trial, the Government conceded that not all carriers were part of the conspiracy:

> And certainly, it may be that there are innocent freight forwarders who the Gosselin defendants simply caused to submit false claims to the government, and we would not dispute that the *Bornstein* analysis applies in that particular situation. . . . [W]here the liability is predicated on the Gosselin defendants causing those innocent freight forwarders to submit false claims to the government and where the submission of those false claims was not known or readily ascertainable by the Gosselin defendants, then the *Bornstein* analysis would apply.

4/8/11 Hr'g. Tr. at 5:25-6:4, 6:8-14 (Ex. G).

At trial, however, the Government presented no evidence as to which carriers were co-conspirators, and thus presented no evidence regarding which claims were submitted pursuant to the alleged conspiracy.  Instead, the Government portrayed the U.S. carriers as powerless victims of Defendants' conduct, not as participants therein.  *See, e.g.*, Pls.' Mem. (Doc. 1078) at 11 ("Deterrence of subcontractors like Gosselin is particularly important in a case such as this where the subcontractors [German agents] wielded significant power over the prime contractors [carriers]…"); Trial Tr. at 1648:2-7 (Ex. A) ("That is what this case is about, power, the power the German local agents had when they banded together and made demands on the U.S. carriers that could not move household goods of military service members and their families without the involvement of those agents.").

And, several carriers who testified expressly denied their involvement in any unlawful, conspiratorial conduct.  Kagan Trial Testimony at 420:5-19 (Ex. H); Groger Trial Testimony (by video) at 131:19-132:4 (Ex. I); Ammons Trial Testimony ("Ammons Tr.") (by video) at 88:4-7 (Ex. J); *see also* Armstrong Trial Testimony (by video) at 55:22-56:7 (Ex. K) (U.S. carrier Armstrong International used a German agent (Thomas) on a non-landed rate and thus is a non-conspiring carrier).  If the jurors could reasonably draw <u>any</u> inference as to which carriers were co-conspirators, they would most likely infer that <u>none</u> of them were, and thus <u>none</u> of their invoices were submitted pursuant to a conspiracy.

Now, however, recognizing this deficiency in its proof, the Government baldly asserts that "Undoubtedly most [carriers], if not all, of them were [coconspirators]."  Pls.' Mem. at 9.  The Government cites no evidence to support this new theory.  At minimum, it is clear that the jury could not have determined without speculating whether the relied-upon invoices (which

10

themselves remained a mystery to the jury) were, in fact, submitted by members of the alleged conspiracy, and pursuant to the conspiracy. The mere fact that Defendants' liability for the Cartwright channels was predicated on their participation in a conspiracy does not rectify this deficiency when Defendants did not submit any claims. The Government failed to present evidence that any given carrier was part of the alleged conspiracy, and instead alleged a general framework within which allegedly fraudulent claims were submitted by carriers. This general showing falls short of proving the requisite falsity. *See* Doc. 737 at 16; Doc. 799 at 3-4.

**VI.    The Court Should Not Assess Defendants Any Civil Penalties on the DPM Claim.**

The Court should set aside the jury's verdict or order a new trial on the DPM claim. (Doc. 1077 at 1-23.) If the Court declines to do either, it still should not assess civil penalties against Defendants for the DPM claim, and certainly not the number of penalties Relator Bunk seeks. The Government ratified Defendants' conduct when it exercised its option to renew the DPM Europe contract with Gosselin for 2003 and 2004 despite its actual knowledge of Mr. Bunk's allegations. (Defs.' Civ. Pen. Mem. (Doc. 1080) at 17-19; Defs.' Mtn. for Jgmt. (Doc. 1077) at 10-12.) There was no showing at trial that the Army had no viable alternative to renewal. The Government, which investigated the DPM claim at the same time it investigated the ITGBL allegations and chose not to bring a criminal indictment or intervene on the civil DPM claim, did not suggest otherwise. Because the Government expected and required the challenged subcontracting agreements, none of the invoices submitted under the 2002, 2003 and 2004 DPM contracts can be false claims for which any civil penalties would be appropriate. (Defs.' Civ. Pen. Mem. (Doc. 1080) at 17-19; Defs.' Mtn. for Jgmt. (Doc. 1077) at 12-13.)

Moreover, as noted previously in this Opposition, the Court should focus on Defendants' specific conduct to determine the number of false claims Defendants caused to be submitted to

the Government.  *See, e.g.*, *Krizek*, 111 F.3d at 939; *Bornstein*, 423 U.S. at 307; *Hess*, 317 U.S. at 552; *Grannis*, 172 F.2d at 515; *Gilbert Realty*, 849 F. Supp. at 74-75.  Here, the "sole basis" for Mr. Bunk's DPM claim is a violation of the Certificate of Independent Price Determination ("CIPD") contained in the DPM Europe Solicitation – *i.e.*, that Defendants falsely certified they arrived at Gosselin's bid to the Army independently.  Trial Tr. at 1464:10-19 (Ex. A).  Defendants signed <u>one</u> CIPD, and thus should be assessed, at most, one civil penalty.

Finally, Plaintiffs assert that the lack of damages for the DPM claim "has no effect on the United States' entitlement to civil penalties" for that claim.  Pls.' Mem. at 4.  As Defendants explained in their motion for judgment (Doc. 1077 at 2 n.2), there is a significant Circuit split on whether damages are a required element for liability under FCA section 3729(a)(1) in the first instance.  To the extent they are, then the lack of damages on the DPM claim means liability for that claim cannot be sustained, and thus no civil penalties may be imposed.

## VII.   If the Court Assesses Any Civil Penalties Against Defendants, Such Penalties Should Be Imposed At the Minimum Statutory Range.

Courts may impose between $5,500 and $11,000 for each violation of the FCA occurring on or after September 29, 1999.  28 C.F.R. § 85.3(a)(9) (2010).  Courts have discretion regarding the amount to impose for a civil penalty within this statutory range.  *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007); *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F. Supp. 2d 546, 565 (E.D. La. 1999), *judgment vacated on other grounds*, 244 F.3d 486 (5th Cir. 2001).

Courts must look to "the totality of the circumstances" when determining the amount to award for civil penalties.  Doc. 737 at 16; *see also Harbert*, 501 F. Supp. 2d at 56.  Factors that have influenced various courts' penalty assessments include: (1) egregiousness of the defendant's conduct; (2) scienter and general culpability as to each false claim; (3) need for

deterrence; (4) proportionality between the Government's damages and the civil penalty; (5) defendant's ability to pay; (6) whether the Government shares in some of the blame for its damages; and (7) general, undefined considerations of fairness.  Doc. 737 at 16.

In their Memorandum Regarding Civil Penalties, Defendants addressed in detail many mitigating factors, including <u>all</u> of the above, that should lead the Court to impose civil penalties at the bottom of the statutory range if any are assessed at all as to the Cartwright or DPM claims. Defs.' Civ. Pen. Mem. (Doc. 1080) at 13-26.  Defendants are prepared to introduce additional evidence regarding civil penalty mitigation during the upcoming evidentiary hearing.

### A.   Any Civil Penalties for the Cartwright Channels Should Be Imposed at the Minimum Statutory Range.

With respect to the Cartwright channels, Plaintiffs argue that the "seriousness" of Defendants' conduct supports a civil penalty award at the maximum end of the guideline range. Specifically, the Government contends that imposing the maximum amount of civil penalties is appropriate due to:  (1) egregiousness of Defendants' conduct; (2) the amount of damages to the Government; and (3) the need for deterrence.  Each of these issues is addressed below.

### 1.   Defendants' Conduct on the Cartwright Channels Was Not Egregious.

Through multiple histrionic statements that have no basis in the evidence in this case, the Government argues that maximum civil penalties are appropriate because Defendants' conduct was sufficiently egregious to warrant such treatment.  In particular, the Government contends that Defendants "threatened to bring down an entire military program by their fraud" and "threatened to bring U.S. ITGBL carriers to their knees and halt global troop movement if the agents' demands were not met."  Pls.' Mem. (Doc. 1078) at 11.  These assertions simply do not reflect the evidence presented at trial, the relevant implications of the jury's verdict, or reality.

The trial evidence demonstrated that Defendants tried to fix a dysfunctional program that regularly led to poor quality work, non-compensatory prices causing devastating industry bankruptcies, and then dramatic price increases in response.  Defendants had a benevolent motivation for their actions – to restore prices to compensatory levels and provide higher quality moves to U.S. military service members – goals that would be fair financially to all concerned and would improve the quality of life for service members and their families.  <u>The military itself shared these concerns</u>, and expressly told Gosselin and other German agents to increase prices. *See, e.g.*, Martinez Trial Testimony ("Martinez Tr.") at 173:6-23 (Ex. L); Cabana Trial Testimony at 494:8-495:25 (Ex. M); Def. Ex. 212 (Ex. N); Graf Trial Testimony ("Graf Tr.") (Def. Ex. 704) at 203:23-204:7 (Ex. O); Baur Trial Testimony (by video) (Def. Ex. 701) at 38:9-17, 93:13-94:13 (Ex. P); Third Interrogatories (Def. Ex. 15) at 18 (Ex. Q).  Despite the Government's dramatic assertions, there is simply no evidence in this case that Defendants threatened to bring down the ITGBL program or halt global troop movement.  The evidence revealed the opposite.

Moreover, the trial evidence compellingly showed that at all times Defendants believed their actions were lawful.  To be sure, so did Judge Lee on the bid-rigging count in the criminal case.  It is telling that not once in Plaintiffs' brief is there any acknowledgment that the jury did <u>not</u> find Defendants liable for FCA violations in connection with the Covan channels on precisely this issue – Defendants' scienter.  Indeed, as to the very conduct the Government consistently has touted as "identical" to the Cartwright channels, the jury expressly found Defendants lacked the requisite knowledge – actual knowledge, reckless disregard, or deliberate ignorance – to be held liable as to the Covan channels.  *See, e.g.*, 5/20/11 Hr'g. Tr. at 20:22-21:2 (Ex. R) (Government refers to Covan's cancellations as "identical conduct" to the Cartwright

14

cancellations that "should also be considered *per se* illegal"); Trial Tr. at 1659:2-8 (Ex. A) (referring in closing argument to cancellation of the Cartwright channels as "the same plan" as the 2001 cancellation of the Covan channels). Defendants' scienter as to the Cartwright channels was not put to the jury, of course, in light of the criminal plea and summary judgment liability in this case based on that criminal plea. Still, the fact the jury found Defendants lacked scienter for what the Government asserts is "identical conduct" for IS01 at least implicitly mitigates the egregiousness of Defendants' conduct in IS02, particularly in light of the conditional nature of the criminal plea. As the Court is aware, the criminal plea was conditional for that very reason – because Defendants genuinely believed in the lawfulness of their conduct in light of the *Tucor* case, Shipping Act and other immunities and MTMC regulations. *See, e.g.*, Smet Trial Testimony ("Smet Tr.") at 1137:18-1144:18 (Ex. S). The conditional plea allowed Gosselin to test this believed legality in court. Three years after the events in question, the Fourth Circuit ruled that Gosselin's understanding of the scope of the immunities was flawed.

The Government also argues for "the maximum amount of civil penalties" because "[Mr. Smet] acted with sufficient intent to sustain a criminal conviction for conspiring to defraud the United States in violation of 18 U.S.C. § 371. There is a need to deter such egregious misconduct by contractors and subcontractors, particularly those that the United States relies on to support its military around the world." Pls.' Mem. (Doc. 1078) at 10-11; *see also* 10/29/10 Hr'g. Tr. at 15:19-22 (Ex. F) (the Government will "seek the maximum amount of civil penalties based on the fact that there was criminal intent here. That is established by the statement of facts."). As is well-known in this case, Gosselin's criminal plea agreement with the Government was conditional, as Gosselin believed all of its conduct was lawful and that it did not knowingly cause the submission of false claims. Gosselin's belief its conduct was lawful turned out in

20/20 hindsight to be incorrect, but in light of the unique nature of the plea agreement – and the high-pressure circumstances in which Gosselin agreed to a plea in the first place (*see* Defs.' Civ. Pen. Mem. (Doc. 1080) at 19) – "criminal intent" in this case should not increase civil penalties.

### 2.     Government Knowledge Mitigates Civil Penalties.

The Government had knowledge of alleged fraud before accepting any bids or entering any contracts, and before the start of the IS02 cycle.  This mitigates the egregiousness of Defendants' conduct, demonstrates some blame on the part of the Government, and impacts the Court's overall fairness considerations when determining the appropriate civil penalty range. Defs.' Civ. Pen. Mem. (Doc. 1080) at 10-12, 18-19, 24.  The Government argues it has no duty to mitigate damages and the fact the government paid false claims even after it learned of their falsity does not preclude an FCA recovery.  Pls.' Mem. (Doc. 1078) at 13-14.  Even if this argument were correct, it is inapposite.  The Government's knowledge of alleged wrongdoing on the Cartwright channels and the DPM Solicitation, and its failure to take action to avoid damages (or affirmative ratification of that conduct) are relevant mitigating factors as to civil penalties.

The Government reluctantly recognizes that "at the summary judgment stage the Court left open the question of the relevance of 'government knowledge' in determining the appropriate civil penalty amount."  Pls.' Mem. (Doc. 1078) at 13 (citing Doc. 737 at 17 n.14).  In fact, in its Order the Court did more than "leave open" this issue; it expressly said "the extent of the government's knowledge and its conduct in light of what it knew <u>remains relevant</u> considerations [sic] to the Court in considering an appropriate civil penalty."  (Doc. 737 at 17 n.14 (emphasis added).)  Regardless, the Government contends "this consideration should be afforded no weight based on both Fourth Circuit case law and the complete lack of evidence at

trial of any knowledge by the government of the Goseelin Defendants' fraud." Pls.' Mem. (Doc. 1078) at 13. The Government's assertion should be disregarded for several reasons.

To begin with, whether or not there was evidence <u>at trial</u> of the Government's knowledge of Defendants' alleged fraudulent conduct is of no moment – the Court made clear pre-trial it would hold a bifurcated proceeding regarding civil penalties, at which time the parties would have the opportunity to present evidence regarding the number and range of civil penalties. Moreover, Plaintiffs' representation that there was a "complete lack of evidence" of any knowledge by the Government is wrong. Uncontested trial evidence demonstrated that the Government had actual knowledge of Relator Bunk's allegations regarding fraud in connection with the DPM Europe Solicitation before exercising its option to renew the contract with Gosselin for 2003 and 2004, and evidence also was introduced suggesting the Government knew or should have known of the subcontracting agreements about which Mr. Bunk complains prior to awarding the contract in the first instance. Defs.' Civ. Pen. Mem. (Doc. 1080) at 12-13 (citing, *inter alia*, Def. Ex. 345 at GSD024608 (DPM Solicitation stating "[i]t is anticipated that significant subcontracting or joint ventures may be required"); Def. Ex. 344 (Gosselin's offer on the DPM contract listing proposed subcontractors)); *see also* Defs.' Civ. Pen. Mem. (Doc 1080) at 10-12 (citing, *inter alia*, Bunk Trial Testimony at 302:21- 303:13 (Doc. 1080-5); Def. Ex. 586 (Doc. 1080-16)). Likewise, evidence was presented regarding the obligation – under the Government's own regulations – of rate-canceling bidders to continue moving tonnage at the prime rate for some period of time even after the cancellation is submitted. *See, e.g.*, Simmons Trial Testimony at 1441:14-1442:8, 1446:14-1447:16 (Ex. T); Martinez Tr. at 111:10-112:12 (Ex. L). These issues will be addressed in more detail during the evidentiary hearing.

Additionally, despite expressly basing its argument on "Fourth Circuit case law," the Government cites no cases even suggesting that government knowledge is irrelevant to determining the appropriate civil penalty amount. Regardless of whether the Government has a duty to mitigate damages, government knowledge is relevant to civil penalties, as this Court has recognized.[4] (Doc. 737 at 17 n.14); *see also United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1018 (W.D. Mo. 1995) (lower penalty due in part to government's "poor investigative procedures" and "confusing regulatory and contractual agreements").

Plaintiffs assert that, as to the Cartwright channels, Defendants "engaged in egregious and calculated criminal activity to advance their own individual and corporate financial interests." Pls.' Mem. (Doc. 1078) at 12. There was no evidence whatsoever that Defendants' goals were to advance their own interests <u>at the expense of</u> the program or the interests of others. Rather, the evidence demonstrated that Defendants' efforts were designed to restore compensatory rates for local German agents (which Defendants were not), prevent devastating industry bankruptcies, and improve the quality of shipments. *See, e.g.*, Weyand Trial Testimony (by video) (Def. Ex. 702) at 101:1-9, 130:11-132:1, 133:2-10 (Ex. U); Graf Tr. (by video) at 188:22-189:12, 190:12-23, 192:8-21, 194:9-14, 196:24-198:2, 200:16-201:3 (Ex. O); Ammons Tr. (7/8/11) at 115:14-117:19 (Ex. J); Ammons Tr. (7/10/07) at 118:12-118:23, 120:16-121:20 (Ex. J); Selvey Trial Testimony at 581:5-11, 586:17-23, 598:2-23 (Ex. V); Bungert Trial Testimony (by video) (Def.

---

[4] As it has repeatedly in this litigation, the Government argues it has no affirmative duty to mitigate its damages. *See, e.g.*, Doc. 701 at 12-13; Doc. 874 at 8-9. Once again, the Government relies on *United States ex rel. Monahan v. Robert Wood Johnson University Hospital at Hamilton*, Civil Action No. 02-5702, 2009 WL 4576097, at *7 (D.N.J. Dec. 1. 2009). *Monahan*, an unpublished District of New Jersey case, misinterpreted *Toepleman v. United States*, 263 F.2d 697 (4th Cir. 1959) ("*Toepleman II*"), to grant the government sweeping immunity from the duty to mitigate in fraud cases. Over 30 cases have cited *Toepleman II* in the past 50 years, and only *Monahan* has mis-read the case in this way. *See, e.g.*, Doc. 718 at 14. Every other case recognized *Toepleman II*'s limited finding regarding whether the Government could recover for damages foreseeable from the defendant's wrongdoing. (Doc. 718 at 14-15.)

Ex. 700) 225:5-226:25 (Ex. W); Labbus Trial Testimony (by video) (Def. Ex. 703) 113:22-25, 114:2-4, 115:20-116:2, 117:16-118:07 (Ex. X).  Certainly, it was in Gosselin's corporate interest and Mr. Smet's individual interest for Gosselin to be fairly compensated for its work, and to stay in business.  But there was no evidence in the case that Gosselin or anyone else made an unreasonable profit from the conduct at issue.[5]  And, the jury found no liability as to the Covan conduct, which Plaintiffs claim was identical to the Cartwright conduct.  The Government's argument that Defendants goals were merely to advance their own interests rings hollow.

### 3. The Amount of Actual Damages for the Cartwright Channels Does Not Warrant a Civil Penalty Award at the Top End of the Statutory Range.

#### a. Defendants Already Restituted the Government's Damages, Which Bear No Rational Relationship to the Amount of Civil Penalties the Government Now Seeks.

The Government contends that Defendants' conduct as to the Cartwright cancellations resulted in "significant financial harm" to the Government.  That harm, $865,000, which pales in comparison to the $47,861,000 in civil penalties the Government is seeking from Defendants on this claim, has been fully restituted to the Government as of 2006.

Moreover, the Cartwright damages were assessed jointly and severally against Pasha and Gosselin, with no stipulation, finding or even allegation as to what portion of the damages figure was specifically attributable to Gosselin's conduct.  Judge Lee did not feel it was necessary to resolve that dispute because the Government could recover under a joint and several liability theory.  *See* 4/12/06 Tr. of Hr'g Before Judge Lee (Doc. 718-3) at 45-46, 53-54 (Ex. Z).

---

[5] To be sure, if greed had been remotely on Defendants' radar screen, the prices they would have charged would have been much higher than the prices they did charge in light of the company's low profit margins. Smet Tr. at 1094:24-1095:19 (Ex. S).  Instead, the price increases were less than the high prices in the industry following industry bankruptcies. *See* Marshall Trial Demonstrative Fig. 7 (Ex. Y).

It is well-established that the amount of damages, trebled, cannot be considered entirely separately from the amount of civil penalties the Government asks the Court to impose on Defendants.  *See, e.g.*, *United States v. Mackby*, 261 F.3d 821, 831 (9th Cir. 2001) ("[T]he amount of the civil penalty and the amount of treble damages need not be considered in isolation as if the other did not exist.  To the contrary, the amount of one will no doubt bear upon the district court's excessive fines analysis with regard to the other.").  The Government does not address why the damages for the Cartwright channels – $865,000 – is "serious" enough to warrant $47,861,000 in civil penalties.  And, in fact, it is not.  *See* Defs.' Civ. Pen. Mem. at 16-17.  The ratio of damages to civil penalties the Government seeks is 55 to 1, a level that constitutes an unconstitutionally excessive fine in violation of the Eighth Amendment.  *See* Defs.' Civ. Pen. Mem. at 26-27.  The amount of civil penalties the Government seeks are grossly disproportional to the Government's damages, and to the gravity of Defendants' offense as to the Cartwright channels, in violation of both the Eighth Amendment and Due Process.  *Hudson v. United States*, 522 U.S. 93, 105 (1997); *see also United States v. Bajakajian*, 524 U.S. 321, 335 (1998); *Peterson v. Weinberger*, 508 F.2d 45 (5th Cir. 1975); *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F. Supp. 2d 546, 565 (E.D. La. 1999).  In fact, in view of the Eighth Amendment constitutional considerations, which would trump the statutorily-allowed civil penalties, the Court has discretion whether to impose civil penalties at all.  Boese, John T., *Civil False Claims and Qui Tam Actions*, 3rd Ed., Section 3.05[B], pp. 3-97, 3-98 (2011 Supp.) (*citing Peterson*, 508 F.2d at 55; *United States v. Halper*, 490 U.S. 435, 449-50 (1989); *Garibaldi*, 46 F. Supp. 2d at 565; *United States ex rel. Wall v. Circle Constr. LLC*, No. 3:07-0091, 2010 WL 1170468, at *9 (M.D. Tenn. Mar. 15, 2010); *United States v. Williams*, No. 02 C 4990, 2003 U.S. Dist. LEXIS 9988, at *6, 12-14 (N.D. Ill. June 12, 2003); *Hays v. Hoffman*, No. 97-CV-1656

(JMR/FLN), 2001 WL 1141827, at *1 (D. Minn. Sept. 26, 2001); *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234 (D.P.R. 2000)).

> **b.**   **The Court Should Not Increase Civil Penalties Based on the Government's Alleged "Investigative Costs"**

In discussing its damages, the Government argues civil penalties should be at the maximum end to compensate the Government for its investigative costs.  Pls.' Mem. (Doc. 1078) at 13.  This request is inappropriate, as forfeitures and multiple damages "recompense the Government for costs of the investigation . . . as well as the actual monetary damage incurred because of the defendant's fraud."  *Killough*, 848 F.2d at 1535.

Since at least October 2010, the Government has contended that the maximum amount of civil penalties should be imposed against Defendants due to "the significant amount of time that has gone into the government's investigations."  10/29/10 Hr'g. Tr. at 15:23-24 (Ex. F).  During the oral argument on the Government's motion for summary judgment on damages and civil penalties, the Court specifically asked the Government where its investigative costs were reflected in the record.  *Id*. at 15:25-16:1.  The Government responded:

> Well, Your Honor, we don't actually have a specific accounting of the exact number of hours and the exact dollar amount of the expenditures that the government has spent investigating this case, but certainly, Your Honor, the fact that this case has been investigated since 2002 – and Your Honor can take judicial notice of the fact that this case has been in litigation since 2008.  We have at this point close to 800 docket entries in the matter, which suggests that a significant amount of time has been spent litigating this matter.

*Id*. at 16:2-12.

Now, nearly a year later, the Government again asks that its "investigative costs" factor into the Court's civil penalty award.  *See* Pls.' Mem. (Doc. 1078) at 13.  The Government still offers no detail whatsoever regarding the value of these expenditures for which it seeks recovery.  Moreover, the vast majority of the "numerous allegations" (*id*.) the Government says it was

investigating and prosecuting were either lawful conduct and/or acts with no scienter for a liability finding. And, at least some of the Government's costs must be attributed to its pursuit of $24,237,000 in "lingering effects" consequential damages and its "elevated prime" theory of recovery, both of which were dismissed by the Court. The Government should not be awarded through civil penalties the "investigative costs" of prosecuting Defendants for lawful activity.

**4.      There is No Need for Further Deterrence.**

The Government urges the Court to impose the maximum civil penalty "to deter such egregious misconduct." Pls.' Mem. (Doc. 1078) at 11. Notably absent from Plaintiffs' motion is any recognition of the $6,000,000 fine Defendants were assessed in connection with the criminal case for their actions relating to the 12 cancelled Cartwright channels in IS02. The fine was calculated, and agreed to by the Department of Justice, after considering, *inter alia*, "the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the organization." United States Sentencing Commission, Guidelines Manual, § 8C2.8(a)(1) (Nov. 2002) (emphasis added); *see also* 18 U.S.C. § 3553(a), (b) (same). The Government offers no explanation why Defendants need to be deterred again – particularly where the conduct at issue occurred nearly 10 years ago and there are no allegations of renewed or ongoing antitrust or FCA violations by Defendants. In fact, Defendants will demonstrate at the evidentiary hearing that Gosselin was and remains a highly valued resource to the Department of Defense and the Department of State. Moreover, in connection with the criminal case, Gosselin entered into an Administrative Settlement Agreement ("ASA") with the military in March 2004. (Ex. AA). An ombudsman was assigned to monitor Gosselin's adherence to the agreement and report on Gosselin's compliance at the conclusion of the settlement period in 2007. According to the

ombudsman, General (Ret.) Michael Kelleher, Gosselin successfully complied with all terms of the ASA, including obeying all laws.  *See* April 5, 2007 Close-Out Report, (Ex. BB).

Finally, the Government wants the maximum civil penalties because it claims that in 2008 the European Commission ("EC") found that Gosselin Group N.V. engaged in "bid rigging" on Belgian moving contracts, and because the General Court ("GC") upheld, in part, the EC's decision on June 16, 2011.  Pls.' Mem. at 12.  This Court should not increase civil penalties based on the EC or GC decisions.  Gosselin has timely appealed the GC decision to the Court of Justice in Luxembourg; if the appeal is successful, the case will be overturned.  A decision is not expected for up to three years, but if this Court relies on the EC or GC decisions to increase civil penalties, Gosselin will be irreparably harmed.  Moreover, these decisions contain inadmissible hearsay under Rule 802 and should not be considered by the Court.  (Doc. 871 at 3-4); *see also* Fed. R. Evid. 1101.  If the Court considers these decisions, Defendants will address them in substance and explain why they do not equate with a need for deterrence.

### B.     Any Civil Penalties Imposed for the DPM Claim Should Be at the Minimum Statutory Range.

Although Plaintiffs set forth supposed aggravating factors to support the maximum civil penalties for the Cartwright channels, they do not do so for the DPM claim. To the extent the arguments herein also apply to the DPM claim, Defendants assert them.  *See also* Defs.' Civ. Pen. Mem. (Doc. 1080) at 21-26. Certainly, Defendants' Eighth Amendment and Due Process concerns are apposite where, with <u>no</u> actual damages, Plaintiffs seek between $50,248,000 and $100,496,000 in civil penalties for the 9,136 allegedly false claims.  *Id.* at 26-29; *see also* p. 20, *supra*.

**VIII.   The Court Should Not Enter Judgment or Award Prejudgment Interest on the Government's Dismissed Claim for Common Law Conspiracy to Defraud.**

In two sentences, the Government contends it is entitled to a judgment of $865,000 and prejudgment interest "dating at least to February 19, 2004" on its common law conspiracy to defraud claim.  Pls.' Mem. (Doc. 1078) at 3-4.  However, the Court expressly dismissed both the Government's common law conspiracy to defraud and common law fraud claims when the Court ruled on Defendants' Motion for Judgment at the close of the Government's case.[6]  Trial Tr. at 1058:11-20, 1064:1-4 (Ex. A).   The Court should deny the Government's request.

**IX.   The Government's Setoff Calculation is Unreliable and Overly Simplistic.**

Defendants are entitled to offset from treble damages the $865,000 they already restituted to the Government in connection with Gosselin Worldwide Moving N.V.'s criminal plea.  *See* Doc. 718 at 19-21; Pls.' Mem. at 19.  In addition, Defendants are entitled to setoffs based on common damage amounts the Government has recovered through settlements with other alleged co-conspirators.  11/10/10 Order (Doc. 737) at 12-13; Pls.' Mem. (Doc. 1078) at 15.

The Government settled with 11 alleged co-conspirators in this case, for a total of $14,654,040.85.  *See* Doc. 718-24[7]; Ex. 23 to Expert Report of Dr. Keith Ugone (Defendants' damages expert), attached hereto as Ex. CC.  The Government concedes that Defendants are entitled to the full amount of the settlement with Cartwright ($255,049.04), which overlapped completely with Defendants' liability.  Pls.' Mem. (Doc. 1078) at 17.

---

[6] As to prejudgment interest, the Court has discretion to deny this request, and should do so.  (Doc. 718 at 22-24.)  "Because treble damages are seen as adequate to make [the] government whole, most courts that have addressed the issue have held that no prejudgment interest is allowable as part of the single-damage calculation."  Boese, § 3.03[B], p. 3-62.  The Court should reject the Government's efforts to back-door recovery through civil penalties what it should not recover in damages.

[7] Defendants filed the settlement agreements as Exhibit V to their Opposition to the Government's motion for summary judgment as to damages and civil penalties (Doc. 718-24).  Citations herein to specific pages of these agreements refer to the filed page number at the top right corner of the 160-page PDF exhibit.

The parties disagree as to the remaining amount of common damages from these settlements. Because the settlement agreements did not specifically allocate the amount of settlement money corresponding to each claim, that task is now up to this Court.

### A.     Professor Marshall's Damages Calculations Were Unreliable.

Based only on the report of its damages expert Professor Robert Marshall, the Government contends that damages for the Cartwright channels account for approximately 2% of the overall damages from the three alleged schemes – the landed rate conspiracy, the Covan cancellation, and the Cartwright cancellation. Pls.' Mem. (Doc. 1078) at 18. Thus, the Government argues that Defendants are only entitled to a setoff equal to 2% of the total amount of the settlements – $293,080.82. This analysis is both unreliable and overly simplistic.

Professor Marshall's methodology was flawed, and his opinions grossly overstate damages in this case. Defendants filed a motion *in limine* to exclude Professor Marshall's testimony and expert reports in large part due to their unreliability. (Doc. 887 at 10-21; *see also* supporting and reply memoranda, Docs. 888 and 942.) Defendants will be prepared to address these issues at the evidentiary hearing, but Defendants' prior motions and the cross-examination of Professor Marshall at trial have alerted the Court as to the unreliable nature of his analysis.

Moreover, a significant portion of Professor Marshall's claimed damages calculation – based upon an "elevated prime rate" theory of damage – was not timely disclosed to the Defendants in the Government's Rule 26 disclosures. Before Professor Marshall's report, the Government consistently maintained that its damages amounted to the difference between the prime rate and the second low rate, which is a damage theory consistent with the Covan and Cartwright allegations. With Professor Marshall's report came a new damage theory that the prime rate, itself, was elevated due to the alleged landed rate conspiracy. Defendants challenged

both the substance of this theory and its late disclosure in violation of Rule 37, filing a separate motion *in limine* to exclude the Marshall report based on this violation.  *See* Docs. 852, 853.

The Government's reliance on *Miller v. Holzmann*, 563 F. Supp. 2d 54, 144-45 (D.D.C. 2008), to justify its reliance on Professor Marshall is unavailing.  In *Miller*, the after-the-fact settlement allocations were based on a jury's actual apportionment of damages as to each claim.  Here, of course, there has been no adjudication of damages; if there had been, the allocation would have been 100% for the Cartwright claim, as the Court held the landed rate activity was lawful and the jury found no liability as to the Covan claim.  Instead, the Government asks the Court to allocate settlement monies based upon its own <u>asserted</u> damages, which Defendants have vigorously contested.  Indeed, the Court ultimately struck Professor Marshall's damage calculations for the Covan channels due to the complete lack of evidence regarding how much tonnage the Army would have been able to ship at the prime rate but for the alleged misconduct.  Trial Tr. at 1054:12-16; 1055:8-114 (Ex. A).  The same deficiency is present as to all of Professor Marshall's other damages calculations, including for the Cartwright channels. Because Professor Marshall's damages calculations and methodology are unreliable, any settlement allocation relying on his calculations would itself be unreliable.

### B.    The Settlement Agreements Belie the Government's Allocation Approach.

Any analysis of an after-the-fact settlement allocation should begin with the language of the settlement agreements, including the relative merit of the settled claims.  *See Sims v. DeArmond*, 42 F.3d 1181, 1184 (9th Cir. 1994) ("[I]t is apparent that any court approving an allocation of a settlement must delve into the strength of the claims.  The merit of the claims and the ability [of the settling defendant] to pay are the primary determinants of settlement value.").  Indeed, numerous courts have recognized that the settling parties' agreed allocations should be

26

"viewed with considerable suspicion because of the risk that liability may have been allocated for strategic reasons." *See, e.g., Slottow v. Am. Cas. Co.*, 10 F.3d 1355, 1359 (9th Cir. 1999); *see also Bowers v. Kuse*, No. 97-2507, No. 97-2583, 1998 WL 957455, at *20-21 (4th Cir. 1998) (discounted settling parties' representations about settlement allocations due to their "collusive potential"). In *Sims*, the Ninth Circuit warned that there are "collusive forces at play in these situations" and held that "the bankruptcy court must undertake an independent allocation of the settlement before it may conclude that [a particular claim] has been completely or partially satisfied." 42 F.3d at 1182, 1185. Relying on *Sims*, the Fourth Circuit in *Bowers* recognized that the settling parties "were not truly adverse when they drafted their settlement agreement." 1998 WL 957455, at *20. The Court noted that the settling defendant "only cared about the total amount of the settlement," while the plaintiff "would of course have preferred that the settlement be structured so as to allow him to recover from other defendants," as well. *Id*. Thus, the Court found that "given the collusive potential of such an agreement and the subsequent risk of prejudice to the interests of non-settling parties, the court is not compelled to accept the [plaintiff's] assertion that its settlement with the [defendant] did not include [a particular claim], but must undertake an independent allocation of the settlement."

What the Government asks the Court to do here – simply allocate settlement monies such that the claims are assigned a pro-rata share of the Government's <u>alleged</u> damages – is even more suspect, particularly where those alleged damages have been fiercely contested by Defendants and have not been adjudicated. This unreliable and overly simplistic approach wholly fails to account for other factors including "[the court's] knowledge of the settlement negotiations and the terms of the settlement agreement." *Bowers*, 1998 WL 957455, at *21.

Here, the agreements and surrounding circumstances reveal that the primary conduct driving the settlement monies related to the Covan and Cartwright rate cancellations, which carried a higher litigation risk for the settling defendants than the landed rate conspiracy theory. At the time of the settlements, several facts material to the parties' risk analysis were widely known: (1) Pasha and Gosselin pled guilty to the allegations regarding the Cartwright channels; (2) Gosselin and Pasha unsuccessfully challenged the legality of the Cartwright-related conduct, as the Fourth Circuit expressly held that Defendants' conduct was not antitrust immune. *United States v. Gosselin World Wide Moving N.V.*, 411 F.3d 502, 510 (4th Cir. 2005); (3) the allegations regarding the Covan channels were substantially identical to the allegations regarding the Cartwright channels; and (4) the Fourth Circuit's explanation as to <u>why</u> the Cartwright-related conduct was unlawful[8] suggests that the landed rate agreement was antitrust immune, as it did not involve the same interaction with U.S. carriers.  Taken together, these facts would tend to increase the settling defendants' risk of litigating the Cartwright and Covan allegations, and would tend to <u>decrease</u> the settling defendants' risk of litigating the landed rate allegations.  And, as noted previously, at the time of the settlement negotiations the Government's "elevated prime" liability and damages theories – which relate to the landed rate allegations – had not even been developed.

---

[8] The Fourth Circuit explained "[t]here is an argument to be made that the agreement defendants made with the local German firms fits under the immunity announced in *Tucor*.  And if defendants' scheme had ended there, we would have to decide whether the agreement did so qualify and whether *Tucor* should be adopted in this circuit."  *Gosselin*, 411 F.3d at 510.  But, the Court found that Gosselin and Pasha's efforts to get a U.S. carrier (Cartwright) to withdraw its prime rate and their efforts to get other U.S. carriers to file bids at or above the second low level "had little to do with the German inland segment of the through services these forwarders offered."  *Id.* at 511.  These "additional steps . . . beyond [the] agreement with the German local agents" were present for both the Covan and Cartwright allegations, but <u>not</u> for the landed rate allegations.

Thus, it is reasonable to conclude that although the settlement agreements released the settling defendants from all claims in the complaint,[9] the dollar amounts of the settlements were based on the Covan and Cartwright allegations. These facts also underscore that a merit-based approach is more appropriate and reliable than the Government's "mechanical" approach.

The language of the agreements corroborates the reality of a merit-based analysis. Ten[10] of the eleven settlement agreements set forth the alleged wrongful conduct, and yet the landed rate theory – which the Government now contends accounts for approximately 95% of its claimed damages – is only vaguely (and inaccurately) referenced in one sentence. *See, e.g.*, Doc. 718-24 at pp. 2-3, ¶ 2.D., p. 17, ¶ 2.D. In fact, the term "landed rate" does not appear in <u>any</u> of the settlement agreements. In contrast, the Covan and Cartwright conduct is addressed expressly and in more detail. *See, e.g.*, *id*. at p. 3, ¶ 2.E., p. 17, ¶ 2.E.

This analysis is particularly true regarding the Pasha's $13 million settlement. *See id*. at pp. 126-41. Like Gosselin, Pasha's criminal plea was limited to the Cartwright allegations. And, the other settlement agreements make clear that Pasha did not join the conspiracy until after the November 14, 2000 landed rate agreement was executed by others. *See, e.g.*, *id*. at pp. 3, ¶ 2.E., p. 17, ¶ 2.E. (after one sentence alleging that Gosselin and German agents executed a written agreement on November 14, 2000 regarding German agent rates, the next paragraph begins "The

---

[9] The settlement agreements also contain two lengthy paragraphs (one as to the United States and one as to Relators) releasing defendants' "past, present and future employees, assigns, officers, directors, shareholders, owners, partners" and thirteen additional categories of affiliates, "whether direct or indirect," from "any and all civil or administrative monetary claims or causes of action" under multiple enumerated statutes or common law. Clearly, it would be inappropriate to allocate settlement monies to these potential claims simply because they are released by the agreements. Indeed, such language is often standard in settlement agreements and may not relate to any contemplated future claims.

[10] Only the Birkart settlement ($70,000) recites no alleged wrongful conduct. (Doc. 718-24 at pp. 46-79.)

United States and Relators allege that the Pasha Group joined the conspiracy" and, together with the German agents, engaged in the Covan and Cartwright-related conduct in IS01 and IS02).

Because settlement agreements focused on the Covan and Cartwright allegations, an appropriate settlement allocation would divide the amount between the Covan and Cartwright claims.  Using $865,000 in damages for the Cartwright claims and the Government's $1,255,000 calculation for the Covan claims, the allocation would be 59% (Covan) to 41% (Cartwright). Thus, rather than offsetting damages by 2% of the total settlements, the Court should offset 41%, which would more closely align with the merits of the settlement agreements than the purely mechanical approach proffered by the Government.

Ultimately, there is no established rule governing how courts must allocate settlement amounts.  Certainly, however, on these facts it would be reasonable for the Court to conclude that the settlement monies were not primarily aimed at recovering for the landed rate allegations. *See, e.g.*, *In re Fla. Hotel Props. Ltd. Partnership Plan Trust Agreement v. Kuse Enters., Inc.*, 1998 U.S. App. LEXIS 23540, at *21-22 (4th Cir. 1998) (applying "clearly erroneous" standard to its review of trial court's analysis of after-the-fact settlement allocation).  At minimum, the parties agree that Defendants are entitled to a setoff of $1,413,129.90 applied to the trebled damages ($2,595,000) for the Cartwright channels.  Defendants urge the Court, however, to look beyond the Government's simplistic and unreliable damage calculations and settlement allocations to determine a more fair apportionment.

## **CONCLUSION**

For the reasons set forth herein and any additional reasons that will be presented during the evidentiary hearing, Defendants request that this Court deny United States and Relators' Motion for Judgment Against Gosselin Defendants for Damages and Civil Penalties.

30

Respectfully submitted,


_____/s/_____

Kerri L. Ruttenberg
Va. Bar No. 70274
Attorney for Defendants Gosselin
World Wide Moving, N.V., Gosselin Group, N.V.
and Marc Smet
JONES DAY
51 Louisiana NW
Washington, D.C. 20001
(202) 879-5419 (Telephone)
(202) 626-1700 (Fax)
kruttenberg@jonesday.com

James R. Wyrsch, admitted *pro hac vice*
Keith E. Drill, admitted *pro hac vice*
Attorneys for Defendants Gosselin
World Wide Moving, N.V., Gosselin Group, N.V.
and Marc Smet
WYRSCH, HOBBS & MIRAKIAN, P.C.
1000 Walnut Street, Suite 1600
Kansas City, Missouri 64106
(816) 221-0080 (Telephone)
(816) 221-3280 (Fax)
jimwyrsch@whmlaw.net
kdrill@whmlaw.net

## CERTIFICATE OF SERVICE

I hereby certify that this 12th day of September, 2011, the above and foregoing was filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Richard E. Greenberg, Esq.
John E. Petite, Esq.
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, MO 63102

Mark Hanna, Esq.
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006

Andrew A. Steinberg, Esq.
Jonathan A. Phillips. Esq.
U.S. Department of Justice, Civil Division
Commercial Litigation, Fraud Section
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Steven E. Gordon, Esq.
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314

William F. Coffield, Esq.
Coffield Law Group LLP
1330 Connecticut Ave., NW, Suite 220
Washington, D.C. 20036

_____   /s/ _____
Kerri L. Ruttenberg
Attorney for Defendants Gosselin World Wide
Moving, N.V., Gosselin Group, N.V., and Marc Smet