**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Kurt Bunk and Daniel Heuser,<br><br>　　Plaintiffs<br>　　　　v.<br><br>Birkart Globistics GmbH & Co., *et al.*,<br><br>　　Defendants. | )<br>)<br>)<br>)<br>)　Civil No. 1:02cv1168<br>)<br>)<br>)<br>)<br>) |
| UNITED STATES OF AMERICA<br>*ex rel.* Ray Ammons,<br><br>　　Plaintiff<br>　　　　v.<br><br>The Pasha Group, *et al.*,<br><br>　　Defendants. | )<br>)<br>)<br>)<br>)　Civil No. 1:07cv1198<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW AND**
**ALTERNATIVE MOTION FOR PARTIAL NEW TRIAL**

Defendants Gosselin Worldwide Moving, N.V., Gosselin Group N.V. and Marc

Smet ("Defendants"), through counsel, hereby submit their Reply In Support of Their

Motion for Judgment As a Matter of Law and Alternative Motion for Partial New Trial.[1]

**ARGUMENT**

**I.      THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE VERDICT ON**
**        THE DPM CLAIM.**

---

[1] Plaintiffs filed 37 pages in opposition to Defendants' motion.  (Doc. 1087, 19 pages; Doc. 1091, 18 pages).  Under Local Civil Rule 7(F)(3), oppositions are limited to 30 pages, to be exceeded only upon a showing of "good cause" "in advance of filing."  Plaintiffs filed their memoranda without seeking prior leave of Court.  Plaintiffs' oppositions should be stricken.

The jury's finding that Defendants violated the FCA as to the DPM claim is not supported by substantial evidence.  The Court should enter judgment in Defendants' favor notwithstanding the verdict.  Relator Bunk's DPM theory was that Defendants falsely signed and thereby breached the terms of the CIPD, a part of the DPM contract, because they agreed to subcontracting prices for certain moving services before submitting their offer.  However, for the CIPD to have been violated, or breached, the price discussions must have been "for the purpose of restricting competition."  The substantial weight of the evidence negates that Defendants had any such purpose.

> **A.     Insufficient Evidence Supported the Jury's Finding That the Purpose of the Subcontracting Agreements Was to Restrict Competition.**

Mr. Bunk argues that the necessity for subcontracting arrangements under the DPM Europe contract is "largely, if not totally, beside the point" and that "what is important" is that there was an agreement regarding prices and territories for one of the important services.  Opp'n Br. (Doc. 1087) at 7.  But an agreement, alone, does not prove the underlying purpose for the agreement, an essential element of Mr. Bunk's claim.

Mr. Bunk asserts that the jury could reasonably infer Mr. Smet and Mr. Graf "discussed pricing of their bids" to the Army based on "the reference to 'bid high.'" Opp'n Br. at 7.  Mr. Graf's handwritten notes state: "Gosselin will make a high priced offer."  Trial Tr. at 1204:17 (Defs.' Mot. for J., Ex. E).  The notes do not say or suggest that Mr. Smet and Mr. Graf <u>agreed</u> on a high bid, or that they discussed total offer prices at all.[2]  Moreover, when asked about Mr. Graf's notes, Mr. Smet did not simply testify "I might have indicated

---

[2] In a footnote, Mr. Bunk quotes only part of a colloquy between the Court and Defense counsel regarding the difference between agreeing on total offer prices versus subcontracting prices for a particular line item.  Rel. Opp'n Br. at 2 n.2.  Mr. Bunk ends his quoted text with the Court's question; Defendants direct the Court to the transcript for Defense counsel's answer, explaining the material distinction.  Trial Tr. at 994:2-996:10 (Ex. A, attached).

to him that I was going to bid a high price." Opp'n Br. at 4. Rather, Mr. Smet related that he did not and would not tell Mr. Graf Gosselin's total offer price (Smet Tr. at 1204:22-1205:12 (Defs.' Mot. for J., Ex. E)). Mr. Smet also made clear that Gosselin was competing with Graf's company (ITO) and the other bidders for the DPM Europe contract (*see, e.g.*, *id.* at 1178:18-1179:4). Likewise, Mr. Graf said ITO was competing with Gosselin for the DPM contract. (Graf Tr. at 267:19-268:3 (Defs.' Mot. for J., Ex. G).) And, despite the subcontracting agreements, the evidence was uncontested that <u>each company was free to bid</u> <u>whatever it wanted on the total contract and on each line item</u>. The trial evidence reflected that Gosselin, for example, actually priced that line item at €36 instead of the "agreed" price of €35. Def. Ex. 345 at GSD024355 (Defs' Mot. for J., Ex. F).

Mr. Bunk correctly notes that the jury should not be "superseded" by Comptroller General or GAO decisions interpreting the CIPD. Opp'n Br. at 9. However, these decisions provide relevant insight into the meaning of "for the purpose of restricting competition" as that term is used in the CIPD. The CIPD proscribes actions that deliberately or purposely prevent competitive bids to the Government from being submitted; the CIPD is not violated merely by price discussions with subcontractors. *See* Defs.' Mem. at 10-13.

Similarly, Mr. Bunk is correct that the provisions of the Federal Acquisition Regulations ("FAR") demonstrating that subcontracting agreements can be "teaming arrangements" are not "dispositive." Opp'n Br. at 9. But, the FAR provisions and authorities Defendants cited provide further guidance that price discussions between contractors and subcontractors to negotiate subcontracting arrangements are not "for the purpose of restricting competition." Defs.' Mem. at 10-11. And, contrary to Mr. Bunk's argument that teaming arrangements "must be used to decrease the cost of the government

contract" (Opp'n Br. at 9), the FAR provision actually states that "team arrangements may be desirable . . . to enable the companies involved to . . . <u>offer the Government the best combination of performance, cost, and delivery</u>."  FAR § 9.602 (emphasis added). Here, the evidence showed that without subcontracting agreements, no one company could have performed the DPM contract at any price.[3]   Thus, to the extent the subcontracting arrangements were "teaming arrangements," they were consistent with the goals stated in FAR § 9.602 because they were necessary to the performance of the contract.

Mr. Bunk then cites another provision of the FAR that he claims Defendants "conveniently fail to mention."[4]  That provision states that contractors "shall select subcontractors [] on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract." FAR § 52.244-5.  Defendants' conduct was consistent with this provision. The unprecedented capacity requirements and geographic scope of the DPM Europe contract required extensive subcontracting and coordination to ensure the offeror's ability to service the contract.  *See* Defs.' Mem. at 6-7.  For that reason, it was completely "consistent with the objectives and requirements of the contract" to reach agreements regarding subcontracting prices and territories as Defendants did here.

It is true that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." Opp'n Br. at 11 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).  To survive a motion

---

[3] Mr. Bunk's argument that calling the subcontracting agreements "joint ventures" does not prevent the jury from finding otherwise is irrelevant.  Opp'n Br. at 10.  Defendants have never contended their subcontracting agreements were joint ventures.

[4] Mr. Bunk repeatedly suggests that Defendants are hiding evidence, even accusing counsel of telling "half truths" to the jury to "fool" them.  *See, e.g.*, Opp'n Br. at 12.  Defendants vehemently deny this accusation.  The DPM Solicitation is more than 300 pages long.  Defendants questioned witnesses about key provisions and introduced the full Solicitation into evidence (Def. Ex. 345), reminding the jury in closing of the exhibit number and encouraging jurors to review the provisions themselves.

for judgment as a matter of law, however, there must be sufficient evidence to support the jury's verdict and from which the jury can draw <u>reasonable</u> inferences. *See* Defs.' Mem. at 2. The jury was entitled to discredit Mr. Smet's or any other witness's testimony, but the burden still rested with Mr. Bunk to prove that the agreements were "for the purpose of restricting competition." The mere fact that various bidders agreed on subcontracting prices does not create a reasonable inference of intent to restrict competition in light of the unique requirements of the Solicitation, and thus could not properly support the jury's verdict.

**B.    There is Insufficient Evidence to Support the Jury's Finding That Defendants Acted Knowingly.**

To "knowingly" submit a false claim for FCA liability, Defendants must be shown to have deliberately entered into subcontracting agreements "for the purpose of restricting competition."   The evidence at trial failed to support a reasonable inference that Defendants acted knowingly toward this purpose at all. *See* Defs.' Mem. at 13-19. Instead, the evidence showed that Mr. Smet met with potential subcontractors to <u>comply</u> with detailed Solicitation requirements regarding subcontracting.  Mr. Smet's interpretation of the CIPD provision to allow such discussions as long as they were not for the purpose of restricting competition clearly was within the "zone of reasonableness." *States Roofing Corp. v. Winter*, 587 F.3d 1364,  1371-72 (Fed. Cir. 2009).  There was no breach or violation of the CIPD provision, and therefore there is no basis for FCA liability. *See* Defs' Mem. at 13-19; *see also United States ex rel. Marcy v. Rowan Cos.*, Civ. No. 03-3395, 2006 U.S. Dist. LEXIS 57936, *24-25 (E.D. La. 2006); *United States ex rel. Coppock v. Northrop Grumman Corp.*, Civ. No. 3:98-cv-2143-D 2002 U.S. Dist. LEXIS 14510, *38-44 (N.D. Tex. 2002) (no FCA liability for implied false certification unless government conditioned payment of particular claim on defendant's certification of compliance with specific contractual provision).

Mr. Bunk argues that Defendants improperly convert the scienter standard for FCA section (a)(1) from knowing to specific intent. Opp'n Br. at 12. Defendants agree that the scienter standard for section (a)(1) is knowing and does not require specific intent to defraud. But, as the case Mr. Bunk cites recognizes, "knowingly" requires the "knowing presentation of what is known to be false." *United States v. Chen*, 402 Fed. Appx. 185, 187 (9th Cir. 2010) (quoting *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)). Here, Mr. Bunk's theory of falsity is that Defendants breached or violated the CIPD by entering into subcontracting price and territory agreements "for the purpose" (*i.e.*, with the intent) of restricting competition. To find liability, the jury must have concluded that Defendants knew they were violating the CIPD because they intended to restrict competition when they entered into the subcontracting agreements. The substantial weight of the evidence simply did not support such a finding. Rather, the evidence showed that Defendants reasonably understood that the CIPD, in light of the Solicitation's demands, allowed them to enter into subcontracting agreements before they submitted an offer. Whether discussed separately or collectively with a subset of subcontractors, there is no evidence that those agreements were intended to or had the effect of restricting competition for the DPM Europe contract. *See* Defs.' Mem. at 8-13.[5]

Next, Mr. Bunk argues the jury's finding of knowing conduct is supported by Mr. Smet's testimony that he was "aware of the CIPD and its requirements and he therefore

---

[5] The only "evidence" that a line item price was "inflated" and negatively impacted competition is Mr. Bunk's testimony. But, Mr. Bunk was not familiar with the unique and onerous requirements of the DPM Europe contract. *See* Bunk Tr. at 295:19-296:11, 300:5-11 (Defs' Mot. for J., Ex. C). And, as Defendants explain in their Reply in Support of their Memorandum Regarding Civil Penalties at 13, a comparison of 1999 DPM prices for the same line item demonstrates that Mr. Bunk's testimony was incorrect. Regardless, this scant evidence does not support a reasonable inference that the agreements restricted competition by "inflating" the price of that line item.

knew that competing bidders could not collude in violation of the CIPD."  Opp'n Br. at 13. Mr. Bunk also argues that ignorance of the law is no defense.  *Id*. at 14.  But the point is not whether Defendants were ignorant of the law, or whether they "misapplied" the law,[6] or even whether Defendants knew that the law prohibited them from engaging in pricing agreements for the purpose of restricting competition. Rather, the issue is whether Defendants reasonably interpreted the CIPD to allow them to meet and agree with potential subcontractors, and whether the conduct engaged in was for the purpose of restricting competition.  Because Defendants' reading of the CIPD was reasonable, and because there was no evidence of a competition-restricting purpose, there was no evidence to support a finding of FCA liability for the DPM contract.

Mr. Bunk claims that Mr. Smet "admitted he had knowledge of the CIPD and then engaged in the collusive conduct nonetheless."  Opp'n Br. at 15.  Mr. Smet did not "admit" he engaged in collusive conduct. He admitted reaching agreements on subcontracting prices and territories, and steadfastly denied that these agreements were designed to restrict competition.  *See, e.g.*, Smet Tr. at 1370:21-1371:1 (Defs.' Mot. for J., Ex. E).

Nor, as Mr. Bunk claims, do Defendants contend Mr. Bunk was required to present direct evidence of Defendants' mental state to prove a knowing violation.  Opp'n Br. at 15. However, the circumstantial evidence at trial was insufficient for a reasonable jury to conclude that the subcontracting agreements were entered into for the purpose of restricting competition.  Mr. Bunk's ongoing efforts to paint the subcontractors' meeting as nefarious –

---

[6] Mr. Bunk claims "Defendants argue that Smet must have 'misapplied' the law." Opp'n Br. at 14-15.  Despite the quotation marks in Mr. Bunk's opposition attributing this argument directly to Defendants' opening brief, Defendants did not make such an argument.  The issue is not whether Defendants knew the law, but whether they knew the subcontractor agreements violated the CIPD because they purposely intended to restrict competition.

this time by repeatedly referring to it as "private" instead of alleging it was at a bar over "drinks" – do not advance his claims.  (Opp'n Br. at 3, 7, 13). The meeting was in the cafeteria of the Graffenwoehr Army base immediately after the Army gathered the participants at the same location for a pre-proposal conference to discuss the unique requirements of the DPM Europe Solicitation; it was not a covert gathering in a confidential location with restricted participation.

Finally, Mr. Bunk argues that the Government's knowledge and subsequent ratification of the contract do not negate the jury's finding of knowing misconduct because there is no evidence that <u>the Defendants</u> "disclosed the collusive conduct" to the Army. Opp'n Br. at 15-16 (relying on *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288-89 (4th Cir. 2002) and *United States ex rel. Harrison v Westinghouse Savannah River Co.*, 352 F.3d 908, 920 n.14 (4th Cir. 2003)).  Mr. Bunk overstates the Court's holdings in *Becker* and *Harrison*.  As explained in Defendants' Civil Penalties Reply at 18-19, the key is the Government's awareness of the alleged fraud, not who happened to disclose it.  *See Becker*, 305 F.3d at 289; *Harrison*, 352 F.3d at 920 n. 14.

### C.   Bunk's Hearsay Testimony Was Erroneously Admitted and Thus Cannot Support the Jury's Verdict.

Defendants explained in their opening brief that Mr. Weyand's statements to Mr. Bunk cannot constitute co-conspirator hearsay under Rule 802 because they were not made in furtherance of the alleged conspiracy.  (Defs.' Mem. at 19-21.)  Mr. Bunk responds that Mr. Weyand's statements can be characterized as statements "to induce enlistment, induce participation, allay concerns or fears or avoid detection" and "to prevent Bunk from competing with the co-conspirators."  Opp'n Br. at 17.  But neither Mr. Bunk nor anyone else testified they thought Mr. Weyand's after-the-fact statements to Mr. Bunk about

subcontracting agreements between Gosselin, Birkart and other companies could have been made for any of these purposes. Mr. Bunk's company, UTD, worked as a subcontractor on the regional DPM contracts within Germany. Defs.' Mem. at 21; Bunk Tr. at 295:19-296:11 (Defs.' Mot. for J., Ex. C). There was no evidence that UTD intended to or would have been capable of submitting an offer on the Solicitation in competition with the other bidders. Rather, Mr. Bunk's own testimony was that he wanted Birkart to bid on the contract so that UTD could provide subcontracting services to Birkart. Bunk Tr. at 362:9-13 (*Id.*). Further, there was no evidence Mr. Weyand ever told Mr. Bunk not to tell anyone about the agreements. At most, the evidence shows Mr. Weyand told Mr. Bunk about already-reached subcontracting agreements. As the cases Relator Bunk cites recognize, "idle chatter" about "past events" fails to satisfy the "in furtherance" requirement necessary to admit the hearsay. *See* Opp'n Br. at 17; *United States v. Conrad*, 507 F.3d 424, 430 (6th Cir. 2007) (quoting *United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003)).

## II.   A NEW TRIAL REGARDING THE DPM CLAIM IS WARRANTED BECAUSE THE VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND IS BASED ON ERRONEOUSLY ADMITTED HEARSAY.

Even if the Court could find there was sufficient evidence to support the verdict, a new trial is warranted because the great weight of the evidence negates the jury's finding that Defendants knowingly submitted a false CIPD. Although Mr. Bunk largely glosses over Rule 59, the law is clear that it is a court's "duty to set aside a verdict and grant a new trial even though it is supported by substantial evidence, if he is of the opinion that the verdict is against the clear weight of the evidence." *Chumbley v. Rockland Indus., Inc.*, 829 F.2d 1119 (Table), Nos. 86-3584, 86-3618, 1987 WL 38213 at *3 (4th Cir. Sept. 17, 1987) (citing *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir. 1959)). Here, the most persuasive evidence is that Defendants did not agree to subcontracting prices and territories for the

purpose of restricting competition.  The only contrary evidence comes from Mr. Bunk's mistaken understanding that no subcontracting agreements could ever promote competition simply because they were reached in a group meeting.

Finally, the Court should order a new trial because critical jury instructions defining the types of knowledge that satisfy the FCA were erroneous.  Defs.' Mem. at 14-16 & nn.7-10.  Relator Bunk does not substantively address these arguments, and instead dismisses them as "pot shots." Opp'n Br. at 18.  These defective instructions governed key concepts central to Defendants' defenses in this case.  It is impossible to know whether the verdict was materially influenced by one of the erroneously defined forms of knowledge, or the jury's own, erroneous understanding of the term "competition."[7]  The Court should grant a new trial on the DPM claim for this reason, as well.  *See* Defs.' Mem. at 16-17.

## III.   JUDGMENT AS A MATTER OF LAW AS TO THE NUMBER OF FALSE CLAIMS FOR THE CARTWRIGHT CHANNELS IS WARRANTED BECAUSE THE JURY'S DETERMINATION WAS BASED ON SPECULATION AND IMPROPERLY ADMITTED EVIDENCE.

The Government argues that civil penalties are "mandatory" under the FCA.  Gov't Opp'n Br. at 13.  The Government still must prove how many false claims were submitted before it can collect those "mandatory" civil penalties.  Similarly, the Government's argument that it somehow was relieved of its burden to prove the number of false claims at trial because the civil penalties phase of the case was bifurcated is mistaken.  *Id*. at 14.  The parties and the Court agreed that determining the number of false claims Defendants caused

---

[7] Defendants conceded in their opening brief that they had not requested a separate instruction defining "competition."   Defs.' Br. at 11 n.5.  Defendants did, however, request multiple instructions, such a Rule of Reason instruction, which would have given the jury guidance on the meaning of "competition" by distinguishing between pro-competitive and anti-competitive conduct and effects.  *See generally* Defs' Proposed Inst. 87, 92, 93 (Ex. B, attached); *see also* Trial Tr. at 1535:25-1536:16 (Ex. A, attached).   Plaintiffs objected and the Court declined to give these instructions.   The failure to give these instructions was error, and upon declining to give these instructions, failing to define "competition" for the jury was plain error.

to be submitted was the jury's task.  The Government clearly recognized this, as it introduced multiple summary exhibits, solicited testimony from DFAS through Jana Haynie, argued the issue to the jury, and agreed to a verdict form that expressly asked the jurors to determine the number of false claims. Plaintiffs cannot now seek to back-fill deficiencies in their proof regarding the number of false claims. The jury's finding that Gosselin caused 4,351 false claims to be submitted in IS02 in connection with the Cartwright channels should be set aside.

### A.   The Evidence Did Not Permit The Jury to Determine The Number of False Claims Without Speculating.

The Government's arguments do not resolve the material deficiencies in the Government's proof of how many false claims Defendants "cause[d] to be presented" for payment in violation of the FCA.  31 U.S.C. § 3729(a)(1).  The fact that the jury ultimately returned a verdict for 4,351 false claims, the precise number on Exhibit 173, does not mean the jury's verdict was not the product of speculation.  Nor does the verdict mean that the jury resolved "any disputes about the accuracy of some of the evidence." Gov't Opp'n Br. at 3.  At minimum, it is clear that the jury's verdict was not supported by sufficient, non-speculative evidence as is required to withstand a motion for judgment as a matter of law.[8]

The Government attempts to dismiss as "hypothetical" the undisputed fact that carriers, at their discretion, would sometimes submit more than one GBL on a single public voucher.  Gov't Opp'n Br. at 3.  But, the Government's own witness, Jana Haynie, testified

---

[8] The Government attacks Defendants' reliance on *United States ex rel. Tyson v. Amerigroup Corp.*, 488 F. Supp. 2d 719, 740 (N.D. Ill. 2007), because the court there held the determination of the number of false claims was not an unsubstantiated guess.  Gov't Opp'n Br. at 7.  *Amerigroup* involved a different holding based on different facts – notably, unlike here, the fact that the witness "counted the claims submitted by the Defendants, not the times the Government reimbursed those claims."  488 F. Supp. 2d at 741.  Both *Amerigroup* and *Hays v. Hoffman,* 325 F.3d 982, 993-94 (8th Cir. 2003), teach that "guesstimates" are insufficient to support a jury finding regarding the number of false claims.

that carriers could and did submit public vouchers containing more than one GBL.  *See* Haynie Tr. at 677:19-678:1 (Defs.' Mot. for J., Ex. FF).  Although it was Ms. Haynie's understanding that this was "rarely" done (Haynie Tr. at 680:12-16 (Ex. C, attached)), she did not testify that this practice was merely a "hypothetical" possibility.  And, because neither Jana Haynie nor any other testifying witness looked at the invoices underlying the summaries, the jury could not determine without speculating which of the 4,351 GBLs were submitted on a single public voucher and would thus constitute a single false claim.

The Government's eleventh-hour argument that carriers could not have submitted more than one GBL per invoice because the billing rules prohibit this practice is unpersuasive.  Gov't Opp'n Br. at 4.  Regardless of the billing policies, Jana Haynie – who presumably was familiar with these policies – testified that carriers could and did bill multiple GBLs on a single invoice at their preference, although it happened rarely.  Further, the fact that two carriers (Cartwright International and Great American Forwarders) submitted GBLs on separate vouchers (Gov't Opp'n Br. at 4-5) hardly proves the billing practices of the more than 100 other carriers who participated in the bidding for IS02.

Additionally, the spreadsheets upon which the jury necessarily relied to reach the 4,351 figure contained numerous entries for small dollar amounts that could not possibly represent an entire ITGBL move.  The Government attempts to explain these charges away based on Ms. Haynie's testimony that these small dollar amounts "could" reflect offsets for amounts the carrier owed the military.  Gov't Opp'n Br. at 6 (citing Haynie Tr. at 647:22-648:3).  But, the jury would be required to speculate that this was the reason for the small dollar amounts because Ms. Haynie herself was speculating about that offset possibility.

She did not review the invoices or confirm that any of the small-dollar-amount invoices were in fact for ITGBL moves, the payments for which were low merely because of offsets.

The Government maintains that even if some GBLs correspond to accessorial charges, each GBL still represented a move (and thus a false claim) because, as Ms. Haynie testified, "for every such charge there had to be an underlying move that was billed to the government." Gov't Opp'n Br. at 7. Rather than resolving or even clarifying the confusion, this explanation creates further uncertainty about what is contained on the spreadsheet of 4,351 GBLs. Ms. Haynie testified that she reviewed the 4,351 GBL numbers and found only one duplicate, meaning Ex. 169 "did not include separate bills for both an underlying move and related service charges." Gov't Opp'n Br. at 7. If the only charge for a given GBL on Ex. 169 is accessorial, that begs the question where is the claim for the underlying move and why is it not included, undermining the reliability of the entire spreadsheet.

Moreover, the Government fails to explain how the jury could determine from the evidence whether any of the entries on the spreadsheets were for services unrelated to the ITGBL bidding process, and thus were not false claims. As Jana Haynie testified, there is no way to know from the data presented at trial which of the 4,351 GBLs were for ocean freight, one-time-only charges, special tenders, or even for U.S. charges, none of which would constitute false claims in this case. *See* Defs.' Mem. at 27.

Another fundamental problem with the Government's proof is the lack of evidence about which carriers would have submitted a bid at the second low rate <u>regardless</u> of Defendants' conduct. Several witnesses said the Cartwright prime rates were non-compensatory and thus too low to be me-too'd. *See* Rizzo Tr. at 738:25-739:1 (Defs.' Mem., Ex. Z); Bungert Tr. at 221:5-222:3 (*Id.*, Ex. AA). As the Court recognized, if the

tonnage would have moved above the prime rate anyway, the Defendants' conduct did not cause that tonnage to move at higher prices; the claims for those shipments were not false.[9]

Thus, the Government's reliance on the parties' stipulation that an agreement existed is unavailing; the stipulation has nothing to do with the number of false claims Defendants caused to be submitted. Gov't Opp'n Br. at 8. Similarly, the Government's reliance on the Raunheim agreement is misplaced. *Id*. at 9. Gosselin and others agreed they would not work for carriers who did not match the second low rate in 12 specific channels. The Government contends that the jury could have inferred from the mere existence of this agreement that "Gosselin, the Raunheim signatories, and Cartwright would not have made these agreements unless they believed the other carriers would not have otherwise bid at the second-low level or above." *Id*. Even assuming the logic of this argument, Gosselin's belief is not proof of whether any of more than 100 carriers actually would have bid at the second low notwithstanding the Raunheim agreement.

The Government also relies on testimony that "in ordinary circumstances" carriers had to match the prime rate to get ITGBL shipments. *Id*. at 9. This generic testimony does not support a conclusion that all carriers would have matched the prime rate in IS02 on the twelve channels at issue. As noted, there was specific testimony that these particular prime rates were too low to match. *See* Rizzo Tr. at 738:25-739:1 (Defs.' Mem., Ex. Z); Bungert Tr. at 221:5-222:3 (*Id.*, Ex. AA). And, several witnesses testified that some tonnage always

---

[9] "[A] particular GBL would be the basis for finding that a false claim had been submitted only if the jury determined that the rate used in computing the GBL was the result of a fraudulent course of conduct. Within the context of the Cartwright and Covan channels, that would require the jury to decide whether the carrier submitting the GBL bid a rate he otherwise would not have bid absent the fraudulent course of conduct." 7/28/11 Ruling on Defs.' Mot. for J. as a Matter of Law, Tr. at 1063 (Defs.' Opp'n to Pls.' Mot. for J., Ex. A).

moved above the prime rate.  *See, e.g.*, Labbus Tr. at 106:7-15 (*Id.*, Ex. BB); Coleman Tr. at 248:24-249:7 (*Id.*, Ex. CC); Hahn Tr. at 257:6-15 (*Id.*, Ex. DD).

Similarly unpersuasive is the Government's argument that "virtually none" of the carriers who bid in the second round matched the second low for the remaining channels in IS02.  Gov't Opp'n Br. at 10 (citing U.S. Ex. 191).  There was no evidence at trial indicating whether the prime rates for those channels were compensatory.  Each channel is bid separately; the prime rates in those channels may have been compensatory and carriers were able to me-too that rate.  There is simply no reasonable or reliable conclusion to draw about the cancelled Cartwright channels from the bidding on the other channels.

The Government also failed to prove which carriers, if any, were members of the conspiracy.  The Government contends that because "some carriers actually did try to file below the second low in the twelve Cartwright Channels," but that Gosselin and Pasha "took steps to assure that those rates too were later cancelled, . . . [t]his strongly suggests that me-too'ing a the second low rate was not a rate filing that *any* carrier would have made absent the fraudulent bid rigging and boycott threats," which would "support the additional finding that every carrier filing at the second-low was a co-conspirator." Gov. Opp'n Br. at 10.  This strained logic fails to prove that those carriers actually <u>were</u> co-conspirators, as opposed to (as the Government collectively painted all U.S. carriers at trial) innocent victims forced to comply with the German agents' demands.  *See* (Defs.' Opp'n to Pls.' Mot. for J. at 10 and Ex. A (Trial Tr. at 1648:2-7).  There simply was no evidence from which the jury could determine which of the more than 100 carriers who participated in the IS02 bidding cycle were co-conspirators, submitting claims pursuant to the conspiracy.  *See* 4/20/11 Order on United States' Mot. for Recons. (Doc. 799) at 3-4.

**B.   The Government Is Estopped from Seeking More than 577 False Claims And Even Failed to Prove That Number at Trial.**

The number of false claims for the Cartwright channels cannot exceed 577, the number of invoices the Government previously represented supported their $865,000 actual damages claim for the Cartwright channels.   The Government argues Defendants waived this argument by not raising it in their initial Motion for Judgment as a Matter of Law at the close of the Government's case.  Gov't Opp'n Br. at 12.   However, judicial estoppel is an equitable doctrine, the purpose of which "first and foremost, is to 'protect the essential integrity of the judicial process' rather than the interests of the opposing party." *Cathcart v. Flagstar Corp.*, 155 F.3d 558, 1998 WL 390834, at *8 n.2 (4th Cir. June 29, 1998) (*quoting Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982)).  Thus, judicial estoppel can be raised by the Court *sua sponte* notwithstanding a party's waiver of the argument.  *See id.*; *see also Kaiser v. Bowlen*, 455 F.3d 1197, 1204 (10th Cir. 2006) ("Hence, we are not bound to accept a party's waiver of a judicial estoppel argument and may consider the issue at our discretion.").   Contrary to the Government's claim now that it "at no time represented that these 577 invoices constituted the universe of false claims caused by the Gosselin Defendants in the Cartwright channels during the IS02 rate cycle" (Gov't Opp'n Br. at 12), the Government did previously make that representation:

> [T]he United States has expended considerable resources physically locating the thousands of payment invoices for moves of household goods under the ITGBL program and has <u>specifically identified those that are related to the twelve IS-02 traffic channels. The United States has now completed that task and provided those invoices to the Gosselin Defendants</u>. It has also appropriately moved for summary judgment now because there are no issues of material fact remaining regarding those claims.  (The 583 invoices at issue were submitted to the Court with the United States' motion.)

United States' Brief in Opp'n to Defs.' Mot. to Strike United States' Mot. for Partial Summ. J. on Damages and Civil Penalties (Doc. 714) at 2-3.

16

Citing *Thorpe v. Mutual of Omaha Insurance Company*, the Government contends it is not bound by the evidence it submitted during summary judgment. Gov. Opp'n Br. at 11. *Thorpe* does not stand for this proposition. There, the court directed a verdict for the defendant on a particular claim before the jury retired to deliberate. 984 F.2d 541, 545 (1st Cir. 1993). The plaintiff argued on appeal that because the defendant's motion for summary judgment on that claim had been denied, reasonable minds could differ and the claim should have gone to the jury. The First Circuit rejected this argument, recognizing that when summary judgment is denied, the "[e]vidence adduced at trial will almost always differ in degree, force, and quantity from that submitted on a motion for summary judgment" and thus the earlier denial of summary judgment "in no way impeaches the later directed verdict." *Id.* Thorpe does not stand for the proposition that a party is entitled to re-open issues at trial that have been <u>resolved</u> by summary judgment.

Here, the Government <u>won</u> summary judgment for the damages it sought <u>based on</u> the 583 (later reduced to 577) invoices it claimed supported its damages. And, the Court expressly held that the Government was not permitted to seek more than $865,000 in damages for the Cartwright channels. Doc. 737 at 11-12 n.9. Judicial estoppel precludes parties "from litigating certain issues if it would require taking positions inconsistent with positions previously taken in judicial proceedings." Doc. 737 at 7-8 (citing *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28-29 (4th Cir. 1995) and *Lowery v. Stoval*, 92 F.3d 219, 224 (4th Cir. 1996)).

Here, the Court granted the Government's motion for summary judgment as to the $865,000 in damages it sought for the Cartwright channels, an amount the Government contended was based on the 577 supporting invoices it presented to the Court. Under

judicial estoppel, and for the same reasons this Court limited the Government to $865,000 in damages for IS02 (*see* Doc. 737 at 11-12 n.9), the Government cannot at this juncture take an inconsistent position because it is now beneficial to the Government to do so. The Court denied summary judgment as to the number of civil penalties because Defendants contested the 577 invoices as <u>overinclusive</u>. The Court allowed the Government to prove and Defendants to challenge that number. Doc. 737 at 16 ("Whether these particular 583 invoices, in fact, substantiate 583 'false claims' remains subject to proof and adjudication."); *see also* Order on Reconsideration, April 20, 2011 (Doc. 799) at 2. The Court did not invite the Government to seek civil penalties for over seven times the number of invoices that even arguably support their $865,000 damage claim.

The Government also claims that the jury "already considered" these 577 invoices because they were included in Government's summary spreadsheets of 4,351 paid GBLs. Gov't Opp'n Br. at 14. But, the Government did not identify which of the 4,351 paid GBLs corresponded to the 577 invoices, and the jury could not determine without speculating which of the 577 invoices were false and were caused by Defendants to be submitted.

### C. The Jury Verdict Was Based on Summary Exhibits That Violated Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 1006.

In addition to the substantive problems with Government Exhibits 169 and 173, the exhibits also were produced in violation of Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 1006 and should not have been considered by the jury.[10] *See* Defs.' Mem.

---

[10] The Government's argument that Rule 37 does not authorize the Court to set aside the verdict misses the point. Gov't Opp'n Br. at 14-15. The verdict can and must be set aside if it is not supported by sufficient evidence. To the extent Rule 37 and FRE 1006 preclude the admission of Exhibits 169 and 173, the verdict lacks sufficient evidentiary support and must be set aside under Rule 50. Indeed, after the close of all evidence, the Court expressly reserved as to the sufficiency of the evidence, including "the exclusion of those [summary] exhibits under Fed. R. Civ. P. 37 and otherwise." Memorandum Opinion, 8/26/11 (Doc. 1072) at 2 n.1.

at 29-30.  In particular, the Government failed to produce the documents underlying the summaries in a manner that afforded the Defendants any meaningful opportunity to assess the accuracy of the summaries.  The Government contends it made the underlying invoices "available" to the Defendants.[11]  Gov't Opp'n. Br. at 15.  To be sure, the Government produced over 900,000 pages of invoices in hard copy (*Id*., Ex. L) and allowed Defendants access to "several hundred boxes of microfilm" (*Id*., Ex. K) containing additional invoices without identifying which invoices were selected for inclusion on Exhibits 169 and 173.  This access hardly afforded the Defendants a meaningful opportunity to test the accuracy of the summaries.  *See Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996) (affirming district court's exclusion of summary exhibits because proponent merely made documents available during discovery and did not identify the specific documents that were the source for the summaries); *Jade Trading, LLC v. United States*, 67 Fed. Cl. 608, 615 n.12 (Fed. Cl. 2005) ("reference to such a document dump without specifying which documents were being summarized does not begin to satisfy Rule 1006's 'made available' requirement"); *Auto Indus. Supplier Employee Stock Ownership Plan v. SNAPP Systems, Inc.*, 2008 WL 5383372, at *8 (E.D. Mich. Dec. 23, 2008) (holding "passive availability" of 961 boxes of documents in a warehouse does not provide "meaningful access" to documents underlying summary exhibits as required by Rule 1006).

The Government's assertion that two weeks was sufficient time to assess the accuracy of the summary exhibits is belied by the Government's own statements that it would have taken "weeks" for Jana Haynie to testify about the "dozens of boxes"

---

[11] The suggestion that the summaries complied with the rules because they were exchanged "at the agreement of the parties" (Gov't Opp'n Br. at 16) is specious.  Defendants agreed to a time table for exchanging summary exhibits; Defendants did not agree to allow the Government to avoid their responsibilities under Federal Rule of Evidence 1006 to identify the information being summarized and afford Defendants a meaningful opportunity to test the adequacy of those summaries.

purportedly containing the support for the summaries.  Gov't Opp'n Br. at 15-17.  Clearly, it would have taken even longer than "weeks" for the Defendants to review and analyze the "dozens of boxes" of invoices. That the Defendants had the opportunity to cross-examine Ms. Haynie about the many deficiencies with the summary charts when neither they nor Ms. Haynie[12] ever actually laid eyes on the underlying invoices is not a meaningful opportunity to review and challenge the accuracy of the summaries.

Finally, the Government's proclamation that Defendants "suffered no prejudice from the time and manner of production" of the summaries is incorrect.  The summaries clearly formed the basis for the jury's verdict on the Cartwright channels.  Exhibit 173 was the *only* exhibit that purported to quantify the number of invoices for IS02 (though in reality it only reflected the number of moves for which payments were made), and the Government repeatedly argued that jurors should look at Exhibit 173 to determine the number of invoices.  *See, e.g.*, Trial Tr. at 1672:19-25 (Defs.' Opp'n to Pls.' Mot. for J., Ex. A) (the number of false claims "is laid out for you in U.S. Exhibits 172 and 173"); *id.* at 1673 ("You have a second summary, U.S. Exhibit 173, that talks about the channels that Cartwright canceled and the carriers were made to me-too at the second level.").  In any event, all of the other evidence from which the jury could have derived the 4,351 false claims figure suffers from the same deficiencies.  Like Exhibit 173, the Government's production of Exhibit 169 violated Rules 37 and 1006 and there was no way for the jury to resolve that exhibit's substantive deficiencies.

---

[12] Ms. Haynie testified that she verified 35 invoices out of the 65,513 invoices used to create the summary exhibits for <u>all</u> of IS01-IW02.  Haynie Tr. at 657:20-658:5 (Ex. C, attached); *see also* Gov. Ex. 170 (Ex. D, attached).

Respectfully submitted,


_____/s/_____
Kerri L. Ruttenberg
Va. Bar No. 70274
Attorney for Defendants Gosselin
World Wide Moving, N.V. and Marc Smet
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C.  20001
(202) 879-5419 (phone)
(202) 626-1700 (fax)
kruttenberg@jonesday.com

James R. Wyrsch, admitted *pro hac vice*
Keith E. Drill, admitted *pro hac vice*
Attorneys for Defendants Gosselin
World Wide Moving, N.V. and Marc Smet
WYRSCH, HOBBS & MIRAKIAN, P.C.
1000 Walnut Street, Suite 1600
Kansas City, Missouri 64106
(816) 221-0080 (Telephone)
(816) 221-3280 (Fax)
jimwyrsch@whmlaw.net
kdrill@whmlaw.net

## CERTIFICATE OF SERVICE

I hereby certify that this 19th day of September, 2011, the above and foregoing was filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Richard E. Greenberg, Esq.
John E. Petite, Esq.
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, MO 63102

Mark Hanna, Esq.
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006

Andrew A. Steinberg, Esq.
Jonathan A. Phillips. Esq.
U.S. Department of Justice, Civil Division
Commercial Litigation, Fraud Section
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Steven E. Gordon, Esq.
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314

William F. Coffield, Esq.
Coffield Law Group LLP
1330 Connecticut Ave., NW, Suite 220
Washington, D.C. 20036

_____ /s/ _____
Kerri L. Ruttenberg
Attorney for Defendants Gosselin
Worldwide Moving, N.V., Gosselin Group,
N.V., and Marc Smet
