IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. Kurt Bunk and Daniel Heuser, | ) ) ) | |
| Plaintiffs/Relators, | ) ) | |
| v. | ) ) | No. 1:02cv1168 (AJT/TRJ) |
| BIRKART GLOBISTICS GmbH & CO., et al., | ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. Ray Ammons, | ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| v. | ) ) | No. 1:07cv1198 (AJT/TRJ) |
| THE PASHA GROUP, et al., | ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION

This False Claims Act case was tried before a jury, which on August 4, 2011, returned a verdict (1) in favor of the Gosselin defendants[1] and against the United States as to what has been referred to in this litigation as the "Covan Channels"; (2) against the Gosselin defendants and in favor of the United States with respect to the number of false claims that the Gosselin defendants caused to be presented to the United States with

_____

[1] Defendants Gosselin Worldwide Moving N.V. ("Gosselin"), its successor Gosselin Group N.V., and Marc Smet are collectively referred to as the "Gosselin defendants" or defendants.

1

respect to what has been referred to in this litigation as the "Cartwright Channels"; and (3) against the Gosselin defendants and in favor of the United States with respect to what has been referred to in this litigation as the "DPM claim," filed and pursued by the Relator Bunk, without the intervention of the United States.

Presently before the Court are post-trial motions consisting of: (1) Defendants' Renewed Motion for Judgment as a Matter of Law and Alternative Motion for Partial New Trial (Doc. No. 1075), which challenges the jury verdict against the Gosselin defendants as to the Cartwright Channels and the DPM claim, and also seeks a set-off against damages otherwise assessable based on the restitution and settlement payments already collected by the government; (2) United States/Relators' Motion for Judgment Against Gosselin Defendants for Damages and Civil Penalties (Doc. No. 1076), which seeks without further proceedings judgment against the Gosselin defendants for treble damages and civil penalties with respect to the Cartwright Channels based on the Court's previous determination of liability and damages and the number of false claims that the jury determined were caused to be presented by the Gosselin defendants, and also as to the DPM claim, based on the jury's finding of liability as to the DPM claim and the parties' stipulation as to the number of invoices that the Gosselin defendants submitted with respect to the DPM claim; and (3) Relators' Motion Regarding Further Proceedings (Doc. No. 1073), which also seeks a determination of civil penalties as to the DPM claim based on the jury's finding of liability as to the DPM claim and the parties' stipulation.[2]

As discussed in this Memorandum Opinion, the Court concludes that the United

---

[2] Also pending is United States' Renewed Motion for Summary Judgment as to Defendant Government Logistics N.V. (Doc. No. 1074), which the Court, following the hearing held on September 23, 2011, deferred pending the resolution of all remaining issues as to the Gosselin defendants.

States failed to present evidence sufficient to allow the jury to determine without speculation the number of false claims that the Gosselin defendants caused to be submitted to the government and for that reason, the Court will grant defendants' motion for judgment as a matter of law with respect to the Cartwright Channels. In addition, the Court conditionally rules pursuant to Federal Rule of Civil Procedure 50(c)(1) that a new trial should be granted as to the number of false claims that the Gosselin defendants caused to be submitted with respect to the Cartwright Channels if this judgment is reversed or vacated on appeal.

Second, the Court concludes that the government is entitled to treble damages in the amount of $2,595,000, or three times the amount of $865,000, which the Court had determined as a matter of law constituted the government's actual, total loss with respect to the Cartwright Channels, subject to any set-offs as a result of the criminal restitution payment of $865,000 made by defendant Gosselin Worldwide Moving N.V. and the approximately $14 million the United States obtained in settlements from those alleged to be jointly and severally liable with the Gosselin defendants. In that regard, the Court concludes that after such restitution and settlement payments are appropriately credited and set-off against the trebled damage amount of $2,595,000, the United States has recovered fully with respect to the Gosselin defendants and no amount remains due and owing from them based on their liability for the claims set forth in the United States' Complaint in Intervention.

Third, the Court concludes that the evidence was sufficient for a reasonable jury to find in favor of the United States on the DPM claim and that as a matter of law, 9,136

false claims were submitted with respect to those claims.[3]  The Court also concludes that the Gosselin defendants are not entitled to a new trial with respect to the DPM claims. The Court will therefore enter judgment against the Gosselin defendants for civil penalties in an amount to be determined following the evidentiary hearing scheduled for October 26, 2011 and also award attorney's fees and a share of the government's recovery to Relator Bunk following a determination of civil penalties.

For the reasons previously stated in open Court and in this Memorandum Opinion, the Court therefore: (1) grants defendants' motion for judgment as a matter of law, and conditionally grants a new trial, as to the number of false claims submitted by the defendants as to the Cartwright Channels; (2) denies defendants' motion for judgment as a matter of law as to the DPM claim and also their request for a new trial as to the DPM claims; (3) grants the United States and Relators' motion for judgment as to damages in the amount of $2,595,000 as to the Cartwright Channels but reduces the amount owed by the Gosselin defendants for those damages to zero after crediting restitution and settlement payments already collected by the government; (4) grants the United States and Relators' motion for judgment for civil penalties against the Gosselin defendants as to the Cartwright Channels to the extent of one civil penalty on one false claim, in an amount to be determined; (5) grants the United States and Relators' motion for judgment of liability against the Gosselin defendants as to the DPM claim for civil penalties on 9,136 false claims, in an amount to be determined; and (6) otherwise denies the United States and Relators' motion for judgment against the Gosselin defendants as to the DPM claim, without prejudice to the assessment of civil penalties, attorney's fees and

---

[3]  The parties stipulated that in the event of liability as to the DPM claim, the defendants filed 9,136 invoices under the DPM contract. *See* Re. Ex. 296.

a share of the government's recovery to Relator Bunk.

## BACKGROUND

The nature and procedural history of this case are set forth in the Court's previous orders and memorandum opinions, including, in particular this Court's Memorandum Opinion dated August 26, 2011 pertaining to aspects of the Court's ruling at trial on Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, made following the close of the government's case in chief. *See* Doc. No. 1072. Briefly stated for the purposes of the current motions, this consolidated action was originally filed by Relator Kurt Bunk and Relator Ray Ammons (collectively "Relators"). On July 18, 2008, the United States intervened as to all claims relating to the International Through Government Bill of Lading ("ITGBL") program. Those ITGBL claims allege that the Gosselin defendants, among others, formed a single, overarching bid-rigging and price-fixing conspiracy on November 14, 2000 that successfully raised the rates charged for packing and unpacking U.S. military household goods within Germany by German moving companies, known as German local agents. Based on these allegations, the United States and Relators assert causes of actions for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)-(3) (2000), common law fraud, common law conspiracy to defraud the United States, and unjust enrichment.

Although the United States intervened as to the ITGBL claims, the United States did not intervene as to the claim referred to as the Direct Procurement Method contract claim, or DPM claim, brought by Relator Bunk. Unlike the ITGBL program, the DPM claim against the Gosselin defendants arises out of the government's contracting directly with the Gosselin defendants for packing and moving services within Europe. Relator

Bunk alleges that the Gosselin defendants violated the FCA by filing a false Certificate of

Independent Price Determination ("CIPD") in connection with their bid for the DPM

contract, under which defendants certified that the prices in their offer had been arrived at

independently, when in fact, they and other potential bidders had entered into a price

fixing agreement and territory allocations.

Related to the current motions are the Court's pre-trial rulings with respect to the

government's motions for summary judgment as to liability, damages and civil penalties

based on the criminal convictions against Gosselin arising out of its conduct with respect

to the Cartwright Channels.[4]  Based on those criminal proceedings, by Order dated

January 25, 2010 (Doc. No. 557), the Court entered summary judgment against the

defendants as to liability on the government's claims for conspiracy to defraud under the

False Claims Act (Count I of the Complaint in Intervention) and for common law

conspiracy (Count II of the Complaint in Intervention).  By Memorandum Decision and

Order dated November 10, 2010 (Doc. Nos. 737 and 738), the Court entered summary

judgment as to damages, finding that as a matter of law based on the restitution order

entered in the criminal case in the amount of $865,000, the government had been

damaged in the amount of $865,000.  In that regard, the Court held that the restitution

order entered against Gosselin in the criminal proceedings constituted a determination of

the total actual loss that the government incurred as a result of the alleged conspiracies

based on the Cartwright Channels and, under the doctrine of judicial estoppel, constituted

the amount of the government's loss as a result of the conspiracies alleged in the United

---

[4] *See United States v. Gosselin World Wide Moving N.V.*, No. 1:03-cr-551 (E.D. Va., April 26, 2006). *See generally United States v. Gosselin World Wide Moving N.V.*, 333 F. Supp. 2d 497 (E.D. Va. 2004), *aff'd in part, rev'd in part and remanded, United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502 (4th Cir. 2005).

States' Complaint in Intervention, as to which liability had been entered based on Gosselin's criminal convictions. *See* Memorandum Opinion and Order dated November 10, 2010, at 10-11 (Doc. Nos. 737 and 738). The Court denied, however, the government's summary judgment motion as to the number of false claims and civil penalties.

In support of its summary judgment motion for the assessment of civil penalties as a matter of law, the government submitted what it claimed were the 577 actual vouchers, also referred to as invoices, that requested payment for moves in the Cartwright Channels at rates, known as the "second low" rates, that the government claimed were the result of the defendants' fraud and conspiracy. *See* Gov. Mot. for Partial Summ. J. (Doc. No. 701) at 5; *see also id.* at Ex. D. In other words, the government claimed as a matter of law based on undisputed facts that defendants submitted or caused to be submitted 577 false claims with respect to Cartwright Channels.[5] The Court rejected the government's contention that as a matter of law the Court could determine that the Gosselin defendants

---

[5] In support of its motion for summary judgment as to the number of false claims and civil penalties, the government represented as follows with respect to the vouchers claimed to be false claims with respect to the Cartwright Channels:

> . . . the United States has expended considerable resources physically locating the thousands of payment invoices for moves of household goods under the ITGBL program and has specifically identified those that are related to the twelve IS02 traffic channels. The United States has now completed that task and provided those invoices to the Gosselin Defendants. It has also appropriately moved for summary judgment now because there are no issues of material fact remaining regarding those claims.

United States' Br. in Opp'n to Defs.' Mot. To Strike United States' Mot. for Partial Summ. J. on Damages and Civil Penalties (Doc. No. 714), at 2-3; *id.* (The 583 – later reduced to 577 – invoices identified were submitted to the Court with the United States' motion.). *See also* Reply Br. in Further Supp. of the Gov't's Mot. for Partial Summ. J. (Doc. No. 723) at 10, n.2 (reducing the originally claimed false claims from 583 to 577).

caused to be submitted 577 false claims with respect to the Cartwright Channels, or that

the Gosselin defendants must necessarily be assessed a civil penalty for every false claim

filed, or that the amount of any such civil penalty should necessarily be assessed at the

maximum amount of $11,000 per false claim.  As the Court ruled in its Order denying

this part of the government's motion for summary judgment, "[w]hether these particular

[577] invoices, in fact, substantiate [577] 'false claims' remains subject to proof and

adjudication."  *See* Order dated November 10, 2010 (Doc. No. 737), at 16.

On March 8, 2011, the government moved for reconsideration of the Court's

denial of its motion for summary judgment with respect to the number of false claims that

the Gosselin defendants caused to be submitted with respect to the Cartwright Channels,

specifically claiming that the Court's holding was based on an incorrect reading of

*United States v. Bornstein*, 423 U.S. 303 (1976).  On April 20, 2011, the Court denied the

government's motion, and, in its order, identified issues that presaged fundamental

evidentiary problems for the government at trial.  The Court stated:

> Among other inadequacies, the summary judgment record does not
> establish that all of the relied upon invoices were, in fact, submitted by
> members of the alleged conspiracy pursuant to the conspiracy or contained
> pricing that was part of the alleged conspiracy.  Rather, the record simply
> contains the relied upon invoices, which reflect the names of a large
> number of freight forwarders about whom there is little or no other
> information, including what contact, if any, they had with Gosselin, Smet
> or any other alleged coconspirators or whether they submitted each relied
> upon invoice as part of the alleged conspiracy.

Order dated April 20, 2011, at 3-4.

Against the backdrop of these rulings, the parties proceeded to trial;[6] and for 11

days beginning on July 18, 2011, this case was tried before a jury.  At trial, the

---

[6]  The government and Relators had settled or otherwise resolved their claims against all
other defendants and alleged co-conspirators.

government did not limit its damages claim or its claim for civil penalties to the 12 Cartwright Channels, on the basis of which it had obtained summary judgment. Rather, it claimed that the Gosselin defendants, through their conspiracy, caused to be inflated all the rates filed with respect to all 416 channels for the movement of goods between the United States and Germany in the 2001 and 2002 rate cycles. As discussed below, the government likewise dramatically increased the number of false claims it claimed the Gosselin defendants had caused to be filed with respect to the Cartwright Channels from 577 to as many as 4,351. *See* Trial Tr. at 1672:19 (Doc. No. 1065).

Following presentation of the government's case in chief, the defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), which, on July 28, 2011, the Court orally granted in part, denied in part, and reserved on several issues.[7] Briefly summarized, the Court ruled that the Gosselin defendants' agreement to set prices for the European inland segment of the ITGBL program, the so-called Landed Rate Agreement or Sonthofen Agreement, was immune from the antitrust laws under the Shipping Act of 1984, 46 U.S.C. app. § 1706(a)(4) (2000), and because that conduct enjoyed that immunity, it could not constitute an unlawful conspiracy under the False Claims Act. The Court also ruled that because the government's claim as to all channels other than the Covan Channels in the IS-01 rate cycle and the Cartwright Channels in the IS-02 rate cycle was based entirely on conduct found to be immune, there was neither liability nor damages as to those channels as a matter of law; accordingly, the Court

---

[7] The Court further denied the government's August 1, 2011 motion for reconsideration of the Court's July 28, 2011 ruling. For a description of the Court's July 28, 2011 ruling, as well as the Court's ruling on defendants' Rule 50 motion as to the DPM claims, submitted following the close of all of the evidence, see the Court's Memorandum Opinion dated August 26, 2011 (Doc. No. 1072), at n.1.

dismissed those aspects of the government's Complaint in Intervention.[8]

On the other hand, the Court found that the defendants' conduct directed to the bids that the freight forwarders filed with respect to the Covan and Cartwright Channels was not immune and therefore denied the defendants' motion as to liability as to the Covan and Cartwright Channels. The Court held, however, that the government failed to prove causation with respect to damages for the Covan Channels, leaving, with respect to the Covan Channels, only the issue of liability for the purposes of civil penalties, as well as the number of false claims, to be decided by the jury. *See* Trial Tr. 1052:7-1058:7.

The Court also reserved on the issue whether there was sufficient evidence for the jury to determine the number of false claims that the Gosselin defendants caused to be submitted with respect to the Covan and Cartwright Channels. The Court reaffirmed its rulings (including its reservation as to whether there was sufficient evidence to determine the number of false claims as to the Covan and Cartwright Channels) following the close of all the evidence and the case was submitted to the jury on the issues of (1) liability as to the Covan Channels, and in the event of liability, the number of false claims the Gosselin defendants caused to be submitted as to those channels; (2) the number of false claims the Gosselin defendants caused to be submitted with respect to the Cartwright Channels (the issues of liability and damages as to those channels having already been decided in the government's favor on summary judgment); and (3) liability as to the DPM claim (Relator Bunk having decided not to attempt any proof of damages and the parties having stipulated that the Gosselin defendants had submitted 9,136 invoices with respect to the DPM contract).

---

[8] The Court also dismissed the government's claim for unjust enrichment in Count IV of the Complaint in Intervention.

On August 4, 2011, the jury returned a verdict in the defendants' favor as to liability with respect to the Covan Channels and in favor of the United States and the Relators as to the Cartwright Channels and the DPM claim. The jury further found that defendants caused to be filed 4,351 false claims as to the Cartwright Channels, rather than the 577 that the government asserted in its summary judgment motion.

On August 29, 2011, the parties filed the post-trial motions referenced above and the Court held a hearing on these post-trial motions on Friday, September 23, 2011, following which the Court took the matters under advisement.

## STANDARD OF REVIEW

On a renewed motion for judgment as a matter of law notwithstanding a jury verdict, the Court is to consider whether "there is substantial evidence in the record to support the jury's findings." *Wilhelm v. Blue Bell*, 773 F.2d 1429, 1433 (4th Cir. 1985). In determining whether the evidence supports the jury's verdict, the Court is to "review the evidence, and all reasonable inferences to be drawn therefrom, in favor of [the nonmoving party]." *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996). In considering the evidence presented at trial, the district court does "not make credibility determination or weigh the evidence," as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). While the Court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them," the Court is "not a rubber stamp convened merely to endorse the conclusions of the jury, but rather ha[s] a duty to reverse the jury verdicts if the evidence cannot support [them]." *Price*, 93 F.3d at 1250.

Pursuant to Federal Rule of Civil Procedure 50(c), should the Court grant a renewed motion for judgment as a matter of law, the Court is required to conditionally rule on any motion for a new trial and, in so doing, state the grounds for conditionally granting or denying the motion for a new trial if the Court's judgment should be vacated or reversed. In considering a motion for a new trial under Federal Rule of Civil Procedure 59(a), the Court must set aside the verdict and grant a new trial if it finds that the verdict: (1) is "against the clear weight of the evidence"; (2) is based on false evidence; or (3) will result in a "miscarriage of justice." *See Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001).

## ANALYSIS

**A.    The sufficiency of the evidence with respect to the number of false claims that defendants caused to be submitted with respect to Cartwright Channels**

The Gosselin defendants challenge the sufficiency of the evidence to support the jury verdict as to the number of false claims that the defendants caused to be presented with respect to the Cartwright Channels on the grounds that (1) the government failed to satisfy the requirements of Federal Rule of Evidence 1006 for the admission of certain summary exhibits, in the absence of which there was no evidence concerning the number of claims, false or otherwise, that the government paid; (2) the government was estopped from claiming that more than 577 false claims generated the government's loss as result of the False Claims Act conspiracy, which the Court had determined to be, and limited to, $865,000; (3) even with the admitted exhibits, the jury necessarily had to speculate as to the number of claims filed since there was insufficient evidence to establish the actual number of vouchers, as opposed to government bills of lading, or GBLs, that the carriers submitted with respect to the Cartwright Channels; and (4) the evidence was insufficient

to establish which vouchers submitted were "false," because the evidence was

insufficient for a jury to determine, as required, which carriers obtained ITGBL contracts,

and filed which vouchers under those contracts, based on bids higher than they otherwise

would have filed in the absence of defendants' fraudulent conduct.

In response to defendants' Rule 50 motion, the government concedes that it did

not produce or make available to the defendants the actual database from which the

challenged summary exhibits were generated but argues that such production was not

necessary because it had produced or made available the thousands of vouchers whose

information was entered into the database. For this reason, the government contends that

the summary exhibits were properly admitted because even though the database that

generated the exhibits had not been produced or made available to the defendants, the

"underlying documents" whose information had been entered into the database had been

made available to the defendants. The government also argues that it had not represented

that the number of false claims was limited to 577 but that in any event, once the Court

denied its motion for summary judgment as to the number of false claims and the amount

of civil penalties to be assessed, it was not bound by the position it had taken in its

summary judgment motion as to the number of false claims. As to the adequacy of the

evidence itself, the government contends that the evidence supported the jury's finding in

two ways. First, the government contends that "[t]he Gosselin Defendants are

responsible for the full extent of the 4,351 false claims found by the jury because their

fraudulent conduct and that of their coconspirator agents was a substantial factor in those

claims and the claims were known and foreseeable consequences of that conduct." *See*

Gov't Reply Brief, at 11. Second, the government contends that "there was evidence to

support the jury's finding that all of the carriers filing at the second low were

coconspirators, even without the carrier-by-carrier enumeration . . . ." *See id.* at 11.

As discussed below, the evidence was insufficient for the jury to determine (1) the

number of claims that the carriers filed with respect to the Cartwright Channels that

caused the government to pay out money, (2) the number of such claims that were "false"

for the purposes of the False Claims Act, and (3) the number of such false claims that the

defendants caused to be presented.

## 1.   The applicable law as set forth in the jury instructions[9]

"The test for False Claims Act liability . . . is (1) whether there was a false

statement or fraudulent course of conduct; (2) made or carried out with the requisite

scienter; (3) that was material; and (4) that caused the government to pay out money or to

forfeit moneys due (i.e., that involved a 'Claim')." *Harrison v. Westinghouse Savannah

River Co.*, 176 F.3d 776, 788 (4th Cir. 1999). Briefly summarized, and as reflected in the

given jury instructions,[10] the government needed to prove the number of vouchers that the

---

[9] For the purposes of the post-trial motions, the parties do not challenge the correctness of the given jury instructions, insofar as they pertain to the Cartwright Channels.

[10] *See* Jury Instruction Nos. 41 ("Fraudulent Conduct for the Purposes of Determining False or Fraudulent Claims") (Fraudulent conduct is non-immune conduct "engaged in for the purpose of restricting or removing competition from the bidding process . . . , including practices known as price rigging and boycotts."); 43 ("What is a Claim") ("A Claim . . . is a demand for payment on the United States government for government money or the transfer of government property. . . . [I]t is the public voucher that a carrier files with the United States in order to obtain payment for a shipment of goods.  It is not a Government Bill of Lading (GLB) or other charge listed on or submitted for payment through the filing of a public voucher."); 44 ("What is a False or Fraudulent Claim") ("A claim is false or fraudulent if it is filed . . . based on a shipping contract that the government was fraudulently induced into awarding to a carrier; The United States was fraudulently induced . . . if the carrier's bid for that shipping contract was the result of a fraudulent course of conduct; A carrier's bid for a shipping contract was the result of fraudulent conduct if that fraudulent conduct was a substantial factor in causing him to file a did he would not have otherwise filed."); 45 ("Causing False Claim to be Filed)

defendants caused the freight forwarders to file and get paid based on bids that were higher than they otherwise would have filed because of defendants' fraudulent scheme. In response to a special interrogatory, the jury determined that the defendants caused to be filed 4,351 false claims with respect to the Cartwright Channels.

### 2. The summary exhibits pertaining to the number of false claims that defendants caused to be submitted.

Although there is no dispute that it is the standard form voucher filed by a carrier that constitutes a "claim," the government did not introduce any of the actual vouchers that were submitted by the carriers for payment with respect to the Cartwright Channels. Nor did it present direct evidence of the actual number of vouchers filed or paid by the government. Rather, the government offered certain evidence from which it contended the jury could infer a certain number of false claims that the defendants caused to be filed and paid.[11] The government attempted this indirect method of proving the number of claims with respect to the Cartwright Channels by utilizing what it offered as summary

---

("[A] defendant causes a false claim to be submitted if his fraudulent conduct was a substantial factor in causing the claim to be filed and it was reasonably foreseeable that the defendant's actions would result in false claims; . . . you must determine whether the conduct was a substantial factor in producing the harm and the outcome was foreseeable. . . . In order for a false claim to be made, it is not necessary for the defendant to actually receive money directly from the government; causing the payment of Government money to some individual will suffice."). *See also* Jury Instructions 30 ("False Claims Act – Definition of Knowingly"); 31("False Claims Act – Actual Knowledge"), 32 ("False Claims Act – Reckless Disregard"); 33 ("False Claims Act – Deliberate Ignorance"), and 37 ("Materiality").

[11] Based on its rulings, there is no need for the Court to consider whether the government was required to prove the actual number of false claims that were, in fact, filed, rather than a number that could reasonably be estimated based on inferences from the evidence. *See, e.g., Hays v. Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003) (cited by both parties) (discussing how to determine the number of claims, concluding that the number must be supported by documentary records); *United States v. Krizek*, 192 F.3d 1024, 1026-31 (D.C. Cir. 1999) (discussing procedural history of case concerning the need to repeatedly recalculate the number of claims by parties, court, and special master, and remanding with prescription for calculating precise number of claims).

exhibits under Fed. R. Evid. 1006, principally Government Exhibits 169, and 173.[12]

Exhibit 169 came from what was referred to as the DFAS DTRS database. It is hundreds of pages long and listed separately, not the vouchers filed, but each of the thousands of GBLs that had been issued to carriers with respect to all of the 208 channels over which goods were moved during the 2002 rate cycle between the United States and Germany and Germany and the United States (the "Code 4" channels). Importantly, Exhibit 169 in its last three columns contained as to each GBL the date, identifying code, and amount of payment on each listed GBL (but not any vouchers). As it turned out, these three columns constituted the only evidence of any government funds paid in connection with the 2002 ITGBL rate cycle.

Exhibit 173 listed in summary fashion as to each of the Cartwright Channels the number of "moves" and "paid moves," with an overall total of 4,543 "moves" and 4,351 "paid moves." Exhibit 173, like Exhibit 169, was supposedly generated from the DFAS DTRS database, but in reality, and as best as the Court can determine based on the foundation testimony offered at trial, the government calculated from the DFAS DTRS database, together with a Microsoft Office program, the number of paid GBLs in the 12 Cartwright Channels and then, based on this information, listed these totals of paid GBLs in Exhibit 173 as the "paid moves," which the government then claimed was equal in

---

[12] Over defendants' objections, the Court conditionally admitted when initially offered Exhibits 169 and 173 and reserved as to their admissibility as part of its ruling on defendants' Rule 50 motion for judgment as a matter of law following the close of the government's case in chief. Following the close of all the evidence, and in response to defendants' renewed Rule 50 motion as to the number of false claims that the defendants caused to be presented, the Court submitted Exhibits 169 and 173 to the jury but continued to reserve as to their admissibility as part of its more general reservation as to the sufficiency of the evidence with respect to the number of false claims that defendants caused to be submitted.

number to the number of false claims that the defendants caused the carriers to submit. Based on this approach, the government claimed that the defendants had caused to be filed, not 577 false claims, as it had claimed in its summary judgment motion based on actual vouchers, but 4,351 false claims based on 4,351 "paid moves" listed in Exhibit 173. *See* Tr. Trans. at 652:8-653:6, 654:7-22 (Haynie testimony). As mentioned above, the jury returned a verdict finding that defendants had caused to be submitted 4,351 false claims, the same number listed in Exhibit 173 for "paid moves."

The DFAS database was not produced or made available to the defendants during discovery or in connection with Exhibits 169 or 173. The government also never produced or identified in connection with Exhibits 169 and 173 either the specific vouchers, or the specific GBLs associated with any specific vouchers, that were summarized as "paid moves," constituted the alleged false claims, or generated the government's actual loss of $865,000. Rather, the government relied on its having made available during discovery, before it tendered Exhibits 169 and 173, the undifferentiated tens of thousands of documents, stored on microfilm, that were submitted to the government in connection with the 2001 and 2002 rate cycles.

The admissibility of summary exhibits is governed by Rule 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006 represents a method to present voluminous amounts of information in a format not otherwise admissible, in order to facilitate the fact-finding process. When a summary exhibit is admitted under Fed. R. Evid. 1006, it becomes the evidence of the

facts presented and displaces the underlying documents or information as that evidence. *See United States v. Janati*, 374 F.3d 263, 272-73 (4th Cir. 2004). For this reason, the rule requires that the opposing party be given a fair opportunity to evaluate the accuracy and reliability of the summary exhibit against the source documents supposedly summarized in the summary exhibit. Normally, to satisfy that requirement, the party offering a summary exhibit must have affirmatively and timely identified and made available the specific documents being summarized in the summary exhibit. *Id.* ("The obvious import of these provisions [of Fed. R. Evid. 1006] is to afford a process to test the accuracy of the chart's summarization.").

Here, the defendants were entitled to inspect the database that produced Exhibits 169 and 173 and also have produced contemporaneously with Exhibit 173 the specific documents that Exhibit 173 purported to summarize as 4,351 "paid moves." Because the government never produced the database or the underlying documents that supported the exhibits, identified as such, the defendants had no real opportunity to test their accuracy or reliability. In short, the government failed to satisfy the core requirement of Rule 1006.[13]

---

[13] The Court also finds that the government failed to establish that the DFAS DTRS database itself was admissible, as Fed. R. Evid. 1006 requires. The evidence was that DFAS maintained the DTRS database as part of its ordinary operations and that it was part of DFAS's regular business to maintain the database. However, the DFAS representative whose testimony was used to qualify the database also testified that at least some of the relevant information that was entered into the database was entered not by DFAS, but by an independent, private contractor, to whom the carriers initially submitted their vouchers for payment and that this contractor, after performing a "prepayment audit," entered information into the database. *See* Trial Tr. at 660:4-662:10 (Haynie testimony). There was no evidence from anyone with knowledge about the reliability or accuracy of the process used by the contractor to enter information into the database (as opposed to the reliability and accuracy of the information subsequently entered by DFAS

The government's position reduces to the claim that because the documents that it made available during discovery contained the documents that would support the summaries it tendered at trial, it satisfied its obligations under Rule 1006 and there was no obligation or need for it to more specifically identify or actually produce the documents supposedly summarized, once it tendered the exhibits. This position essentially eliminates the mechanisms embedded in Rule 1006 to ensure that a summary is accurate and a party has a fair opportunity to test that accuracy, particularly in a case like this where the pre-trial productions went far beyond the scope of the documents supposedly being summarized and the parties have had fundamental disagreements over what documents evidence false or fraudulent claims. *See United States v. Strissel*, 920 F.2d 1162, 1164 (4th Cir. 1990) (Rule 1006 requires production of underlying documents that are supposedly accurately summarized "so that a proper cross-examination may be had.")

The government's discharge of its general discovery obligations did not satisfy its specific obligations under Fed. R. Evid. 1006 to tender the actual vouchers or GBLs that supposedly constituted and were summarized as the "paid moves" that, under the government's theory, equaled the number of false claims with respect to the Cartwright Channels. Whether intended or not, the government's decision to proceed as it did effectively prevented the defendants from challenging whether the 4,351 "paid moves" in fact corresponded to 4,351 separate false claims, which would necessarily involve 4,351

---

based on its actual payments and other activities). *See generally id.* at 642:6-648:25, 657:1-662:10.

separately filed vouchers for services based on allegedly inflated bids.[14]

For the above reasons, the Court concludes that at least the last three columns of Exhibit 169 (pertaining to payment information) should not have been admitted. Likewise, the Court concludes that Exhibit 173, which was generated from Exhibit 169, should not have been admitted. In the absence of these exhibits, there was no evidence from which a jury could determine the number of claims that were filed by the carriers and paid by the government with respect to the Cartwright Channels. There was therefore insufficient evidence from which a jury could determine the number of false claims that the defendants caused the carriers to submit with respect to the Cartwright Channels.

### 3. The government's failure to prove the number of claims that caused the government's harm.

Independent of this Court's determination that Exhibits 169 and 173 should have been excluded and that the evidence was insufficient in the absence of those exhibits, the Court also concludes that the evidence was insufficient to prove the number of false claims that the defendants caused to be filed because there was no evidence to establish the number of vouchers that caused or in any way related to the $865,000 in damages that the Court had determined constituted the amount, and limit, of the United States' actual

---

[14] In response to the 583 actual vouchers that the government identified and produced in its summary judgment motion as the false claims that caused the government's loss of $865,000, the Gosselin defendants, based on their review of those vouchers, claimed (with some agreement by the government) that some of the vouchers did not deal with the Cartwright Channels and others requested payment for service whose pricing was not based on the allegedly inflated bids or were filed by carriers that did not operate under a landed rate system. *See* Defendant's Motion Regarding Civil Penalties, Ex. E. The government's decision to attempt to prove the number of false claims at trial through summary exhibits, without producing or specifically identifying the specific vouchers that allegedly constitute the false claims, effectively foreclosed the same review and attack on the government's proof.

loss as a result of the alleged FCA and common law conspiracy.  In fact, and as discussed

above, the government did not introduce into evidence any vouchers, not even the 577

vouchers that it tendered in support of it request for summary judgment as to damages in

the amount of $865,000 and the civil penalties related to those damages.

The government argues that it was not required to identify which vouchers or

GBLs supported the $865,000 in damages because, as this Court recognized within the

context of the DPM claim, damages need not be proven to establish liability for civil

penalties under the FCA.  However, what the government overlooks is that for the

purposes of proving that a claim is false as to the Cartwright Channels, the government

was required to prove that it paid more than it otherwise would have absent the

defendants' fraudulent conduct.  For this reason, within the context of the Cartwright

Channels, unlike that of the DPM claim, only those vouchers that caused the government

to pay more money as a result of the defendants' fraudulent conduct (that is, caused a

monetary damage) could constitute a false claim; and since the government's loss was

limited to $865,000, the government was required to identify how many vouchers caused

that loss amount.  As a result, unless it were shown that a particular voucher filed with

respect to the Cartwright Channels was associated with some inflated payment by the

government – some fraction of the government's incurred damages – that voucher could

not have been a false claim.  But the government produced no evidence that would have

allowed a reasonable jury to determine how vouchers accounted for some portion of the

government's loss, an amount which the Court had already determined as a matter of law

was $865,000.  Indeed, there was no evidence from which the jury could even begin to

determine whether the government's loss was caused by 577 vouchers, 4,351 vouchers,

21

or some other number of vouchers.

### 4. The government failed to prove which carriers that filed claims did so as part of the alleged conspiracy.

The government claims that the evidence was sufficient for the jury to determine the number of false claims submitted because the jury could have reasonably determined that every carrier that filed at the second low rate during the me-too round for the Cartwright Channels were co-conspirators with the Gosselin defendants and acted as part of and in furtherance of the conspiracy. After review of the evidence, the Court concludes that there was no evidence from which the jury could determine that any carrier, other than Cartwright, was part of the conspiracy and submitted bids for the Cartwright Channels in furtherance of the conspiracy. More specifically, there was no evidence from which a jury could reasonably conclude that any carrier other than Cartwright – let alone *every* carrier that submitted bids for the Cartwright Channels – had entered into an agreement of any kind with the defendants or any member of the alleged conspiracy, or acted as part of any agreement with any member of the conspiracy, with respect to bidding for the Cartwright Channels. In fact, the government never identified at trial any particular carrier, other than Cartwright, that it claimed acted as a co-conspirator.[15]

---

[15] Before trial, the Court had ordered the government to identify those individuals whose statements the government contended would be admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E). In its submission as to this issue, the government did not identify a single carrier whose representative's statements would be admissible as co-conspirator statements. *See* United States' and Relators' Evidence of Co-Conspirator Statements (Doc. No. 971). Likewise at trial, there was no evidence that any member of the conspiracy, other than Cartwright, participated in the conspiracy at the direction of or with the knowledge of a carrier. At most, the evidence showed that co-conspirators passed on information to certain carriers concerning the position that the German agents had taken with respect to the Cartwright Channels.

**5. The government failed to prove that the defendants' conduct caused the carriers to file bids higher than they otherwise would have in the absence of defendants' unlawful conduct.**

In order to prove that the defendants caused a carrier to file false claims, the government needed to produce evidence that would allow a reasonable jury to conclude that the defendants' fraudulent conduct was a substantial factor in causing a carrier to file a bid that resulted in a contract and that was higher than the bid it otherwise would have filed. Within the context of this case, the government was required to prove that the carriers who bid at the second low rate for the Cartwright Channels in the me-too round would have me-too'ed the Cartwright prime rate had Cartwright not cancelled that rate as part of the defendants' conspiracy.

There was no direct evidence that any particular carrier would have me-too'ed the Cartwright prime rate absent the conspiracy or any of the Gosselin defendants' efforts to influence that carrier's bid. Representatives of six of the more than 100 carriers that submitted bids for the Cartwright Channels testified, but none stated that it would have me-too'ed the Cartwright prime rate had it not been cancelled.[16] In fact, the uncontradicted evidence was that a substantial number of carriers did not even operate under the Landed Rate system that, according to the government, allowed the Gosselin defendants to influence a carrier's bids through the threatened boycott.

The government heavily relies on the parties' Joint Stipulation, Ex. 179, at ¶¶ 23-29, but the Stipulation, which is based on the written statement of facts that Gosselin agreed to in the criminal proceedings, only describes the agreement among certain co-

---

[16] Similarly, although there was evidence that three carriers did me-too the Cartwright prime rates, only to subsequently cancel those rates, no representatives from those carriers testified and there was no evidence as to why those carriers cancelled their bids at the prime rate.

conspirators with respect to the Cartwright Channels and does not state that the defendants or their co-conspirators caused any carriers to file bids they would not have otherwise filed or that any carrier in fact filed a particular bid as a result of instructions from the defendants. Moreover, the only two carrier representatives that spoke to whether they would have me-too'ed the Cartwright prime rate testified that they did not view the Cartwright prime as compensatory for their carriers, and that they would not in any event have me-too'ed the Cartwright prime rate because they could not perform profitably at that rate given the costs they knew they would incur. *See* Trial Tr. at 716:7-23 (testimony of Mario Rizzo); Bungert Dep. at 221:5-222:3 (testimony of Klaus Bungert, presented at trial through deposition, *see* Trial Tr. at 210:17); Trial Tr. at 756:22-757:2 (Mario Rizzo).[17] In short, the government failed to present sufficient evidence that would allow a reasonable jury to conclude that because of the defendants' conduct, any particular carrier filed a bid with respect to the Cartwright Channels higher than it otherwise would have.

In support of its position that there was "overwhelming evidence" to support the jury's finding of 4,351 false claims, the government claims that the jury could have inferred from general testimony pertaining to industry practice that the defendants' conspiracy caused carriers to file bids at rates higher than they otherwise would have filed. In that connection, the government presented testimony (not specifically directed to the Cartwright Channels) that carriers knew that "in ordinary circumstances" a carrier

---

[17] Although still falling short, the closest the government came to presenting the required evidence was through one carrier representative who testified that he "might have" bid at the Cartwright prime, had the defendants not refused to service his company if it did not me-too at the second low or higher. *See* Trial Tr. at 405:14-18 (testimony of Jack Kagan, of Great American Forwarders ("GAF")).

had to me-too the prime rate in order to assure itself of some business (or "tonnage") in a given cycle. *See* Gov't Opp'n Br. at 9 (citing to portions of the testimony). Based on this testimony, the government argues that the jury reasonably could draw the inference that all the carriers that bid at the second low in the me-too round would have me-too'ed the Cartwright prime "absent the fraudulent [conduct] of [defendants]" and thus "all claims for payment at the second low level were false by virtue of the Defendants' fraudulent conspiracy." *Id.* at 10.

The Court concludes based on the evidence, or lack of evidence, that this testimony concerning "ordinary" industry practice, even when viewed in the light most favorable to the government, did not permit the jury to draw the inferences necessary to carry the government's burden with respect to causation. First, the evidence was undisputed that a carrier had an obligation under the applicable regulations to file only rates that were "compensatory," that is, rates that allowed a carrier to cover its costs and collect a reasonable profit. *See* Trial Tr. at 119:7-23 (testimony of D. Martinez). The government's position fails to account for that obligation and what carriers would have in fact done in response to the prime rate set for the Cartwright Channels, particularly because there was no evidence any carrier other than Cartwright viewed the Cartwright prime rate as compensatory. In fact, the government's position ignores a fundamental aspect of the causation analysis: whether any carrier would have wanted business at the prime rate set by Cartwright for the Cartwright Channels. On that question, and as mentioned above, the carriers that did speak to the Cartwright prime rate testified that they considered it non-compensatory and would not have me-too'ed that prime rate even in the absence of the defendants' conduct. *See* Trial Tr. at 738:25-739:1 (Rizzo

25

testimony); Bungert Tr. at 221:5-222:3.

Second, there was no evidence that any carrier was prepared to me-too a non-compensatory rate with respect to the Cartwright Channels out of economic or legal necessity, the regulatory obligation to file a compensatory rate and the non-compensatory nature of the Cartwright rate notwithstanding. None of the carriers that filed bids during the me-too round for the Cartwright Channels had any legal obligation to do so. And there was no evidence that even suggested an economic necessity on the part of any carrier to obtain business with respect to the Cartwright Channels, particularly if it would have been unprofitable: there were over ninety other channels within the IS-02 rate cycle for which the carriers could submit bids, and the carriers in fact did bid on these other channels.

Third, and just as significant, the jury heard uncontradicted evidence from three carriers that in every cycle, carriers secured business through bids above the prime rate, including bids above the second low, at the so-called "me-three" rate. *See* Labbus Tr. Testimony at 106:7-15 ("There are always some shipments moving on higher rates, they call it Me-3."); Coleman Tr. Testimony at 248:24-249:7; Hahn Tr. Testimony at 257:6-15 ("[T]here definitely was shipments moved during [the 1999 to 2002] cycles at . . . the me-three or higher levels.") (all cited in Defs. Mot. at 6).[18]

For the above reasons, the Court also rejects the government's position that the jury could have inferred that carriers would have me-too'ed the Cartwright prime rate absent defendants' unlawful conduct, based on evidence that large numbers of carriers did me-too the prime rate in the non-Cartwright channels in the 2002 rate cycle. The

---

[18] *See, e.g.*, Ex. 191 at 2 (projecting that for US24, one of the Cartwright Channels, only 50 percent of the tonnage would move at the prime rate).

Cartwright Channels were targeted by the German agents precisely because the

Cartwright prime rate was viewed by them as non-compensatory to the carriers, unlike

the prime rates filed in the non-Cartwright Channels during the IS02 rate cycle; and there

was no evidence that would have allowed the jury to infer from the conduct of the

carriers as to the non-Cartwright channels what the carriers would have done as to the

Cartwright Channels in the absence of the defendants' conduct.

In essence, the government's position conflates liability and causation; and in the

end, the government did no more than present evidence of the defendants' conspiratorial

agreement to bid-rig without demonstrating any causation beyond Cartwright's

cancellation of its prime rate.[19]  That evidence, however, does not support the broader,

necessary inference that defendants' conduct caused other carriers, not proven to be part

of the alleged conspiracy, to file rates higher than the prime rate they otherwise would

have me-too'ed.  Given this uncontroverted testimony, and the absence of any testimony

that any particular carrier in fact filed a rate higher than it otherwise would have absent

the defendants' conduct, the jury could not reasonably infer from the fact of the

defendants' conspiracy that the conspiracy caused carriers to file rates higher than they

would have otherwise filed.

The government argues that by having established liability and damages under

the FCA in the amount of $865,000, the defendants cannot now claim that no false claims

were actually submitted to the United States.  But as the Court already explained in

connection with its order granting the government's motion for partial summary

---

[19] In its closing argument, the government essentially argued that the defendants'
established liability as to the Cartwright Channels was sufficient for the jury to find that
all the claims it found to be false were false claims that the defendants caused to be
submitted. *See* Trial Tr. at 1672:19-1677:23; 1677:6-16.

judgment as to damages, the fact that the government was damaged does not establish the number of false claims that were presented to cause those damages; and the government's position – just as its case at trial – ignores completely its own burden to show both (1) how many claims filed and paid were false (which required a showing that bids were filed at rates higher than they otherwise would have been because of fraudulent conduct), and (2) how many of those false claims incorporated bids that were inflated as a result of defendants' conduct.  The government failed to carry its evidentiary burden as to both issues.

Based on all the evidence presented, when viewed most favorably to the government, there was insufficient evidence from which a jury could determine without speculating either the number of false claims filed with respect to the Cartwright Channels or the number of false claims that the defendants caused to be presented with respect to the Cartwright Channels.[20]  The Court does agree, however, that its finding of liability and damages for conspiracy under the FCA establishes that the defendants caused to be presented at least one false claim and will assess a civil penalty for one false claim, the amount to be determined following the Court's hearing on civil penalties scheduled on October 26, 2011.

---

[20] Based on the Court's rulings, there is no need for the Court to determine the appropriate number of civil penalties to be assessed based on the holding of *United States v. Bornstein*, 423 U.S. 303, 312-13 (1976) (holding that where the number of claims submitted by a prime contractor is a "fortuity," the number of false claims to be assessed against a defendant who does not actually submit a claim is to be determined by the number of causative acts in which the defendant engaged).  Finally, there is no need to consider whether the government was precluded from claiming more than 577 false claims by virtue of its representations made in connection with its motion for summary judgment.

**B.     Conditional Ruling on Defendants' Motion for New Trial as to the Cartwright Channels**

Having granted defendants' renewed motion for judgment as a matter of law, the

Court must also conditionally rule on defendants' alternative motion for a new trial by

determining whether a new trial should be granted if the judgment is latter vacated or

reversed, stating as well the grounds for conditionally granting or denying the motion for

a new trial. Fed. R. Civ. P. 50(c)(1). Based on the evidence at trial, the Court concludes

that should this Court's judgment under Rule 50(b) be vacated or reversed, a new trial

should be granted as to the United States' claims pertaining to the Cartwright Channels.

Even if legally sufficient, the jury's determination that it could determine the

number of false claims that the defendants caused to be filed with respect to the

Cartwright Channels without speculating was against the clear weight of the evidence.

Neither Exhibit 169 nor 173 allowed the jury to engage in any real analysis or evaluation;

and the foundation testimony for those exhibits was in material respects unclear,

confusing and at times ostensibly inconsistent.[21] Even if Exhibits 169 and 173 contained

all the information theoretically necessary to permit a calculation of the number of claims

---

[21] For example, the foundation testimony offered by the government for the admission of Exhibit 169 was, on the one hand, that only one GBL was issued for each move, and that with one exception, no GBL numbers were listed more than once in Exhibit 169, such that the total number of paid moves equaled the total number of paid GBLs listed in Exhibit 169. There was other testimony, however, that there was no way to know whether a GBL listed in Exhibit 169 contained pricing based on a bid that was alleged to be fraudulently inflated or whether it related to accessorial or other charges for services provided during a move whose pricing had nothing to do with any allegedly fraudulent scheme. That testimony also appears to accept that different services provided during the same move could be listed in separately listed GBLs in Exhibit 169, but in any event all services provided during the same move would be listed with the same GBL number, ostensibly raising the possibility that the same GBL number could appear multiple times in Exhibit 169. *See* Trial Tr. at 637:6-9; 644:18-24; 647:5-12; 647:22-648:11; 662:25-665:3; 667:8-670:11; 676:23-677:23; 679:15-680:16 (Haynie testimony).

that were filed at the second low during the me-too round with respect to the Cartwright

Channels, that evidence, as a practical matter, was so voluminous, over-inclusive, indirect

and circumstantial that in the event the jury thought there were false claims, the jury was

necessarily forced to speculate to an undesirable degree and simply to accept the

government's conclusory tabulation of "paid moves" in Exhibit 173 as the number of

fraudulent vouchers that constituted the false claims that the defendants caused to be

submitted as to the Cartwright Channels, all without the benefit of even one voucher that

actually constituted a false claim.  The Court's concern over this practical inability of the

jury to engage in any independent analysis of the evidence pertaining to the number of

false claims is underscored by the government's decision to claim, through the summary

and indirect methods of proof it utilized, nearly eight times as many false claims as the

government had claimed before trial.  Overall, these clearly tactical decisions, even if not

precluded under Rule 1006, and the government's representations in pre-trial

proceedings, so affected the overall fairness of the trial process that the interests of justice

would not be served by permitting the judgment produced through that process to stand.

**C.      The Sufficiency of the Evidence with Respect to the DPM Claims**

The defendants were required to sign and file a Certificate of Independent Price

Determination ("CIPD") in connection with their successful bid on the DPM contract.

The defendants' liability on the Relator's DPM claim depended entirely on whether

defendants' CIPD was false.  The Court concludes that the evidence was sufficient for a

reasonable jury to find that it was false.

In their Rule 50 motion with respect to the DPM claim, defendants argue that the

verdict should be set aside for two reasons: (1) "Plaintiffs failed to produce sufficient

evidence to prove Defendants intended to restrict competition on the DPM contract to sustain the verdict"; and (2) "the jury was mischarged on all key knowledge issues and was not charged on antitrust issues that were relevant to 'restricting competition.'" *See* Defs.' Mot. at 1 (Doc. No. 1077). The Court rejects both grounds of defendants' argument.

In support of their first contention – that the evidence was insufficient for a jury to find that the defendants had filed a false CIPD because there was no evidence that they acted for the purpose of restricting competition – defendants argue that the evidence did not establish that the defendants had reached a price-fixing agreement with other bidders as to the prime contract bids that each would file with the government on the DPM contract. The defendants then contend that the evidence established only that the pricing and other agreements they did reach collectively with other bidders on the DPM contract were for their services as subcontractors to the successful prime contractor bidder, but not with respect to their bids as prime contractors. In this connection, the defendants claim that they did nothing other than what was expected of them under the terms of the DPM contract solicitation, which contemplated that the successful bidder would need to subcontract portions of the DPM contract, and in fact, required a prime contract bidder to identify the specific subcontractors that the bidder had lined up for that purpose. The Court has reviewed the evidence, including the terms of the DPM solicitation, and concludes that the evidence was sufficient for a jury to find that the defendants' CIPD was false, even if the evidence of price-fixing related solely to subcontract pricing and not prime contract pricing. The issue at the heart of defendants' challenge – whether defendants possessed the requisite intent – is a classic jury issue; and the jury could have

31

reasonably inferred such an intent to restrict competition from the existence of defendants' subcontract price fixing agreement itself. Accordingly, the Court rejects defendants' challenge to the jury's verdict on this ground.

The Court also rejects defendants' argument that the verdict should be set aside because the jury was "not charged on antitrust issues that were relevant to 'restricting competition.'" Defs.' Mot. at 1. Subsection (a)(1) of the CIPD submitted with the DPM contract requires the submitting party to certify that "[t]he prices in this offer have been arrived at independently, without, <u>for the purposes of restricting competition</u>, any consultation, communication, or agreement with any other offeror or competitor . . . ." *See* Re. Ex. 181 (emphasis added). The CIPD does not itself define "competition" or "restriction of competition."

Defendants' liability on the DPM contract claim was not based on anti-competitive conduct that would establish liability under the antitrust laws; and there is no reason that defendants' certified compliance with a straightforward obligation under the CIPD should have been infused with the complex concepts applicable to antitrust liability. Rather, the CIPD was phrased in terms of commonly used and commonly understood words. When such terms are undefined in a contract-forming document such as the CIPD, the words are given their ordinary and customary meaning. "Competition" and "restricting competition" are commonly used and understood words for which the jury was capable of using its commonsense to supply a meaning. Moreover, as defendants concede, neither party asked the Court to define "competition" for the jury separate from the antitrust concepts they proposed. For the above reasons, the Court rejects defendants' challenge to the jury's verdict on this ground and denies defendants'

Rule 50 motion with respect to the DPM claim.

As to the number of false claims that defendants presented in connection with the DPM contract, the Court concludes as a matter of law that each invoice filed with the government with respect to that contract was a false claim. The parties stipulated that the defendants filed 9,136 invoices. *See* Re. Ex. 296. The Court therefore concludes that defendants presented 9,136 false claims under the DPM contract. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("In order for a false statement to be actionable under the False Claims Act it must constitute a 'false or fraudulent claim.' '[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'") (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) (alteration in original).

**D.    The Defendants' Motion for a New Trial as to the DPM Claim.**

For essentially the same reasons that the Court finds that the evidence was sufficient for the jury to reach its verdict as to the DPM claim, the Court denies defendants' motion for a new trial as to the DPM claim. Simply put, given the admitted price-fixing among the potential subcontractors and the incorporation of that fixed subcontractor pricing into the Gosselin defendants' DPM contract bid, the jury's verdict was not "against the clear weight of the evidence" and the Court finds no other grounds that would justify a new trial as to the DPM claim. The Court will therefore enter judgment against the Gosselin defendants for liability as to the DPM claim and will determine the civil penalties associated with that liability following the evidentiary hearing scheduled on October 26, 2011. At that hearing, all parties will be permitted to present relevant evidence pertaining to the appropriate civil penalty to be assessed for

each false claim and also the constitutional limits on such penalties under the Excessive

Fines Clause of the Eighth Amendment, including, without limitation, evidence

pertaining to any damage or injury suffered by the government as well as the benefits

received by the government and the Gosselin defendants under the DPM contract.

## E.      Damages and Set-offs

The FCA authorizes treble damages. *See* 31 U.S.C. § 3729(a). Since the total

loss incurred by the government in the Cartwright Channels has been established at

$865,000, the Gosselin defendants are liable jointly and severally for treble damages in

the amount of $2,595,000. The United States concedes that this trebled damages amount

should be reduced by the restitution payments that Gosselin has already made, which

total $865,000. The United States also concedes that the trebled damages amount should

be reduced by a portion of the $14,654,040.85 that the government has collected under

settlement agreements with all alleged coconspirators other than the Gosselin defendants.

It is generally agreed that when a plaintiff settles with one of several joint

tortfeasors, the non-settling defendants are entitled to a credit for that settlement. *See,*

*e.g.*, *Chisholm v. UHP Products, Inc.*, 205 F.3d 731, 735 (4th Cir. 2000) (adopting "the

premise that 'when a plaintiff settles with one of several joint tortfeasors, the non-settling

defendants are entitled to a credit for that settlement.'") (quoting *McDermott, Inc. v.*

*AmClyde*, 511 U.S. 202, 208 (1994). Within the context of this case, the United States

agrees that "when a plaintiff receives a settlement from one defendant, a nonsettling

defendant is entitled to a credit of the settlement amount against any judgment obtained

by the plaintiff against the nonsettling defendant as long as both the settlement and

judgment represent common damages." *Singer v. Olympia Brewing Co.*, 878 F.2d 596,

34

600 (2d Cir. 1989). The United States contends, however, that only a small percentage of the settlement amounts it has collected constituted "common damages" that should be credited against the trebled damages, even though the settlements were obtained from joint tortfeasors with respect to claims identical to those asserted against the Gosselin defendants. This is so, the government contends, because the settling defendants settled all the claims asserted against them whereas the Gosselin defendants proceeded to trial on all of those same claims and the government recovered only as to portion of those claims, specifically the claims that related to the Cartwright Channels. For this reason, in the government's view, the only "common damages" to be set-off against the trebled damages is that portion of the settlement amount that the settling defendants paid in settlement of the government's claims based on the Cartwright Channels. Since the settlements did not allocate or apportion the settlement amounts to any particular claims settled, "the Court must determine the relevant percentage [of the total settlement amounts collected] to be setoff against the judgment [for trebled damages]." Gov't Reply at 19. Based on the testimony of the government's damages expert (whose testimony the Court struck at trial), the government contends that its $865,000 recovery against the Gosselin defendants, before trebling, represents approximately 2% of the value of the claims that the government settled, and therefore only 2% of the settlement amounts should be offset against the trebled damages.[22]

In reviewing this issue, the Court starts with a number of undisputed propositions. First, the government has alleged a single, overarching conspiracy against the Gosselin

---

[22] The government also proposes an additional reduction of approximately $255,000 on the grounds "that the United States settled with defendant Cartwright in connection with the Cartwright cancellation scheme for $255,049.04. That amount thus is common damages with the judgment here." Gov't Mot. at 17.

defendants and the settling defendants.  Second, the settling defendants are alleged to be co-conspirators with the Gosselin defendants with respect to that single overarching conspiracy and therefore were jointly and severally liable with the Gosselin defendants for any liability resulting from that conspiracy.  Third, based on their alleged joint and several liability, the settling defendants and the Gosselin defendants are considered joint tortfeasors.  *See* Hrg. Tr. at 75:3-20; 77:25-78:4 (statement of counsel for government at motions hearing on September 23, 2011 conceding that the settling defendants and the Gosselin defendants are joint tortfeasors) (Doc. No. 1101).  Fourth, before entering into the settlements with the settling defendants, the government had asserted against the settling defendants the same claims and causes of action as were asserted against the Gosselin defendants.  For that reason, the government tried against the Gosselin defendants precisely the same claims it would have tried against the settling defendants had the settlements not been reached.

Here, the settling defendants shared joint and several liability with the Gosselin defendants as to all the claims the government settled and all claims the government tried against the Gosslin defendants.  The amounts the government obtained from the settling defendants through settlements and the judgment the government obtained at trial with respect to those same settled claims were "common damages."  The Gosselin defendants are therefore entitled to a credit against their liability for the amount the government has already collected with respect to those common claims and "common damages."  After that credit, the Government has fully recovered with respect to the Gosselin defendants' liability for compensatory damages and is not entitled to the entry of any judgment

36

against them.[23]

The government relies heavily on two cases, *Miller v. Holzmann*, 563 F. Supp. 2d

54 (D.D.C. 2008), and *Grant Thornton, LLP v. FDIC*, Nos. 10-1306 & 10-1379, 2011

WL 2420264 (4th Cir. June 17, 2011). Neither supports its position. In *Miller*, the Court

recognized that where the settling and non-settling defendants shared joint and several

liability as to all the same claims, "the settlement payments and the judgment represented

'common damages'" and for that reason "a simple, *pro tanto* credit against their overall

liability would have been appropriate." *Miller*, 563 F. Supp. 2d at 144. Only where the

asserted claims differ as between settling and non-settling defendants, as they did in that

case as between certain co-defendants, does an allocation of the settlement amounts to

common claims need to be calculated before a credit based on common damages can be

applied against a non-settling defendant's liability. In *Grant Thornton*, 2011 WL

2420264, at *12-13, the Fourth Circuit upheld the district court's determination that only

---

[23] The government appears to agree that the *pro tanto* credit is appropriate with respect to
"common damages," under which the amounts already collected are applied dollar for
dollar and the non-settling party is responsible for any amount of damages not already
paid by another source. A second common approach is the "proportionate share" or "*pro
rata*" approach, under which the non-settling defendant is only liable for his proportion of
the total damages award. Thus, to calculate the liability of any one non-settling
defendant under the *pro rata* approach, the liability of the non-settling defendant is
reduced by the ratio of settling defendants to the total number of defendants so that if
there were ten defendants and nine settled, the liability found against the one non-settling
defendant would be reduced by nine-tenths. In this case, the Gosselin defendants have
already paid $865,000 in criminal restitution payments, an amount equal to one-third of
the total damages. As the number of settling and non-settling defendants far exceeds
three, under the *pro rata* method, the Gosselin defendants would have already paid more
than their share of the damages for which they are responsible. Additionally, as the
payments by the settling defendants far exceeded the trebled damages amount against the
Gosselin defendants, under the *pro tanto* method, the government would not be entitled
to recover any additional amount from the Gosselin defendants. Therefore, the
government is not entitled under either method to recover further against the Gosselin
defendants based on their liability as determined at trial.

a portion of a settlement with a codefendant should be setoff because the settled claims against the settling defendant were different in scope than those proved against the non-settling defendant and for that reason, the damages were divisible and the setoff credit was equal to only the percentage of the settlement amount that equated with the percentage of the damages for which the non-settling defendant was jointly liable. *See Grant Thornton, LLP v. FDIC*, 694 F. Supp. 2d 506, 532 (S.D.W.Va. 2010), *aff'd in relevant part by Grant Thornton*, 2011 WL 2420264, at *12-13.[24] Here, the settling defendants and the Gosselin defendants were alleged to be jointly liable for all the same claims.

## CONCLUSION

For the above reasons, the Court (1) grants defendants' motion pursuant to Fed. R. Civ. P. 50(b), and conditionally grants a new trial pursuant to Fed. R. Civ. P. 50(c)(1), as to the Cartwright Channels in the IS-02 rate cycle; (2) denies the defendants' motion pursuant to Fed. R. Civ. P 50(b) and for a new trial as to the DPM claims; (3) grants the government's motion for damages in the amount of $2,595,000 as to the Cartwright Channels, but reduces that amount to zero after crediting against that amount the amounts already collected by the United States through restitution and settlement payments, and

---

[24] The government has also asked for prejudgment interest. The Court concludes that prejudgment interest is not appropriate because the trebled damages are intended to fully compensate the government. *See, e.g., Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975); *United States v. McLeod*, 721 F.2d 282, 286 (9th Cir. 1983); *United States v. Foster Wheeler Corp.*, 447 F.2d 100, 102 (2d Cir. 1971); *United States v. Uzzell*, 648 F. Supp. 1362, 1368 n.6 (D.D.C. 1986); *accord United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943) (holding "the device of double damages [under the pre-1986 FCA] plus a specific sum was chosen to make sure that the government would be made completely whole"). Moreover, and in any event, any assessment of prejudgment interest would not result in any residual amount owed to the government by the Gosselin defendants after setoffs.

also awards a civil penalty for one false claim in an amount to be determined; and (4)

grants the Relators' motion pursuant to Fed. R. Civ. P. 50(c) as to liability on the DPM

claim; and otherwise denies that motion without prejudice to the assessment of penalties,

attorney's fees, and a share of the recovery to Relator Bunk following the evidentiary

hearing scheduled on October 26, 2011.

The Clerk is directed to forward copies of this Memorandum Opinion to all

counsel of record.

                                                    _____/s/_____
                                                    Anthony J. Trenga
                                                    United States District Judge

Alexandria, Virginia
October 19, 2011