IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. Kurt Bunk and Daniel Heuser, | ) ) ) | |
| Plaintiffs/Relators, | ) ) | |
| v. | ) ) | No. 1:02cv1168 (AJT/TRJ) |
| BIRKART GLOBISTICS GmbH & CO., et al., | ) ) ) | |
| Defendants. | ) ) | |
| UNITED STATES OF AMERICA ex rel. Ray Ammons, | ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| v. | ) ) | No. 1:07cv1198 (AJT/TRJ) |
| THE PASHA GROUP, et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

These consolidated actions present claims asserted under the False Claims Act,

31 U.S.C. § 3729(a)(1)-(3) (2000) ("FCA").  Beginning on July 18, 2011, this case was

tried before a jury, which on August 4, 2011, returned a verdict against the Gosselin

Defendants[1] and in favor of the United States with respect to what has been referred to in

this litigation as the "DPM claim," filed and pursued by Relator Bunk, without the

---

[1] Defendants Gosselin Worldwide Moving N.V. ("Gosselin"), its successor Gosselin
Group N.V., and Marc Smet are collectively referred to as the "Gosselin Defendants" or
"Defendants."

1

intervention of the United States.[2]  Presently pending before the Court is the Plaintiffs'

post-trial motion for an award of civil penalties under the False Claims Act with respect

to the DPM claim.  For the reasons stated herein, the Court concludes that the mandatory

civil penalty of at least $50,248,000 constitutes an unconstitutionally excessive fine in

violation of the Eighth Amendment and, having made that determination, further

concludes that it does not have the discretion to fashion some other civil penalty that

would be within constitutional limits; and therefore no civil penalty will be imposed.

## BACKGROUND

The nature and procedural history of this case are set forth in the Court's previous

orders and memorandum opinions.[3]  Briefly stated for the purposes of the pending

motions, these consolidated actions were originally filed in 2002 by Relator Kurt Bunk

and Relator Ray Ammons (collectively "Relators"),[4] and remained under seal for several

years while the United States pursued and resolved its criminal charges against the

Gosselin Defendants, *see* Case No. 1:03-cr-551 (E.D. Va.), and evaluated whether to

---

[2] The jury also found in favor of the Gosselin Defendants as to the "Covan Channels" and against the Gosselin Defendants as to the number of false claims that the Gosselin Defendants caused to be presented with respect to the "Cartwright Channels."  In post-trial proceedings, by memorandum opinion and order dated October 19, 2011 (Doc. Nos. 1104 and 1105), the Court concluded that the evidence was insufficient to sustain the jury's funding as to the number of false claims with respect to the Cartwright Channels, vacated and set aside the jury's verdict in that regard, and awarded one civil penalty with respect to the Cartwright claim in an amount to be determined.  In addition, the Court concluded that the amount of treble damages otherwise assessable against the Gosselin Defendants based on the Cartwright Channels, $2,595,000, was completely offset by the restitution and settlement payments that the government had already received.

[3] *See*, in particular, this Court's Memorandum Opinion dated August 26, 2011 (Doc. No. 1072) and Memorandum Opinion dated October 19, 2011 (Doc. No. 1104), and related orders.

[4] Relator Heuser voluntarily withdrew from this case by consent of all parties.  *See* Order dated June 6, 2011 (Doc. No. 895).

intervene in these actions.  On July 18, 2008, the United States intervened as to all claims

relating to the International Through Government Bill of Lading ("ITGBL") program (the

"ITGBL claims"), but not as to any claims relating to the contract awarded to Gosselin in

2001 (the "2001 DPM contract") under the Direct Procurement Method ("DPM")

program (the "DPM claims").  All ITGBL claims against the Defendants have been

resolved; and with respect to the DPM claim, the only remaining issue to be decided is

the amount of civil penalties to be assessed against the Gosselin Defendants.

In late summer and early fall of 2000, the Department of Defense Contracting

Office in Grafenwoehr, Germany, also known as the CCPSO, announced that it would be

soliciting bids under the DPM program for the transportation of military household goods

owned by U.S. military personnel and their families between U.S. military installations

in, to, and from Germany, Italy, Belgium, The Netherlands, and Luxemburg.  Under this

contemplated procurement, the government would contract directly with local agents in

those countries, rather than indirectly through United States freight forwarders, as under

the ITGBL program; and unlike in other DPM procurements, for the 2001 procurement,

only one company would be selected for all the included countries, rather than, as in prior

years, several regional providers.  Bidders were therefore required to demonstrate the

ability to service all of the countries covered by the contemplated DPM contract; and if

arrangements with subcontractors or joint venture partners were necessary for that

purpose, to identify those arrangements in its bid.

On February 15, 2001, before bids were due, the government held an information

session at the United States military installation in Grafenwoehr for all prospective

bidders, at which the government detailed the 2001 DPM contract requirements.

3

Immediately following that presentation, representatives of Gosselin, ITO, Birkart, Viktoria, and others met in the cafeteria at Grafenwoehr to discuss the DPM contract. At this meeting, three companies – Gosselin, ITO and Viktoria – discussed and agreed among themselves as to the prices each would charge and the territories they would service as subcontractors to the winning bidder, regardless of who actually was awarded the 2001 DPM contract.

The agreed upon subcontractor prices were confirmed in a later memorandum from ITO to Gosselin regarding "the rates that were agreed by the participants in the February meeting for the services to be rendered under the DPM contract." Further, ITO wrote that "[w]e find this very important as we go ahead and stabilize this business. We talk a lot about TRUST and we feel it is outmost [*sic*] important that we all work together in a good system, as we will trust you that things will happen just as they are being said." Shortly thereafter, by email dated February 20, 2001, Gosselin confirmed with ITO, Birkart, Viktoria, and Andreas Christ – other bidders on the 2001 DPM contract – the rates to be paid agents or subcontractors for certain services under the 2001 DPM contract. In that same email, Gosselin also listed trucking rates and disclosed that "a 5 [percent] rate increase per year is buil[t] into these rates." Gosselin further instructed the other bidders to list certain agents as servicing agents for each country.

By solicitation dated February 28, 2001 (Solicitation DAJA 16-01-R-0003), the CCPSO formally solicited bids for the 2001 DPM contract. Although discussions with a bidder's prospective subcontractors were implicitly contemplated, nothing in the solicitation indicates that the competing bidders were permitted, prior to submitting bids, to confer and collusively agree among themselves on what would be charged for

4

servicing as a subcontractor under the 2001 DPM contract or to agree to share the contract and divide territories.

On February 28, 2001, Gosselin submitted its bid on the 2001 DPM contract. Included within that bid was a Certificate of Independent Pricing ("CIPD"), which affirmed that "[t]he prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods of factors used to calculate the prices offered[.]" *See* Defs.' Ex. 335 at 254. On April 11, 2001, the United States awarded to Defendant Gosselin the 2001 DPM contract, DAJA-0016-01-0018, and Gosselin's services under that contract commenced on or around May 1, 2001.

In this action, Relator Bunk (who was employed by Birkart) alleged that the Gosselin Defendants violated the FCA by filing a false CIPD in connection with their bid for the 2001 DPM contract, under which Defendants certified that the prices in their offer had been arrived at "independently," when in fact, they and other potential bidders had entered into a subcontract price-fixing agreement and territory allocations. For 11 days beginning on July 18, 2011, this case was tried before a jury which, on August 4, 2011, returned a verdict in favor of the Relators as to the DPM claim.

Although Relators alleged damages in their original and amended complaints, *see, e.g.,* Doc. No. 448, the Relators did not seek damages at trial.[5] Relators also presented no

---

[5] As explained in Relators' Trial Brief on DPM Claims, "Relator Bunk is not seeking actual damages on his DPM claim, in that he could not procure from the government evidence necessary to support a damages analysis and [expert] opinion . . . . Rather, Relator Bunk seeks only a civil penalty of $5,000 to $10,000 for each false claim submitted . . . ." *See* Doc. No. 951 at 20-21.

evidence at trial relating to the number of false claims arising out of the 2001 DPM contract; and the jury considered only the Defendants' liability with respect to the DPM claim, not the number of false claims that Defendants submitted under the 2001 DPM contract. In order to establish the number of false claims under the 2001 DPM contract, the Relators have relied entirely on the parties' stipulation that Defendants filed 9,136 invoices under the 2001 DPM contract. As discussed above, the jury returned a verdict against the Defendants on liability under the FCA based on the 2001 DPM contract.

Following the trial, the Defendants challenged the sufficiency of the evidence as to the jury's finding of liability on the DPM claim. *See* Defs.' Renewed Mot. for J. as a Matter of Law and Alternative Mot. for Partial New Trial (Doc. No. 1075). Based on the jury's finding of liability, the Plaintiffs sought to have a civil penalty of between $5,500 and $11,000 assessed as to each of those 9,136 invoices that the parties stipulated had been filed under the DPM contract. *See* United States and Relators' Mot. for J. Against Gosselin Defendants for Damages and Civil Penalties (Doc. No. 1076); Relators' Mot. Regarding Further Proceedings (Doc. No. 1073). By Memorandum Opinion and Order dated October 19, 2011, the Court concluded that the evidence was sufficient to sustain the jury's verdict as to Defendants' liability on the DPM claim and that as a matter of law, each of the 9,136 invoices constituted a false claim. *See* Doc. Nos. 1104 and 1105. In order to determine the amount of civil penalties to be assessed with respect to the 2001 DPM contract, the Court held an evidentiary hearing on October 26, 2011.[6]

---

[6] Following the Court's Order dated October 19, 2011 (awarding one civil penalty with respect to Defendants' liability based on the Cartwright Channels), the United States did not to present any evidence as to the appropriate amount of that civil penalty and proposed that the Court assess the minimum amount of $5,500 for that one civil penalty. *See* Oct. 26, 2011 Hrg. Tr. at 6:19-21.

Central to the imposition of civil penalties based on the DPM claim is whether the minimum mandated civil penalty is unconstitutionally excessive under the Eighth Amendment; and if so what, if any, alternative civil penalty should be awarded. The Court ordered the parties to file supplemental memoranda concerning those issues, including specifically the Court's authority to impose a penalty other than that mandated under the statute in the event it found that penalty unconstitutionally excessive.[7] The Court has now received and considered the parties' supplemental memoranda and responses thereto, and finds that additional hearings in this matter would not further aid the Court.[8]

## STANDARD OF REVIEW

The standard for evaluating challenges under the Eighth Amendment's Excessive Fines Clause was announced by the Supreme Court in *United States v. Bajakajian*, 524

---

[7] *See* Order dated October 31, 2011 (Doc. No. 1114). Among other issues, the Order required the parties to address (1) the accuracy or inaccuracy of the data and the analysis submitted by the parties with respect to the harm suffered by the United States as a result of the Defendants' subcontract pricing conspiracy; (2) whether the amount of civil penalties calculated at $5,500 on 9,136 false claims ($50,248,000) is within or beyond constitutional limits under the Excessive Fines Clause of the Eighth Amendment; (3) what methodology should the Court use in determining whether the civil penalties required to be imposed under the FCA were "grossly disproportional" to the "harm" suffered by the United States; and (4) should the Court determine that the assessment of a civil penalty calculated at $5,500 on 9,136 false claims is unconstitutional, whether the Court should impose a civil penalty that would be within constitutional limits and if so, how should the Court determine what that civil penalty would be, and what is the legal authority for the Court to engage in that exercise.

[8] In addition to the memoranda directed by the Court to be filed, the United States also filed (1) the United States' Motion to Strike Certain Testimony of Stephen Marshall (Doc. No. 1121), and (2) the United States and Relators' Motion for Leave to File Reply to Defendants' Response to United States and Relators' Memorandum Of Law in Support of Award of Civil Penalties (Doc. No. 1124), which the Defendants have opposed. By Order dated February 13, 2012 (Doc. No. 1130), the Court has denied the United States' Motion to Strike (Doc. No. 1121) and granted the United States and Relators' Motion for Leave to File Reply (Doc. No. 1124).

U.S. 321, 334 (1998): "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000), the Supreme Court made clear that damages imposed under the FCA are "essentially punitive in nature." *See also id.* at 786 (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."); *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) ("We conclude the civil sanctions provided by the False Claims Act are subject to analysis under the Excessive Fines Clause because the sanctions represent a payment to the government, at least in part, as punishment. Inquiry must be made, therefore, to determine whether the payment required by the district court is so grossly disproportionate to the gravity of [defendant's] violation as to violate the Eighth Amendment."). "In an Excessive Fines Clause inquiry, the burden rests on the defendant." *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 744 (N.D. Ill. 2007) (citing *Bajakajian*, 524 U.S. at 348 (Kennedy, J. dissenting)).

Courts have recognized a variety of factors to consider when evaluating whether a fine is excessive under the Eighth Amendment. Among those generally recognized are (1) the extent of the harm caused; (2) the gravity of the offense relative to the fine; (3) whether the violation was related to other illegal activity, and the nature and extent of that activity; and (4) the availability of other penalties and the maximum penalties which could have been imposed. *See, e.g., United States v. 3814 NW Thurman St., Portland, Or.*, 164 F.3d 1191, 1197-98 (9th Cir. 1999) (citing *Bajakajian*, 524 U.S. at 336-39).

## ANALYSIS

**A.     Whether application of the FCA to the DPM claim results in an unconstitutional penalty.**

The FCA provides that a person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990." 31 U.S.C. § 3729 (citing 28 U.S.C. § 2461 note, Public Law 101-410). The applicable civil penalty, as adjusted, with respect to Defendants' liability based on the 2001 DPM contract, is no less than $5,500 and no more than $11,000.

As the False Claims Act has been interpreted in decisions binding on this Court, a civil penalty must be assessed for each false claim; and each claim for payment made under a fraudulently induced contract constitutes a separate false claim. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("In order for a false statement to be actionable under the False Claims Act it must constitute a 'false or fraudulent claim.' '[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' " (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) (alteration in original)); *id.* at 793-94 ("Each claim for payment under the contract was therefore submitted under a contract which was fraudulently approved. So, [the defendant] could face False Claims Act liability for each claim for payment under the [fraudulently approved contract]."). The parties stipulated at trial that the Defendants submitted 9,136 invoices under the 2001 DPM contract; and the Court has already determined that as a matter of law each of those invoices constitutes a false claim for the purposes of

9

assessing a civil penalty under the FCA. *See* Memorandum Opinion (Doc. No. 1104) at 33. The Court is therefore obligated to assess a civil penalty of no less than $5,500 and no more than $11,000 for each of 9,136 false claims, which amounts to no less than $50,248,000 and no more than $100,496,000. For this reason, the Court must determine whether an assessment in this case of civil penalties of at least approximately $50 million would exceed constitutional limits under the Eighth Amendment. In order to determine whether a civil penalty is "grossly disproportional to the gravity of a defendant's offense" for Eighth Amendment purposes, the Court must first determine the "harm" caused by Defendants' conduct. That analysis requires an assessment of both economic and non-economic harm. If the Court were to determine that the mandated civil penalty is grossly disproportional to that harm, resulting in an unconstitutional application of the False Claims Act, the Court must then consider whether it has the authority to proceed further and impose a lesser amount that would be within constitutional limits and if so, what is that amount, and how is it to be determined.

### 1. *Whether the government suffered any economic harm as a result of Defendants' conduct.*

The Court's task with respect to economic harm is particularly challenging in this case, raising unsettled procedural and substantive issues, since neither the government (which did not intervene with respect to the DPM claim) nor the Relators attempted to prove at trial any damages associated with the DPM claim; and there was in fact no evidence during the trial of any cognizable financial harm to the United States as a result of the 2001 DPM contract. Rather, the only attempt to quantify the harm caused by Defendants' conduct came at the post-trial evidentiary hearing held on October 26, 2011

for the purpose of determining the amount of civil penalties to be assessed.[9]  At that

hearing, Plaintiffs attempted to quantify the relevant harm, not based on any cognizable

theory of damages under the FCA, but rather, based on a comparison of Defendants'

pricing under the 2001 DPM contract with the pricing provided by a variety of

contractors, including Gosselin, under government contracts for comparable services in

prior years.

The government's solicitation for proposals with respect the 2001 DPM contract

required a bidder to list separate pricing for 51 separate tasks, each disclosed in a separate

line item. *See, e.g.*, Trial Tr. at 1687:13-19. The principal task that accounted for most

of the expense to be incurred by the government was the basic packing and loading of

household goods, listed as line item 1AA, and it was Defendants' pricing for this line

item that at trial was effectively the sole basis for the Relators' claim that Defendants

filed with their proposal a false CIPD.  In its proposal, which the United States accepted,

Gosselin submitted a bid for item 1AA services of €36 per hundredweight.  This bid was

in turn based on the unlawful agreement among certain bidders to charge €35 per

---

[9] The Defendants have objected to any attempt in post-trial proceedings to claim that the
Defendants' conduct caused the government to sustain quantifiable economic damage on
both substantive and procedural grounds, including that (1) the Plaintiffs' decision not to
claim damages at trial precluded them from claiming financial harm for the purposes of
assessing civil penalties; (2) that the legal measure of harm for the purposes of assessing
civil penalties is the same as the legal measure of damages under the FCA and that since
the Plaintiffs did not prove any legally cognizable damages, either at trial or at the post-
trial evidentiary hearing on civil penalties, they are precluded from claiming financial
harm for the purpose of justifying or determining the appropriate amount of civil
penalties; and (3) the Plaintiffs failed to disclose and substantiate their theory of harm for
the purposes of civil penalties during pre-trial discovery, including their failure to
identify expert witnesses that testified at the evidentiary hearing on civil penalties, and
were therefore precluded from presenting that evidence.  As substantial as these
objections are, given the Court's determination that the Plaintiffs failed to substantiate
any financial harm to the government as a result of Defendants' conduct with respect to
the 2001 DPM contract, the Court declines to rule on these objections.

hundredweight as a subcontractor for item 1AA services, regardless of who was awarded the contract.

Plaintiffs claim that Defendants' item 1AA pricing was inflated and the amount by which the government overpaid as a result of the subcontractor pricing conspiracy could be calculated by comparing the pricing under the 2001 DPM contract with what the government paid for comparable services in 1999 and 2000. Based on this approach, Plaintiffs claim that the Defendants' conduct caused the government to pay between approximately three and five million dollars more than it should have.[10] As discussed

---

[10] Plaintiffs' primary claim is that Defendants' conduct caused approximately $5 million of economic harm. In support of this amount, Plaintiffs claim that "a simple average of the prices for the same service [covered by the 1AA complete packing service] indicates that the prior price for the 1AA complete packing services was, on average, 32.4 Deutsche Marks ("DM") under the 1999 DPM Contracts[, which] is less than half of the price charged under the 2001 DPM Contract . . . ." *Id.* at 8. (The parties have assumed that for the time period of the 2001 DPM Contract, 1 DM was roughly equivalent to €0.50, and €1 was roughly equivalent to $1.) Plaintiffs then argue that because the total cost of the item 1AA complete packing service under the 2001 DPM Contract, as estimated by Gosselin, was €1.113 million for Germany in each of the three years that the contract was in effect, for a total of €3.3 million, the harm to the government as a result of Defendants' conduct is "50% of €3.3 million which equates to $2.455 million [and w]hen interest is included for the decade that the Gosselin Defendants have had the benefit of their ill gotten gains to the detriment of the United States, the damages double to $5 million." *See* Doc. No. 1086 at 7-8 (citing Re. Ex. 177 at 9, 26, 43).

Plaintiffs alternatively claimed that the harm can also be calculated by comparing "the cost of a 'standard' packing service of 10,000 pounds, with 10 percent consisting of oversize and overflow household goods with 10 crates." *See* United States and Relators' Mem. of Law in Supp. of Award of Civil Penalties, Doc. No. 1117 at 2 (citing Re. Ex. 300). Based on this approach, Plaintiffs claim that the average cost to the United States for this service under the 2001 DPM contract was 87% higher than under the six 1999 DPM contracts. *Id.* Plaintiffs therefore calculate that the United States paid €4 million for these services under the 2001 DPM contract, which, according to the 87 percent overcharge figure, "equates to an overcharge of €1.87 million," which Plaintiffs equate to an overcharge of "approximately $2 million," and Plaintiffs employ this rounded up $2 million figure in their subsequent calculations. *Id.* at 3. Plaintiffs then "[a]pply[] a 4 percent interest rate [to the overcharge amount, which] increases the principal debt by 50 percent over a ten-year period," *id.* at 3, resulting in damages to the United States of $3 million, "consisting of $2 million in overcharges and an additional $1 million for the

below, the Court concludes that the Plaintiffs have failed to establish, based on reliable information, that the Defendants' conduct, in fact, caused the government any economic harm.

First, there was no evidence that any bidder on the 2001 DPM contract would have offered or the government would have accepted a lower overall bid or even a lower price for line item 1AA. In fact, one of the three bids on the 2001 DPM contract that was rejected by the United States was submitted by a company that was not a party to the subcontract pricing conspiracy. In short, there was no evidence that the United States could have or would have obtained item 1AA services under the 2001 DPM contract for a lower cost, absent the subcontract pricing conspiracy. *See* Hrg. Tr. (Oct. 26, 2011) at 48:20-49:4 (Plaintiffs conceding that they had no evidence that absent the conspiracy, anyone would have bid a lower amount for item 1AA services under the 2001 DPM contract). But this is precisely the type of evidence needed to establish and calculate damages under the FCA: the amount the government paid over and above what the government would have paid if not for the fraudulent activity. *See, e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943) ("We think the chief purpose of the statutes here was to provide for *restitution to the government of money taken from it by fraud* . . . ."); *United States ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 884 (S.D. Ohio 1999) ("The *Marcus* Court used a 'but for' test in its analysis of FCA damages. In other words, a court should ask the question of, 'How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant?' "). For these reasons, the Plaintiffs' analysis for economic harm does not conform to any recognized

---

carrying cost incurred by the United States due to the lost use of the $2 million over a decade." *id.* at 3-4.

measure of economic harm or damages.

Second, the Court concludes, based on the evidence presented, that Gosselin's pricing for item 1AA services under the 2001 DPM contract was substantially the same as, and perhaps less than, its pricing for comparable services to the United States during 1999 and 2000, especially since certain costs had increased significantly by 2001, including the cost of fuel and labor, and the United States required Gosselin, as it did all bidders, to propose prices for the 2001 DPM contract that would remain in effect without escalation for three years (the 2001 DPM contract's first year as well as its two option years). *See, e.g.*, Defs.' Supp'l Mem. at 19.

Third, the contracts that the Plaintiffs rely on for their pricing comparisons were structured differently than the 2001 DPM contract and invited pricing strategies that make overall cost comparisons with the 2001 DPM contract difficult. For example, the 2001 DPM contract awarded to one company, Gosselin, services that in 1999 were split across six different contracts with six different companies (one of which was Gosselin), and the 2001 DPM contract consolidated in item 1AA services that in prior years were split into multiple line items, each priced separately, in some instances with large differences, such that the overall cost of providing in prior years what were included in item 1AA services in the 2001 DPM contract depended on a number of shipping and packing decisions that could and did dramatically affect the government's overall cost for those services.[11] For example, in the Birkart contracts for 1999, which the Plaintiffs used

---

[11] More specifically, under the 2001 DPM contract, a range of packing services were all covered by line item 1AA, for which Gosselin charged €36 (or approximately 72 DM) per hundredweight. However, in prior years, the packing services covered by this single line item were split into three different line items – basic or standard packing, packing that used "oversized" packing boxes, and packing that used "overflow" packing boxes –

in their calculation of "average pricing" and "comparable" pricing, Birkart charged either 1 DM or 10 DM per hundredweight for standard or basic packing services, while charging 425 DM and 625 DM per hundredweight respectively for "overflow" and "oversize" boxes. *See* Doc. 1086-3 at 30. Gosselin, on the other hand, charged 72 DM for basic packing services and 85 DM for oversized and overflow packing in one 1999 contract and in another contract, 40 DM for basic packing and 80 DM for oversized and overflow packing. Significant, however, is that whereas Gosselin and other packers used the costlier overflow and oversize packing services in 54% or fewer of their jobs, Birkart used the more expensive packing services in 89% of their jobs.[12] Indeed, based on this pricing scheme, and the incentives Birkart had to pack in a way that allowed it to bill at 425 DM to 625 DM per hundredweight rather than 1 DM or 10 DM per hundredweight, Birkart's overall cost to the government was much higher than Gosselin's under either Gosselin's 1999 DPM contracts or under the 2001 DPM contract itself. In fact, the Defendants introduced uncontradicted testimony that the government restructured the 2001 DPM contract in order to eliminate the abusive pricing and billing it perceived in rate structures such as those charged by Birkart. *See* Hrg. Tr. at 72-73, 80-81.

In summary, the Plaintiffs have argued that the cost for services under the 2001 DPM contract was higher than in prior years for comparable services, while the Defendants have argued the opposite. It does appear that while the cost for services that the government paid to Gosselin under the 2001 DPM contract was higher than it had

---

each priced separately, and the overall cost in those prior years for services depended on a company's packing decisions.

[12] In terms of each company's overall tonnage moved, Gosselin moved 5.41% of its tonnage at the more expensive rates under one 1999 contract and 10.13% under another, compared with Birkart, which under two 1999 contracts moved 16.85% and 19.97% of its total tonnage at the more expensive rates.

paid to certain packers in prior years, such as Viktoria, the cost was less than what it had

paid to others in prior years, such as Birkart, and about the same or less than what it had

paid to Gosselin in prior years. There is also strong evidence that, overall, the 2001 DPM

contract provided pricing more favorable to the government than in prior years; and that

the government benefitted substantially from eliminating the opportunity for packers,

such as Birkart, to offer extremely low, non-compensatory pricing for certain packing

services that were relatively infrequently charged, with any benefit to the government

from that pricing more than offset by utilizing a different packing method governed by a

much higher charge. In any event, the Court concludes that the evidence presented is

simply inadequate by any standard of proof to establish that the government paid more

for services under the 2001 DPM contract than it otherwise would have as a result of the

subcontract pricing conspiracy that formed the basis for Defendants' liability under the

FCA as to the 2001 DPM contract. On this basis, the Court concludes that the evidence

is insufficient to quantify in any meaningful way any economic harm sustained by the

government under the 2001 DPM contract.

### 2. Whether and to what extent the government has sustained non-economic harm as a result of Defendants' conduct.

In evaluating the harm for Eighth Amendment purposes, the Court must also

consider non-economic harm, including the adequacy of the services performed and the

impact of Defendants' conduct on the integrity of the government contracting process.

*See United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) ("[The defendant's]

false claims also harmed the government, in the form of both monetary damages and

harm to the administration and integrity of [a government program]."); *id.* at 1019 ("The

government has a strong interest in preventing fraud, and the harm of such false claims

16

extends beyond the money paid out of the treasury. Fraudulent claims make the administration of [government programs] more difficult, and widespread fraud would undermine public confidence in the system."). Here, there is no doubt that the kind of price-fixing conspiracy that the jury found existed in this case is fundamentally inimical to the integrity of the procurement process and the public interest. Nevertheless, and without minimizing Defendants' conduct, there exist a number of facts and considerations that bear on the extent to which Defendants' conduct compromised the integrity of the contracting process that resulted in the 2001 DPM contract.

First, Plaintiffs offered no evidence, nor have they claimed, that the services provided by the Defendants under the 2001 DPM contract were deficient in any way. As mentioned above, the government twice extended the 2001 DPM contract with Gosselin without any evidence of any performance deficiencies.

Second, the subcontract pricing conspiracy did not extend to the overall bids that Gosselin and the other bidders submitted for the 2001 DPM contract. There is no evidence, and the government does not contend, that Gosselin's actual overall bid price on the 2001 DPM contract was disclosed, discussed or the subject of any collusion with any other bidder. Rather, the subcontract pricing conspiracy was effectively limited to the subcontract price that certain packers would charge for item 1AA services, regardless of whom was awarded the DPM contract. There is also no evidence, as discussed above, that any packers were prepared, absent their subcontract pricing agreement, to provide item 1AA services for a price lower than Gosselin's bid for item 1AA.

Third, while Defendants failed to abide by the critical and important difference between negotiating subcontract pricing on an individual basis with only one company at

17

a time, without collusive agreements, rather than on a collective, collusive basis, its level of culpability must be assessed within the overall context of the solicitation. In that regard, the 2001 DPM contract solicitation, and the government's explanation of those solicitation requirements in a group meeting of potential bidders, presented new, if not novel, contracting and performance requirements that at least encouraged, if not required, discussions with potential subcontractors. For example, the 2001 DPM contract required a successful bidder to have the capacity to handle, on short notice, any packing and shipping requirements in any of the five countries covered by the contract. The government recognized that no individual packer likely had that capacity and therefore required a bidder to disclose what subcontracting or joint venture arrangements a bidder had made in order to have the practical ability to satisfy the government's needs. While this requirement did not suggest or justify collusive subcontract pricing, it did require a certain amount of communication and collaboration among otherwise competing companies.

Fourth, the degree of harm to the contracting process must be assessed within the context of the substantial transparency that existed in Defendants' bid for the 2001 DPM contract and also the government's own substantial knowledge and experience in contracting for the services covered by item 1AA. In their bid submission, Defendants broke out their services into 51 separate line items. The government, which had been contracting for comparable services for decades, had the regulatory obligation to determine, before accepting Gosselin's bid, whether the DPM pricing was the "overall 'Best Value' to the Government." The government in fact determined that Gosselin's bid for the 2001 DPM contract constituted a fair price for the contract and exercised both

18

options to renew the contract for two additional years rather than soliciting new bids. This decision by the government to renew the contract came after the government had received Relators' allegations of subcontract price fixing. In fact, those allegations were submitted to the very government official who subsequently decided to twice exercise the 2001 DPM contract options. While this evidence does not constitute "government knowledge" sufficient to preclude or estop the government from pursing claims against the Defendants based on the false CIPD submitted in connection with its bid, it is probative of how the government viewed the merits of Gosselin's bid, the value of the 2001 DPM contract to the government, Gosselin's performance under that contract, and the propriety of the solicitation process that resulted in that bid and contract.

Defendants' specific conduct is also relevant in assessing the impact of that conduct on the integrity of the contracting process. As discussed above, the conspiracy did not extend to the actual bids that would be submitted or even the amount of mark-up above the agreed-upon subcontract price for 1AA services. Rather, Defendants' FCA liability with respect to the 2001 DPM contract was based on the one-time filing of a single CIPD that was false with respect to one line item of the 51 line item bid. The parties stipulated that in the event the jury found Defendants liable on the DPM claim, the number of invoices Defendants submitted under the 2001 DPM contract was 9,136. However, none of those invoices contained or referenced the false CIPD contained in the Defendants' bid for the 2001 DPM contract; and none of those 9,136 false invoices contained any factually false information. Rather, they are deemed false as a matter of law based on judicial constructions of the FCA. For this reason, the number of invoices, in and of themselves, is not reflective of Defendants' level of culpability, particularly

19

since the number of invoices that Defendants ultimately filed was determined by the number of jobs the government assigned to Gosselin over the life of the contract; and how Gosselin decided to bill those jobs. In other words, Defendants' false CIPD did not necessarily cause or correspond to any particular number of invoices that Gosselin would ultimately file; and there could have been substantially more or fewer invoices than actually filed without any real difference in Defendants' overall level of culpability.

### 3. Whether the violation was related to other illegal activity, and the nature and extent of that illegal activity.

As mentioned *supra*, and described in detail in this Court's prior opinions, *see, e.g.*, Doc. Nos. 1072 and 1104, Defendants also engaged in other unlawful conduct in connection with the ITGBL program during approximately the same time period as their conduct related to the 2001 DPM contract. The evidence demonstrates, however, that Defendants' conduct with respect to the ITGBL program was distinct from and unrelated to Defendants' conduct with respect to the 2001 DPM contract, as evidenced by, *inter alia*, the government's decisions not to pursue any criminal charges or intervene in the litigation instituted by the Relators based on the 2001 DPM contract, as it had done with respect to the ITGBL program. Furthermore, the government knew about Relators' allegations pertaining to the ITGBL program, as well as the 2001 DPM contract, before exercising its options to extend the 2001 DPM contract, all of which suggests, at the very least, that the United States did not consider the two courses of conduct to be related or intertwined in any significant way. Accordingly, the Court concludes that Defendants' illegal conduct pertaining to the ITGBL claims, and the harm related thereto, are not relevant or material considerations in analyzing under the Eighth Amendment issues

pertaining to a civil penalty based on the 2001 DPM contract.[13]

### 4. Whether the civil penalties required to be assessed under the FCA are grossly disproportional to the harm caused by Defendants' conduct.

Having assessed the harm associated with Defendants' conduct, the Court must next determine whether the civil penalties to be assessed are grossly disproportional to that harm. There is surprisingly little jurisprudence concerning how to determine whether a civil penalty is disproportional to harm. Some courts have considered the amount of the civil penalties as a multiple of actual damages sustained as a result of a defendant's conduct, taking guidance from the Supreme Court's decisions concerning how to evaluate the constitutionality of punitive damages awards under the Due Process Clause of the Fifth and Fourteenth Amendments, even though the legislative judgment embodied in a civil penalty is not itself subject to a Due Process analysis. *See Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 126-28 (Fed. Cl. 2007). Others seem to make a less structured or discernible judgment based on all the facts and circumstances. *See* cases cited *infra* at 25.

In order to make a judgment as to "gross disproportionality," the Court has principally considered the following factors: (1) the relationship of the mandated civil penalties to the harm, as discussed above; (2) the benefits Defendants derived from the illegally procured 2001 DPM contract; (3) the deference to be afforded to legislative judgments as reflected in the statutory language; and (4) the criminal penalties that pertain to the subject matter of Defendants' conduct, as well as certain other more

---

[13] For presumably similar reasons, the government takes the position that for the purposes of the Eighth Amendment analysis of the mandated civil penalties for the DPM claim, the substantial criminal fines assessed in connection with the ITGBL program should not be considered.

explicit civil penalties.

First, as discussed above, the government did not sustain any demonstrable damages and therefore the mandated civil penalties of at least approximately $50 million cannot be expressed or justified as a multiple of those damages. Second, with respect to the benefits derived by the Defendants, the evidence is that the government paid approximately $3.3 million for the basic packing service covered by line item 1AA during the three years the 2001 DPM contract was in effect, and that the Defendants realized an overall profit of 4.4355% on the 2001 DPM contract over three years, which when applied to the revenue received for line item 1AA services, results in a presumed profit of approximately $150,000 for those services. There is nothing about this level of gain that would justify the minimum mandated civil penalty of over $50 million.

Third, there is nothing in the language Congress adopted in the FCA that suggests that Congress ever contemplated that civil penalties would be imposed at the level required here under facts similar to this case. Rather, Congress chose to say only that a person who violates the FCA is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000. Congress did not say, as it did in other federal statutes, that a civil penalty shall be assessed for each false claim or that a Court, in its discretion, may impose a civil penalty up to a certain amount. *See, e.g.*, 42 U.S.C. § 11045(d)(1) (trade secret claimant who asserts a frivolous claim "is liable for a penalty of $25,000 *per claim*") (emphasis added); 7 U.S.C. § 9 (persons found to have engaged in certain unlawful conduct pertaining to the commodities markets would be assessed a civil penalty of "*not more than* the higher of $100,000 or triple the monetary gain to such person *for each such violation*," or in certain cases, of "*not more than* the greater of

$1,000,000 or triple the monetary gain to the person *for each such violation*") (emphasis added); 7 U.S.C. § 136l(a)(1) (establishing civil penalty of up to $5,000 for each offense of distribution or sale of unauthorized pesticides); 8 U.S.C. § 1253(c)(1) (establishing civil penalty of $2,000 for each violation of detention and removal requirements imposed upon owners or operators of vessels and aircraft arriving in United States with alien stowaways); 15 U.S.C. § 45(1) (establishing civil penalty of up to $10,00 for each violation of Federal Trade Commission order). Given the FCA's language pertaining to the imposition of a civil penalty, it is difficult to justify, in terms of deference to a legislative judgment, the civil penalty mandated in this case under judicial constructions of the statute.

Finally, the Court also has considered certain federal criminal fines pertaining to false claims and other statutory civil penalties in assessing whether the FCA civil penalties are within constitutional limits. While there is no reason to think that Congress enacted such criminal fines or civil penalties at what it thought was the outer reach of the Eighth Amendment, such statutory fines and penalties provide some guidance as far as what penalties Congress thought are proportional to the conduct that would justify them and therefore provide some measure of proportionality within the context of this case, which presumably would be no greater than within a criminal or other civil penalty context. With respect to criminal fines, the United States Code contains at least two criminal statutes with fines that would often apply to the filing of false claims.[14] The

---

[14] 18 U.S.C. § 287 makes it a crime to "make[] or present[] to any person or officer in the civil, military, or naval service of the United States . . . any claim . . . knowing such claim to be false, fictitious, or fraudulent," and prescribes a fine of either (1) not more than $250,000, or (2) if the "offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain

parties differ substantially in their views of what maximum or likely fine Defendants would pay were their conduct subject to sanction under these statutes. It would nonetheless appear that however calculated, the maximum criminal fines that could be imposed for the Defendants' conduct pertaining to the 2001 DPM contract, were it a proper basis for a criminal sanction, would be a small fraction of the civil penalties mandated under the FCA on the facts of this case. Likewise, as to civil penalties under other statutes, the Court has found no instance in which an amount as high as $50 million was specifically stated or otherwise authorized other than as a specific multiple of a defendant's gain or some other objective measure. *See, e.g.*, 7 U.S.C. § 9, discussed *supra* at 23.

For all of the above reasons, the Court concludes that the minimum mandated civil penalty of $50,248,000 is grossly disproportional to the harm caused by the Defendants with respect to the 2001 DPM contract. The Court therefore concludes that the FCA, as applied to the Defendants based on the facts of this case, results in the imposition of an excessive fine in violation of the Eighth Amendment. For that reason, the Court refuses to impose that civil penalty.

**B.      Whether the Court can impose a civil penalty less than that mandated by the FCA in order to avoid an unconstitutional result.**

Having determined that the civil penalty required to be assessed under the FCA results in an unconstitutional application of the FCA, the issue for the Court is whether no civil penalty should be imposed or whether the Court should determine and impose a civil

---

or twice the gross loss . . . ." 18 U.S.C. § 3571(b)(3) and (d). A party convicted of conspiring to defraud the United States by obtaining the payment of a false claim in violation of 18 U.S.C. § 286, or of violating the general criminal conspiracy statute, 18 U.S.C. § 371, faces the same potential fines as provided for a conviction under 18 U.S.C. § 287. *See* 18 U.S.C. § 3571(d).

penalty that would be within constitutional limits and, if so, how should the Court determine such a civil penalty. Upon consideration of this issue, and having determined that the mandatory, nondiscretionary penalty imposed under the FCA is unconstitutional as applied in this case, the Court concludes that it does not have the discretion to fashion some other civil penalty other than the one required by statute, as that statute has been construed by the Fourth Circuit.

Neither the Supreme Court nor the Fourth Circuit has dealt specifically with this issue. Certain courts, having found the FCA's civil penalty excessive when applied to the facts of those cases, have in fact fashioned a different, constitutional penalty. *See e.g., United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1145 (N.D. Okla. 1999) (stating as *dicta*, without holding, that "[i]f the [FCA], as interpreted and applied to a particular set of facts, produces an unconstitutionally excessive fine, the amount of the penalty can then be remitted to prevent an unconstitutional result"); *United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1018-19 (W.D. Mo. 1995) (concluding that $3,430,000 in civil penalties would be unconstitutionally excessive under Eighth Amendment and entering a civil penalty of $365,000); *United States ex rel. Smith v. Gilbert Realty Co., Inc.*, 840 F. Supp. 71, 75 (E.D. Mich. 1993) (determining that a civil penalty totaling $290,000 was excessive relative to actual damages of $1,630, and reducing the penalty to $35,000 because "any civil penalty above $35,000 is excessive and violates the Eighth Amendment of the United States Constitution"). Nevertheless, the Court has not found any real discussion in any case, binding precedent or otherwise, concerning the legal basis on which a Court may fashion its own civil penalty when an otherwise binding, nondiscretionary statutory penalty or fine is deemed unconstitutional.

*See Bajakajian*, 524 U.S. at 337, n.11 (refusing to consider "whether a court may disregard the terms of a statute that commands full forfeiture").

The Court is driven to its conclusion that it must simply refuse to enforce the mandated penalty after finding it unconstitutional under the facts of this case, and not substitute its own fashioned penalty, in large part due to the structure and language of the FCA itself. Here, Congress mandated a civil penalty that authorized the courts to exercise a certain scope of discretion but no more; that is, the FCA authorizes a court to set the amount of the penalty within a certain range, but does not grant the court authority to impose a total penalty below the amount derived after the exercise of that discretion within the prescribed range. This precisely delineated and circumscribed discretion contrasts with other congressional enactments that establish a maximum penalty, with no minimum, and grants to the court complete discretion as to whether or to what extent that maximum penalty should be imposed. *See, e.g.*, 29 U.S.C. § 1132(c)(1)(B) (providing for a penalty for a violation of certain notification requirements under the Employee Retirement Income Security ("ERISA") program "in the court's discretion . . . in the amount of up to $100 a day"). Congress chose not to grant to the Court "up to" authority under the FCA when imposing civil penalties. Rather, it took a different approach and required the imposition of a mandatory minimum penalty, with a mandatory maximum, and gave the courts the limited discretion to determine the amount of that penalty only within that minimum-maximum range. Having determined that any amount that the Court is authorized by statute to award would result in an unconstitutionally excessive fine, the Court would need, in effect, to grant to itself the discretion that Congress chose not to give it. Basically, the Court would need to rewrite the FCA, as given to this Court,

26

in order to fashion a constitutional civil penalty under the facts of this case. Such an undertaking is particularly ill-advised given that Congress has repeatedly revised and amended the FCA following the judicial constructions, binding on this Court, without amending the civil penalty provision. In similar circumstances, courts have presumed that Congress has approved the judicially construed statutory construction. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982) ("[T]he fact that a comprehensive reexamination and significant amendment of the [Commodities Exchange Act] left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy."); *id.* at 382 n.66 ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]") (citations omitted). Had the interpretation of the civil penalty provision not been the subject of judicial constructions binding on this Court, the Court would be inclined to consider, as it does below as an alternative ruling, a reasonable construction of the FCA that results in the imposition of a constitutionally valid civil penalty. However, to engage in that exercise would cause this Court to adopt a construction of the statute that would be inconsistent with both binding judicial constructions and the presumed intent of Congress, in effect an unauthorized exercise of statutory revision.[15]

---

[15] Plaintiffs appear to share this view. *See* Pls.' Mem. of Law in Supp. of Award of Civil Penalties (Doc. No. 1117) at 8 (quoting S. Rep. No. 345, 99th Cong. 2d Sess. 8 (1986)) ("The Court has no discretion to reduce the number of civil penalties below the amount required under the statute . . ." but, rather, "[t]he legislative history of the 1986 FCA amendments makes clear that civil penalties are 'automatic and mandatory for each claim which is false.'"); *id.* at 9 ("*United States v.] Bornstein*[, 423 U.S. 303 (1976),] does not support an alternative construction that would permit the Court to deviate from issuing

Based on all the applicable considerations, the Court concludes that having found that the mandatory civil penalty in this case constitutes a constitutionally excessive fine in violation of the Eighth Amendment, and that the FCA does not give the Court any discretion to award any other civil penalty, it is not authorized to impose a lesser civil penalty that would be within constitutional limits. The Court is therefore left with no option other than to refuse to enforce the civil penalty provision of the FCA, as applied to the facts of this case.

**C.     Alternative rulings as to the amount of the civil penalty to be imposed.**

Given the lack of any binding precedent concerning the Court's authority to impose an alternative penalty, the Court has also considered alternative rulings, based on alternative approaches, in the event that upon review by the Court of Appeals, it is determined that this Court does have the authority to impose a civil penalty other than the mandatory, but constitutionally excessive, civil penalty prescribed by statute. In this regard, the Court has considered (1) an alternative reasonable and principled construction of the FCA's civil penalty provision that avoids a constitutionally excessive fine; (2) an enforcement of the mandated civil penalty up to the constitutional limit, determining for

---

one mandatory civil penalty per false claim in this case."); *id.* at 10 (The "Court[] may not adopt 'alternative statutory constructions' on the question of statutory penalties."); *id.* at 9 ("[T]he Court must assess one civil penalty of at least $5,500 for each of the false claims . . . ."); *id.* at 8 ("The Court has no discretion to reduce the number of civil penalties below the amount required under the statute.") (citing cases including *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, No. 1:04cv199, 2009 WL 3756343, at *1 (E.D. Va. Oct. 14, 2009) ("District courts have no discretion to award less than the minimum civil monetary penalty for each violation")); *id.* at 11 ("[A] district court does not have the 'power to mitigate what appear[s] to him to be the acerbities of the statutes by single-handedly reducing the amount of penalties to which the United States is entitled.") (citing *United States v. Cato Bros., Inc.*, 273 F.2d 153, 156 (4th Cir. 1959)); *id.* at 10 ("The Supreme Court has made clear that it is primarily the duty of Congress – not the district court – to determine the appropriateness of a punishment prescribed for an offense.") (citing *Bajakajian*, 524 U.S. at 336).

that purpose the constitutional limit, and whether Plaintiffs' proposed $24 million civil penalty is within that constitutional limit; and (3) an assessment of a civil penalty that is appropriate under all the facts and circumstances of this case.

### 1. An alternative construction of the FCA.

Courts have long recognized that there are circumstances in which a statute should be construed, if possible, in a reasonable, principled way to avoid an unconstitutional result. Indeed, it has been described as a court's duty when faced with the application of law that results, or even may result, in a violation of the Constitution, to determine whether any other application or construction exists that is reasonable and within the limits of the Constitution so as to avoid creating a constitutional issue. *See, e.g., Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail . . . ."); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) ("The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same.") (citing cases); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). The Court therefore looks to the statute to determine if there

29

exists a reasonable construction of the statutory language that could avoid the

constitutional problem. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir.

2010) ("[T]he doctrine of constitutional avoidance attempts to 'giv[e] effect to

[legislative] intent, not [to] subvert [ ] it,' since it is premised on the 'reasonable' notion

that legislatures 'd[o] not intend [an interpretation] which raises serious constitutional

doubts.') (citing *Clark v. Martinez*, 543 U.S. 371, 382 (2005)). Here, it would be

particularly appropriate to consider whether an alternative construction of the FCA

avoids the constitutional problem since the unconstitutional result does not necessarily

flow from Congress's chosen statutory language on its face, but rather from a judicial

construction of that language.

   As discussed *supra*, the FCA does not explicitly state that a civil penalty is to be

assessed per false claim. Rather, the FCA states only that someone who violates the

statute by engaging in certain conduct is "liable for a civil penalty between $5,500 and

$11,000." That language, on its face, permits an alternative reasonable interpretation,

*viz.*, that a civil penalty should be applied for each act that violated the statutory

prohibition, which, as applied in this case, is each factually false statement, not each

claim paid as a result of that false statement. Here, the Defendants actually made only

one false statement contained in the one false CIPD filed as part of their bid on the 2001

DPM contract, and for that reason, the FCA can be reasonably read to require only one

civil penalty of between $5,500 and $11,000, a penalty clearly within constitutional

limits. For the above reasons, the Court concludes that were it appropriate to consider an

alternative reading of the FCA in order to avoid an unconstitutional result, the Court

would conclude that one civil penalty should be imposed and assess an award of

$11,000.[16]

## 2. *Enforcement of the mandated civil penalty up to the constitutional limit.*

As a second alternative, and in the event that the Court were not authorized to adopt the above alternative construction of the FCA, the Court has considered what penalty could be imposed were this Court permitted simply to enforce the mandated civil penalty up to an amount that that would be within constitutional limits, although untethered to any specific textual reading of the statute. In that connection, the Court has

---

[16] Plaintiffs have argued that this construction of the FCA is foreclosed by *Marcus v. Hess*, 317 U.S. 537 (1943) (which the Plaintiffs contend "impliedly rejected" a reading of the FCA that provides for imposing one civil penalty per fraudulent scheme or actor, rather than one civil penalty per false claim submitted), and also by *United States v. Bornstein*, 423 U.S. 303 (1976). The Court rejects this position. First, neither case considered the issue faced by this Court: having found the FCA unconstitutional as applied, should it adopt a construction not otherwise appropriate in order to avoid the constitutional infirmity. Moreover, it appears that in *Hess*, the Supreme Court (which noted that its conclusions were related to the "circumstances of th[at] case," 317 U.S. at 552) actually approved of a penalty, not on each invoice filed under fraudulently procured contracts, but only for each project that was fraudulently obtained. *See id.* Likewise, in *Bornstein*, the Court's decision strongly suggests that the number of civil penalties awarded need not be the same as the number of false invoices submitted, particularly where a defendant does not control the circumstances that require claims to be filed. As the Supreme Court stated, a court is to "distinguish between the acts committed by [the defendant] and the acts committed by [another party]." 423 U.S. at 312. As the Court continued in *Bornstein*, "[i]f, as a result of the same act by [the defendant], [the other party] had filed three false claims, [the defendant] would still have committed only one act that caused the filing of false claims, and thus, under the language of the statue, would again be liable for only one forfeiture." *Id. Bornstein* thus holds that "[a] correct application of the statutory language requires, rather, that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *Id.* at 313. Here, while the Defendants filed the claims directly with the government, those claims were deemed false only because of one fraudulent act, the filing of a false CIPD. Applying the language of *Bornstein* to this case, a court could easily conclude that because the same one act caused the filing of all of the false claims, the false claims were the result of the same one act and that only one forfeiture (civil penalty) is therefore appropriate. Finally, if the government is correct that the Court's alternative construction of the FCA is foreclosed, then there is no alternative, principled construction that would avoid the unconstitutional application of the statute and allow the Court to enforce the civil penalty of the FCA.

31

considered whether there is any economic or other measure that could reasonably serve as a touchstone for a determination of proportionality that would establish the constitutional limit. Here, there are no demonstrable damages,[17] but there is demonstrable financial gain to the Defendants associated with the tainted line item 1AA services of approximately $150,000.[18] Using that figure, and the multiples identified by the Supreme Court as representing the outer limits of propriety under the Due Process clause for assessing punitive damages, the Court concludes that a total penalty of $1.5 million would reflect, based on the facts of this case, the outer limit of a constitutionally permissible fine under the Eighth Amendment, and the Court would award a civil penalty in that amount, were the Court directed to do so on this basis. For this reason, and those set forth in Part A.4, *supra*, the Court concludes that the amount of $24 million proposed by the Plaintiffs would not be within constitutional limits since it would be grossly disproportional to any harm caused by the Defendants.[19]

_____

[17] The Plaintiffs argue that its proposed $24 million civil penalty is within constitutional limits principally on the grounds that it constitutes an acceptably low multiple of the government's claimed economic harm. Given the Court's rejection of the Plaintiffs' claim that the pricing contained in the 2001 DPM contract was inflated as a result of the subcontracting pricing conspiracy, *see* Part A.1 *supra*, the Plaintiffs' principal justification for the proposed $24 million civil penalty fails completely for Eighth Amendment purposes.

[18] *See supra* at 22. *See also* Commentary, ¶ 3(B), to Section 2B1.1 of the United States Sentencing Commission Guidelines manual (when the actual or intended loss to the victim cannot reasonably be determined, the court may use gain to the defendant for the purpose of calculating an enhancement to the offense level based on loss).

[19] The Court also fails to understand the government's position with respect to the Court's legal authority to impose a $24 million civil penalty. On the one hand, it takes the position that the Court has no discretion to impose less than the mandated civil penalty, which in this case is $50,248,000. *See* Pls.' Mem. at 8 (quoting S. Rep. No. 345, 99th Cong. 2d Sess. 8 (1986)) ("The Court has no discretion to reduce the number of civil penalties below the amount required under the statute . . ." but, rather, "[t]he legislative history of the 1986 FCA amendments makes clear that civil penalties are 'automatic and mandatory for each claim which is false.'"). *See also id.* at 9 ("*Bornstein* does not

### 3. Assessment of a civil penalty that is appropriate under all the facts and circumstances.

The Court cannot conclude that the congressional purpose behind the civil penalty provision of the FCA is to impose a penalty that reaches the constitutional limits of the Eighth Amendment, but rather that it is to allow a Court to impose a civil penalty that is appropriate under the circumstances of a particular case. For this reason, the Court has considered what such a civil penalty would be, were it authorized to impose a civil penalty on that basis.[20] Based on all the facts and considerations set forth above pertaining to the specifics of Defendants' conduct, the gain obtained, the need to deter others as well as sanction the Defendants, and the public interest in protecting the integrity of the public procurement process, the Court would award, were it directed to do

support an alternative construction that would permit the Court to deviate from issuing one mandatory civil penalty per false claim in this case."). On the other hand, the government takes the position that the Court can, and should, impose a civil penalty of $24 million, because the government, in the exercise of its "prosecutorial discretion," only seeks a civil penalty in that amount. *See id.* at 7. Left unexplained is how the government, through the exercise of "prosecutorial discretion," can require the Court to impose a civil penalty it is not authorized by statute to impose, since the $24 million civil penalty does not result from any principled application of the FCA, as it is not a multiple of 9,136 and any number within the statutory range of $5,500 and $11,000. Rather, the proposed penalty appears to be based on nothing more than what the Plaintiffs think is an appropriate number under the circumstances of the case. *Compare United States v. Mackby*, 221 F. Supp. 2d 1106, 1110 (N.D. Cal. 2002) (government justified its requested civil penalty upon a reasonable construction of FCA as applied to facts of that case).

[20] Without explicitly stating so, some courts appear to have effectively made a civil penalty award on this basis. *See, e.g., United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F. Supp. 2d 546, 565 (E.D. La. 1999) (reducing civil penalty award amount from $7,850,000 to $100,000); *Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975) (reducing civil penalties from $240,000 to $100,000, holding that "the court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government").

so on this basis, a civil penalty of $500,000.[21]

## CONCLUSION

For the above reasons, the Court finds and concludes that the FCA's mandated civil penalty of at least $50,248,000 is unconstitutionally excessive under the Eighth Amendment and therefore may not be enforced. The Court also concludes that it does not have the discretion to award some other civil penalty within constitutional limits. Accordingly, the Court will award no civil penalty with respect to Defendants' liability based on the 2001 DPM contract. [22]

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

The Court will issue an Order.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
February 14, 2012

---

[21] This amount corresponds to approximately three times Defendants' presumed profit on the services provided under line item 1AA of the 2001 DPM contract and also to Defendant's approximate profit on the entire 2001 DPM contract over three years.

[22] With this ruling, the Court has now disposed of all remaining issues in this case with the exception of (1) whether or not Defendant Government Logistics, N.V., has successor liability with respect to any liability on the part of the Gosselin Defendants, an issue presented in pending cross-motions for summary judgment (Doc. Nos. 775 and 1074); (2) Relators' claim for a percentage award of certain recoveries by the United States in this case; and (3) Relators' claim for attorney's fees. As set forth in the Order entered together with this Memorandum Opinion, the Court denies the parties' motions for summary judgment with respect to the imposition of successor liability on Defendant Government Logistics, and also defers ruling on any attorney's fee and other awards to Relators, pending the final disposition of any appeals in this case. The Court has also directed the entry of a final judgment under Federal Rules of Civil Procedure 54(b) and 58 as to all parties except Defendant Government Logistics.