IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Kurt Bunk and Daniel Heuser, | ) ) ) | |
| Plaintiffs/Relators, | ) ) | |
| v. | ) ) | No. 1:02-cv-1168 (AJT/TRJ) |
| BIRKART GLOBISTICS GmbH & CO., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |
| UNITED STATES OF AMERICA *ex rel.* Ray Ammons, | ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| v. | ) ) | No. 1:07-cv-1198 (AJT/TRJ) |
| THE PASHA GROUP, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Presently pending are cross-motions for summary judgment with respect to plaintiffs'

claim for successor liability on the part of third-party defendant Government Logistics N.V.

("GovLog") ("the Motions").[1] The Court held a hearing on the Motions on December 12, 2014,

following which it took the Motions under advisement. By way of brief summary, the Relators

and the Government (collectively referred to as "Plaintiffs") currently claim successor liability

---

[1] *See* Doc. No. 1337 (Relators' Motion for Summary Judgment), Doc. No. 1338 (Gov Log's Motion for Judgment on the Pleadings or in the Alternative Renewed Motion for Summary Judgment), and Doc. No. 1339 (the United States' Motion for Summary Judgment as to Successor Liability of Defendant Government Logistics, N.V., and Alternative Motion for Leave to Amend its Complaint).

solely under the fraudulent transfer exception to the Traditional Rule.[2]  In essence, plaintiffs'

allege that in 2007, shortly after being notified by the Department of Justice that two False

Claims Act cases had been filed against it and that it was considering intervening, Gosselin

terminated any direct contractual relationships with American carriers in connection with its

International Through Government Bill of Lading (ITGBL) business, while instigating the

creation of GovLog, through which it continued to generate revenue from ITGBL contracts, all

for the purpose of hindering the collection of any future judgments that the United States might

obtain against it under the False Claims Act.  More specifically, plaintiffs complain that because

of Gosselin's business restructuring, they do not have the ability to attach and garnish in the

United States any future revenues that Gosselin may receive for ITGBL related services provided

to GovLog; and as a consequence, they will be likely forced to seek collection against Gosselin

in Europe.  Plaintiffs seek to impose successor liability on GovLog on the ground that GovLog

knew of Gosselin's "fraudulent purpose" in terminating direct relationships with Transportation

Service Providers (TSPs) and entering into a contractual relationship to facilitate of GovLog's

ITGBL business.

 The Court first concludes that neither plaintiff has adequately pleaded its current theory

of successor liability.[3]  Alternatively, the Court finds that there are no genuine issues of material

---

[2] *See infra* at part III, for a description of the Traditional Rule pertaining to successor liability.

[3] When the issue of successor liability was first briefed and argued on cross motions for summary judgment, the government relied only on the "substantial continuity" test. May 6, 2011 Hearing, Doc. No. 826, Tr. at 9. After the Court rejected that test as a basis for successor liability, plaintiffs then for the first time explicitly relied on the fraudulent transaction theory, which plaintiffs contend has been adequately pleaded, at least in Paragraph 30 of the Relators' Third Amended Complaint. Doc. No. 1340 at p. 8. GovLog challenges that position and alternatively seeks summary judgment on the grounds that the plaintiffs never adequately placed GovLog on notice of the fraudulent transaction theory.

fact and GovLog is entitled to judgment as a matter of law on plaintiffs' current theory of successor liability. With respect to that theory, there is an absence of evidence sufficient for the jury to find that the challenged transaction between Gosselin and GovLog lacked adequate consideration or any other recognized indicia of a fraudulent transaction, absent which, plaintiffs' successor liability claim fails as a matter of law, regardless of any effect Gosselin's business decisions may have in the future on plaintiffs' post judgment remedies.[4] The Court will therefore GRANT GovLog's Motion for Summary Judgment and DENY Relators' and the United States' Motions for Summary Judgment.

## I. Facts [5]

---

The Court concludes that the plaintiffs had not, prior to the current round of summary judgment proceedings, adequately placed GovLog on notice of the their fraudulent transaction theory. For this reason, the Court concludes that GovLog is entitled to judgment based on the Court's earlier ruling that the "substantial continuity" test is not available to impose successor liability under the facts of this case. Nevertheless, the Court has considered on the merits the fraudulent transaction theory and alternatively enters summary judgment in GovLog's favor with respect to the merits of that claim. In light of the Court's alternative ruling, the Court also denies the United States' alternative request for leave to amend its Complaint in Intervention to adopt paragraph 30 of Relators' Third Amended Complaint. See Doc. No. 1339.

[4] The Court had previously denied cross motions for summary judgment. *See* Doc. No. 1132 (February 14, 2012 Order). The Court stayed the case as to plaintiffs' successor liability claims, however, during the appeal of those issues that the Court certified as final under Fed. R. Civ. P. 54(b) and 58, *see Id.* at 3. After the case was remanded, the Court decided that the "traditional rule" applied, *see* Doc. No. 1332 (September 12, 2014 Order). The Court then directed the parties to file, if they deemed appropriate, renewed summary judgment motions based on that ruling. *See Id.* The government had previously conceded that were the Court to reject the "substantial continuity" test as the basis for successor liability, as it did in its ruling on September 12, 2014, successor liability could not be otherwise imposed on GovLog under the "mere continuation" theory of the "traditional rule." *See, e.g,* Doc. No. 826, Tr. at 30:6-10 ("We would agree that the mere continuation doctrine, and I'm putting that in quotes, it does not – it does not apply in this case.").

[5] These facts are based on the parties' respective statement of facts and consist of facts that are either undisputed or most favorable to the plaintiffs. In this regard, both the plaintiffs and GovLog contend that while the undisputed facts dictate judgment in their favor, there are disputed issues of fact that preclude summary judgment in the other's favor, principally those

In May-Sept 2006, the United States advised Gosselin that two False Claims Act lawsuits had been filed against it under seal. Doc. No. 1337-1 at ¶ 4.  In December 2006, the United States advised Gosselin that it was considering intervening in those actions and made a settlement demand the following month. *Id.* at ¶ 4.  Thereafter, in March 2007, defendant Smet of Gosselin, "fed up" with the United States government and (in the words of Jan Lefebure) its "chasing after his person," decided to reorganize Gosselin's business, stop dealing directly with TSPs and United States contracting agencies, and terminate its then existing direct contractual relationships with the United States and certain TSPs who had received ITGBL contracts.[6] *See* Doc. No. 1337-1 at ¶¶ 7-8.  He informed two of his employees who had been managing Gosselin's ITGBL business, Messers. Geurts and Noppen, of these decisions, and the reasons for them.  On June 27, 2007, Gosselin, through Smet, loaned to GovLog's four owners a total of €100,800 in unsecured interest free demand loans for the purpose of capitalizing GovLog.  Doc. No. 1337-1 at ¶ 11.  GovLog began operating on July 1, 2007.  All of GovLog's 16 employees came directly from Gosselin, and they kept their same positions, salaries, and benefits.  Doc. No. 1337-1 at ¶¶ 25-26.

Central to plaintiffs' claim is the ITGBL Purchase and Sale Agreement (the "PSA") that Gosselin and GovLog entered into on June 29, 2007, without any competing proposals from other companies and no negotiations about the amounts GovLog would pay to Gosselin.  *See*

---

related to Gosselin's intent and GovLog's knowledge.  As discussed herein, the Court concludes that there are no disputed material fact pertaining to plaintiffs' current theory of successor liability, which fails as a matter of law.

[6] GovLog also presented uncontested evidence that in restructuring Gosselin, Smet also sought to avoid severance costs associated with eliminating his U.S. contracting department.  *See* Doc. No. 1338-1 at ¶ 5.

Doc. No. 1337-1 at ¶¶ 15-16 ("Gosselin, through Smet, decided every term."). [7] Under the PSA, Gosselin would continue to service its then existing ITGBL business through the IS07 cycle that ended on September 30, 2007, referred to as the Transition Period; during this Transition Period, GovLog would assist Gosselin in performing its IS07cycle obligations through the former Gosselin employees that had moved to GovLog. ITGBL PSA, Doc. No. 1338-8 at ¶ 2.8. Also during the Transition Period, Gosselin would transfer to Govlog "such equipment and other items"[8] that would place GovLog in a position to engage in the ITGBL business beginning with the IW07 cycle that started on October 1, 2007. *Id.* Gosselin would retain all revenues received with respect to its the IS07 cycle business and GovLog would pay Gosselin 25% of the "Net Revenues" that GovLog derived from the IW07 and IS08 cycles.[9] *Id.*at ¶ 4.4.c.i. Otherwise, "GovLog shall be alone entitled to receive all commercial benefits of the ITGBL business with respect to all invoicing for services performed by GovLog on or after 1 October 2007." *Id.* at ¶ 4.3.b. During the Post Transition Period, viz., beginning October 1, 2007 with the IW07 cycle, GovLog was to perform all ITGBL business in its own name, obtain all permits and licenses in

---

[7] As recited in the PSA, "as an integral part of Gosselin's restructuring of its operations, Gosselin intends to quit, sell and dispose of the US government business undertakings, operations in contracts, including any direct involvement of provision of services directly to carriers engaged in the International Through Government Bill of Lading (ITGBL) business relating to movement of military household goods." ITGBL PSA, Doc. No. 1338-8 at at ¶ 2.3.

[8] The Facilities and Servicing Agreement entered into between GovLog and Gosselin's various affiliates referenced the transfer under the PSA of "certain matters relating to the business carried on by Gosselin as direct contracting partner with ITGBL program carrier-customers, in particular, customer lists, customer files and related data, good will, all interest of Gosselin in rate agreements, along with all obligations and entitlements as more fully set out in the said [PSA]." *See, e.g.* Facilities and Servicing Agreement, Doc. No. 1338-9 at 1.

[9] As recited in the PSA, because there is no obligation on the part of GovLog to obtain any support services from Gosselin, this provision was intended to compensate GOSSELIN for "the sale of the valuable ITGBL business to GovLog." *Id.*at ¶ 4.4.c.

its own name and conclude any rate or other agreements in its own name with carriers. *Id.* The

PSA was conditioned on GovLog "actually obtaining" any required US Government approvals,

licenses or permits. *Id.* at ¶ 4.1.a-b. Gosselin disclaimed any guarantees or assurances to

GovLog that any carriers that Gosselin had dealt with in the past would elect to use GovLog; and

GovLog was solely responsible for concluding any agreements with any carriers. *Id.* at ¶ 2.8.

Gosselin reserved the right to compete for ITGBL business in the future.[10] *Id.* at ¶ 2.6.

On June 29, 2007, Gosselin and GovLog also entered into a number of support services

agreements with various Gosselin's affiliates, as they existed following Gosselin's restructuring

(collectively referred to as "Support Services Agreements"). *See* Doc. No. 1337-1 at ¶¶ 19-23;

Doc. No. 1338-9.[11]  Under these Support Services Agreements, none of which required Govlog

to in fact use Gosselin, Gosselin agreed to provide various support services related to the ITGBL

business, including local agent services, line-hauls services, port agency services, customs

clearing services, container handling, warehousing, trucking/drayage services, factoring services

and administrative services (including invoicing, bookkeeping, information technology, and

human resources).  Doc. No. 1337-1 at ¶ 21.

Also on June 29, 2007, Gosselin and GovLog entered into another Purchase and Sale

Agreement, not at issue here, similar to the ITGBL PSA and the Support Services Agreements,

---

[10] There is no evidence that anything represented or stated in the PSA was untrue or stated with an intent to defraud. *See Nat'l Am. Ins. Co.v. Ruppert Landscaping Co.*, 25 F. App'x 116, 121 (4th Cir. 2001) ("Such express language weighs heavily against any finding of an implied assumption of liabilities or that the transaction was fraudulent in fact.").

[11] As reflected in the summary judgment record, these agreements include (1) a Facilities and Servicing Agreement with Gosselin Container Terminal NV; (2) a General Facilities and Serving Agreement with Gosselin Italia s.r.l.; (3) a Facilities and Servicing Agreement with C.G.C. NV; (4) a Facilities and Servicing Agreement with Gosselin Support Services NV; (5) a Facilities and Services Agreement with FOCUS Transport Services NV; and (6) a Factoring Agent Agreement with Gosselin Suisse SA.

but pertaining to a long term contract with the State Department for packing and crating services, known as the ELSO contract (the "ELSO PSA"). Doc. No. 1338-11. The parties also entered into a Novation Agreement whereby GovLog assumed all obligations and liabilities under the ELSO PSA. Doc. No. 1338-12. This Novation Agreement, together with the ELSO PSA, which referenced and attached the related support services agreements, were submitted to the United States for approval in September 2007. *Id.* As part of that submission, Gosselin disclosed that it had undergone a "comprehensive corporate restructuring" that was based, in part, "on Gosselin's decision to discontinue its involvement in direct US Government contracting." Doc. No. 1338-15 at 1. The United States approved the Novation Agreement on September 28, 2007; and GovLog performed pursuant to that Agreement and the ELSO PSA.[12] *See* Doc. No. 1338-12; Doc. No. 1337-1 at ¶¶ 17-18.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.

---

[12] Under the ELSO PSA, Gosselin was to receive twenty percent of all "Net Revenues" derived by GovLog from invoicing to the US Government under the ELSO Contract. Doc. No. 1338-11 at ¶ 4.3.c.i.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 247–48. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.,* 478 F.3d 640, 642 (4th Cir.2007).

### III. Analysis

The Court has previously ruled that federal common law governs plaintiffs' successor liability claims, *see* Doc. No. 742 (November 15, 2010 Order), and that the "traditional rule," rather than the "substantial continuity" test, governs the issue of successor liability in this False Claims Act case. *See* Doc. No. 1332 (September 12, 2014 Order). Under the so-called "traditional" common law rule of successor liability, a corporation that acquires the assets of another corporation does not take the liabilities of the corporation from which the assets are acquired unless one of four exceptions applies. Plaintiffs claim that one of those exceptions, that the transaction is fraudulent, imposes successor liability on GovLog.[13] The transaction was fraudulent, according to the plaintiffs, because GovLog was created "to hinder the United States and Relators as potential False Claims Act judgment creditors by eliminating direct contractual privity between Gosselin and the United States government and American TSPs." United States

---

[13] The four exceptions under the traditional rule are that "(1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a mere continuation of the predecessor; or (4) the transaction is fraudulent." *United States v. Carolina Transformer Co.,* 978 F.2d 832, 838 (4th Cir. 1992) (internal quotation marks omitted).

and Relators' Supplemental Memorandum in Response to the Court's December 12, 2014 Order,

Doc. No. 1361 at 3. Plaintiffs' core contention in this regard is that because of Gosselin's

business restructuring in 2007, they cannot attach and garnish in the United States any ITGBL

business revenue that may be payable to Gosselin in the future by providing services to GovLog.

The premise embedded in plaintiffs' theory is that Gosselin is obligated to generate ITGBL

revenue through direct contractual relationships with TSPs or the United States, or not at all.

Viewing these facts and drawing all inferences in a light most favorable to the plaintiffs, the

Court finds that there is insufficient evidence for a fact finder to conclude that the Gosselin-

GovLog transaction was fraudulent.[14]

Plaintiffs point to the generally recognized "badges of fraud" under state law fraudulent

conveyance jurisprudence to support their claim that the PSA and related agreements constitute a

fraudulent transaction. *See, e.g., Fox Rest Assocs., L.P. v. Little*, 717 S.E.2d 126, 131 (Va.

2011).[15] There is, however, no evidence sufficient to establish any of the recognized "badges of

fraud." Plaintiffs do not contend that the transaction caused or will cause Gosselin to be

---

[14] The parties dispute the standard of proof for establishing successor liability under a fraudulent transaction theory. GovLog contends that a derivative liability claim based on fraud is subject to a clear and convincing standard. By contrast, Plaintiffs contend that the standard for all theories of successor liability, including fraudulent transaction, is a preponderance of the evidence standard. Because the Court concludes that there is insufficient evidence under either of these standards, the Court does not resolve this dispute.

[15] "The badges of fraud [necessary to establish a prima facie case of fraudulent conveyance under Virginia state law] include:

> (1) retention of an interest in the transferred property by the transferor; (2) transfer between family members for allegedly antecedent debt; (3) pursuit of the transferor or threat of litigation by his creditors at the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by transferor; and (6) fraudulent incurrence of indebtedness after the conveyance."

*Id.* at 132.

insolvent. In fact, they concede that Gosselin is likely better off than it would have been, had it simply not provided any support services to GovLog after it ended its direct contractual involvement with TSPs. Presumably for that reason, they do not seek to set aside or have declared void any aspect of the Gosselin-GovLog transaction or relationship. *See* Doc. No. 1361 at 3 ("The United States and Relators are not seeking to set aside or void the transaction creating GovLog or the written instruments through which it was accomplished...[or] contend that Marc Smet and the four GovLog principals ran afoul of any American or Belgian corporate laws when creating GovLog.")

Plaintiffs also concede that Gosselin had an absolute right to end its direct contractual relationship with the American carriers and there was nothing that could be deemed fraudulent based on that decision alone. *See, e.g., Crawford Harbor Associates v. Blake Const. Co.,* 661 F. Supp. 880, 884 (E.D. Va. 1987) (finding no successor liability under a fraudulent transaction theory where "[n]othing before this Court suggests that [the predecessor company's] right to seize and transfer those assets was anything less than absolute, or that the consideration [the predecessor company] received was inadequate."). Similarly, the Government has conceded that Gosselin was not under any obligation to stay in any particular line of business in order to generate revenue to pay the judgment. *See* Doc. No. 749 Tr. at 74:17-23. Likewise, they acknowledge that GovLog's ownership by former Gosselin employees is not alone sufficient to impose successor liability[16]; and that had the same business arrangement been established with a

---

[16] The PSA provides that GovLog is being formed by "*former* employees and officers of GOSSELIN who have substantial and long-term experience within Gosselin in handling US Government business and customer-base." Doc. No. 1338-8 at ¶ 2.4 (emphasis added).

company other than GovLog, the PSA and related arrangements would not be sufficient to impose successor liability.[17] *See* Doc. No. 1359, Tr. at 19:1-22.

There is also no evidence that Gosselin concealed, secreted or misrepresented any assets. In fact, it would appear that the government had complete transparency with respect to Gosselin's restructuring, Gosselin's basic decision behind the restructuring, and the transactions and agreements with GovLog. It explicitly approved the ELSO PSA and related Novation Agreement; and while there were no assigned contracts under the PSA for the government to approve, the government was no doubt aware of GovLog's participation in the ITGBL program as well.

Plaintiffs claim that the evidence shows that Gosselin transferred "its entire future US government business" to GovLog in exchange for a "lack of or gross inadequacy of consideration." There is, however, no evidence sufficient to establish that Gosselin received inadequate consideration for any business that transferred to GovLog under the PSA or for the services provided under the Support Services Agreements. The PSA did not transfer or assign any ITGBL contracts to GovLog. In fact, there is no evidence that Gosselin had any contracts to transfer other than for the IS07 cycle, the American carriers had no obligation to use Gosselin in the future, and, as it appears from the PSA, Gosselin continued to receive directly from the TSPs all contract revenues payable to it during the IS07 cycle. Plaintiffs complain that Gosselin did

---

[17] Courts have generally recognized that an identity of ownership, or employees, between two companies has more legal significance under the "mere continuation" theory than under other theories of successor liability. *See, e.g. Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1283 (8th Cir. 1994) (explaining that only "[t]he traditional mere continuation exception focuses on the continuation of management and ownership between the predecessor and successor corporations," whereas with other theories of successor liability, "continuity of ownership and management is not dispositive"); *Armour-Dial, Inc. v. Alkar Eng'g Corp.*, 469 F. Supp. 1198, 1201 (E.D. Wis. 1979) (no successor liability under mere continuation theory where none of predecessor's officers, directors or stockholders retained a position with successor).

11

not receive adequate consideration for Gosselin's goodwill with its TSP customers, but there is
no evidence sufficient to establish that Gosselin was not adequately compensated for that asset,
or any other asset, transferred under the PSA.  GovLog was solely responsible for obtaining any
new contracts in the highly competitive ITGBL business; and Gosselin provided no guarantees
or assurances to GovLog that the US carriers would renew or enter into any future contracts
GovLog.  Gosselin also expressly retained the right to compete with Govlog for ITGBL business.
Likewise, plaintiffs conclusorily argue that the agreements were not "arm's length" and
"create[d] the illusion of consideration."  Doc. No. 1337-1 at 16-17.  The summary judgment
record does not contain any evidence concerning the details of GovLog's ITGBL business,
including the profitability of that business, which TSPs GovLog contracted with, whether
GovLog's TSP customers were the same or different than Gosselin's former TSP customers,
what specific support services Gosselin provided, how much revenue Gosselin in fact has
received from GovLog and to what extent GovLog used the services other than or in addition to
Gosselin's. There is likewise no evidence, expert or otherwise, that the PSA or the support
services agreements did not provide commercially reasonable terms or adequate consideration.

  Overall, plaintiffs appear to argue that regardless of whether the PSA and related
transactions are fraudulent under some recognized measure, GovLog should nevertheless be
financially responsible for Gosselin's judgments because Gosselin had the intent to hinder or
delay judgment creditors, its restructuring did just that[18] and GovLog knew of Gosselin's
motivation. The Court finds the evidence insufficient to establish any of these propositions; but
even if it were, that alleged intent, restructuring and knowledge, standing alone, would not be

---

[18] There is no evidence that any judgment creditors actually existed at the time of the PSA.  A
restitution judgment had been entered against Gosselin in the criminal case that had concluded as
of date of the PSA, but there is no evidence whether that restitution judgment, which Gosselin
has in fact now satisfied, was still outstanding in whole or in part when it entered into the PSA.

sufficient to impose successor liability on GovLog under the fraudulent transaction exception. As the Court has concluded that the evidence is insufficient to find that the Gosselin-GovLog transaction was fraudulent or unlawful, the fraudulent transaction theory fails, regardless of the motivation for the transaction or the effect of Gosselin's otherwise legitimate business decisions on plaintiffs' post-judgment remedies. In short, imposing liability under a fraudulent transaction theory without a fraudulent transaction, solely because of the incidental effects of that transaction, turns that theory, in effect, into a theory of strict liability. The plaintiffs have cited no authority, and the Court has found none, that allows the imposition of successor liability under a fraudulent transaction theory under these circumstances.

Imposing successor liability on GovLog under a fraudulent transaction theory seems particularly inappropriate in this case. In that regard, plaintiffs are not claiming that had Gosselin not restructured its ITGBL business in 2007, they would have been able to attach any of the revenues that Gosselin would have received directly from the TSPs. Rather, plaintiffs are claiming that in the future GovLog should be responsible generally for Gosselin's judgment out of whatever assets or revenues it may have. In other words, plaintiffs seek to impose liability on GovLog as if it were Gosselin. But that theory does not fit well, or at all, under the fraudulent transaction theory of successor liability; and in the end, plaintiffs effectively conflate the fraudulent transaction theory with the very different "substantial continuity" and "mere continuation" theories, under which they cannot recover in this case.

### IV. Conclusion

For the above reasons, the Court finds and concludes that plaintiffs have not adequately pled a fraudulent transaction theory of successor liability. Alternatively, the Court finds that there are no genuine issues of material fact and that GovLog is entitled to judgment as a matter

of law on the merits of that theory.  For these reasons, the Court will grant GovLog's motion for

summary judgment and DENY plaintiffs' motions for summary judgment.

The Court will issue an appropriate order.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 23, 2014

14