IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Kurt Bunk and Daniel Heuser, <br><br> Plaintiffs/Relators, <br><br> v. <br><br> GOSSELIN WORLDWIDE MOVING, N.V., GOSSELIN GROUP, N.V., MARC SMET, *et al.*, <br><br> Defendants. | Nos. 1:02-cv-1168 (AJT/MSN) <br> 1:07-cv-1198 (AJT/MSN) |

## MEMORANDUM OPINION AND ORDER

In this False Claims Act case, a $24 million judgment has been entered against Defendants Gosselins Group, Gosselin Worldwide Moving, N.V. ("Gosselin"), and Marc Smet ("Smet") (collectively, the "Gosselin Defendants"). Realtor Kurt Bunk ("Bunk") now seeks to impose liability for that judgment on Defendant Government Logistics, N.V. ("GovLog") under a theory of successor liability.[1]

The Fourth Circuit has remanded this case for trial following its reversal of the Court's granting summary judgment in GovLog's favor with respect to Bunk's successor liability claim. Upon consideration of the parties' memoranda and the argument of counsel at the hearing and status conference held on February 10, 2017, the Court concludes that the particular grounds for the successor liability claim asserted in this case—that a transaction between Gosselin and GovLog was fraudulent—is by its nature an equitable claim for which a jury trial was not recognized at the time the Seventh Amendment was adopted. It is therefore a claim that is to be tried without a jury at the trial scheduled to begin on Wednesday, May 17, 2017.

---

[1] The United States did not intervene with respect to the claim that resulted in the judgment, and the successor liability claim is therefore being pursued solely by Bunk on behalf of the United States.

## BACKGROUND

The factual background is more thoroughly laid out in the previous opinions of the Fourth Circuit and the Court. Briefly summarized, these consolidated actions were originally filed in 2002 by Relators Bunk and Ray Ammons but remained under seal until May 19, 2008, following the conclusion of criminal proceedings against the Gosselin Defendants and another company involved in the "ITGBL program," described below. In May and Sept 2006, the United States advised Gosselin that two lawsuits with False Claims Act ("FCA") claims had been filed against it under seal. Those claims were based on Gosselin's involvement in the movement of household goods for American military personnel in Europe, primarily Germany, under two separate government programs. The first FCA claim was based on Gosselin's participation in the International Through Government Bill of Lading program, in which Gosselin, located in Europe, was a subcontractor to American "freight forwarders," also known as Transportation Service Providers ("TSPs"), located in the United States, that had received prime contracts from the Department of Defense to move household goods of military personnel to Germany (the "ITGBL claim"). The second FCA claim was based on Gosselin's participation in the Direct Procurement Method program, in which Gosselin was the prime contractor directly with the Department of Defense for the transportation of household goods of military personnel in Europe back to the United States (the "DPM claim"). The United States intervened in the ITGBL claim, but not the DPM claim. The ITGBL claim against Gosselin was eventually resolved without any outstanding judgment in favor of the United States.

The DPM claim against Gosselin ultimately resulted in the $24 million judgment,[2] which remains unsatisfied.[3] On October 2, 2008, in Count II of his Second Amended Complaint, Bunk sued GovLog as a defendant on the theory that GovLog had successor liability for Gosselin's FCA violations because in June 2007, Gosselin and GovLog had entered into a "sham transaction for inadequate consideration through which Gosselin Group . . . and/or its operating subsidiaries still profit through their business interests in shipping related to the U.S. Government markets and that transaction is designed to hinder, delay and /or defraud Relators as a potential judgment creditor." *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 270 (4th Cir. 2016) (quoting Bunk Third Am. Compl. [Doc. No. 448] ¶ 30) (omission in original). On May 11, 2011, the Court bifurcated the trial of the underlying DPM claim against Gosselin and the successor liability claim against GovLog, finding that bifurcation would "facilitate the orderly resolution of the remaining issues, particularly given the derivative and equitable nature of the government's claims against GovLog, which are to be determined by the Court, as opposed to jury." [Doc. No. 816.][4] On August 4, 2011, the jury returned a verdict on the DPM claim that ultimately resulted in the $24 million judgment.

On December 23, 2014, the Court entered summary judgment on Bunk's successor liability claim against GovLog. On November 15, 2016, the Fourth Circuit reversed that order,

---

[2] The $24 million judgment was based exclusively on statutory penalties under the FCA, with no compensatory damages sought by or awarded to the Relators/United States.

[3] All of these proceeding played out against the backdrop of the concluded criminal proceeding against Gosselin, in which Gosselin ultimately pled guilty to criminal antitrust violations in connection with its ITGBL subcontracts and paid a $6 million fine and restitution (jointly and severally with its codefendant) in the amount of $865,000.

[4] The United States' Complaint in Intervention also included a successor liability claim against GovLog with respect to the ITGBL claim. The Court's bifurcation order applied to both the United States' and Bunk's successor liability claims against GovLog. Bunk did not appeal this bifurcation ruling either in his appeal from the Court's final judgment in favor of Gosselin on Bunk's DPM claim that eventually resulted in the $24 million judgment against the Gosselin Defendants, *see* Brief for Relators-Appellants, *United States ex rel. Bunk v. Birkart Globistics*, 741 F.3d 390 (4th Cir. 2013), or in his appeal from the Court's final summary judgment in favor of GovLog on his successor liability claim, *see* Relators-Appellants' Brief on Appeal, *United States ex rel. Bunk v. Government Logistics N.V.*, 842 F.3d 261(4th Cir. 2016).

3

finding that there were genuine issues of material fact to be decided by a factfinder. *See Bunk*, 842 F.3d at 279.

## ANALYSIS

Federal Rule of Civil Procedure 39(a) provides that "[w]hen a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action." The parties agree that a proper jury demand was made under Rule 38 with respect to Bunk's successor liability claim. Accordingly, the trial on that claim "must be by jury unless . . . (2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a). The federal right to a jury is determined by the scope of the Seventh Amendment.

The Seventh Amendment provides in relevant part: "In Suits at common law . . . the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. The Amendment guarantees that a party in a civil case has a right to a jury trial if its cause of action is one that was cognizable in the courts of law in 1791 or is a modern-day analog to such a cause of action. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 40-41 (1989). To make this determination, the Court must (1) compare the cause of action "to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," but more importantly, (2) examine the remedy sought to "determine whether it is legal or equitable in nature." *Id.* at 42 (internal quotation marks omitted).

In claiming a right to a jury, Bunk first contends that his successor liability claim is a statutory claim "embedded" in the FCA because the FCA imposes liability on any "person," which, under the Dictionary Act, is defined to include a corporation and its successors. Based on this theory, Bunk contends that if GovLog is found to have liability as a successor under the

fraudulent transaction theory, it is jointly and severally liable with Gosselin for the "$24 million in civil penalties as a matter of statutory construction, not pursuant to a stand-alone equitable remedy." The Court rejects this position.

As Bunk notes, the FCA "imposes liability on 'any person' that violates its provisions." Relator's Response to Government Logistics N.V.'s Brief Pursuant to the Court's Order of February 10, 2017 [Doc. No. 1432], at 5. But Bunk does not allege that GovLog, as the successor to Gosselin, violated the FCA. Rather, Bunk's claim against GovLog is based on events and facts that have nothing to do with the conduct that resulted in the $24 million judgment against Gosselin or any other alleged FCA violation. As the Fourth Circuit explained, a successor's liability in this context is imposed by the federal common law, not the FCA. *Bunk*, 842 F.3d at 272-74 & n.15 ("As the Supreme Court instructed in *United States v. Bestfoods*, however, the failure of a statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law. Put simply, the FCA does not speak to successor corporation liability and thus has no impact on the traditional common law principles governing successor corporation liability.") (internal quotation marks, citation, and alterations omitted). For these reasons, Bunk has no statutory claim for successor liability against GovLog under the FCA. The Court must therefore determine whether Bunk's successor liability claim based on a fraudulent transaction theory under federal common law is one that was cognizable in the courts of law in 1791 or is a modern day analog of such a cause of action.

Neither party has pointed to an 18th-century analog of this particular successor liability claim. Rather, the parties have attempted to define the nature of this successor liability claim in

5

a way that aligns with claims found to be within or outside the scope of the Seventh Amendment. In that regard, Bunk argues that successor liability is akin to those fraudulent conveyances or preferential transfers by bankrupts that the Supreme Court in *Granfinanciera*, 492 U.S. at 43, concluded were often pursued historically through common law actions of trover and money had and received. GovLog, for its part, argues that a successor liability claim based on a fraudulent transaction is most analogous to corporate veil piercing, which the majority of courts have found to be equitable claims. As the parties correctly concede, however, Bunk's successor liability claim has aspects analogous to both fraudulent conveyances and corporate veil piercing but is the equivalent of neither; and the Court has found no 18th-century action or claim at law analogous to Bunk's successor liability claim.

In *Granfinanciera*, the United States Supreme Court observed that a claim based on an allegedly fraudulent transfer of an intangible property, such as a business unit, as opposed to tangible property such as a chattel or cash, would have been within the purview of the English courts of equity:

> If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received. Such actions at law are as available to the trustee to-day as they were in the English courts of long ago. If, on the other hand, the subject matter is land *or an intangible*, or the trustee needs equitable aid for an accounting or the like, he may invoke the equitable process, and that also is beyond dispute.

*Granfinanciera*, 492 U.S. at 44 (quoting 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, at 183-84 (rev. ed. 1940)) (emphasis added);   The Court went on to explain why:

> To be sure, in *Drake v. Rice*, 130 Mass., at 412, Justice Gray says that, '[b]y the law of England before the American Revolution, . . . fraudulent conveyances of choses in action, though not specified in the statute [of Elizabeth], were equally void, but from the nature of the subject the remedy of the creditor must be sought in equity.' But the reason why suits to recover fraudulent transfers of choses in action had to be brought in equity, Justice Gray points out, is that they could not be attached or levied upon. *Id.*, at 413. *See*

>   *also* O. Bump, supra, § 531 ("[T]here is no remedy at law when the property can not be taken on execution or by attachment"). Justice Gray's summary of 18th–century English practice does not extend to cases, such as those involving monetary transfers, where an adequate remedy existed at law.").

*Id.* at 47 n.6 (alterations and omissions in original). As reflected in the discussion in *Granfinanciera*, historically, in determining the respective jurisdictions of the equity and law courts, there was a critical distinction between fraudulent transactions based on the transfer of intangible assets and those based on the transfer of only money or tangible personal property. While the "modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth," *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 (1994), that statute did not change a party's remedies; and thus only the courts of equity were available to remedy a fraudulent transaction involving "a voluntary settlement of stock, or of choses in action, or of copyholds, or of any other property, not liable to execution." 2 J. Story, Commentaries on Equity Jurisprudence, §§ 367-68 (10th ed. 1870). Here, Bunk's successor liability claim is based on the allegedly fraudulent transfer of mostly intangible property.

The nature of the remedy that would be available to Bunk, were liability established on his successor liability claim, also places his claim within what would have been the jurisdiction of the 18th-century equity courts. As explained by the Fourth Circuit, a corporation that acquires the assets of another corporation does not also acquire its liabilities, subject to four recognized exceptions: (1) "the successor expressly or impliedly agrees to assume the liabilities of the predecessor"; (2) "the transaction may be considered a de facto merger"; (3) "the successor may be considered a 'mere continuation' of the predecessor"; or (4) "the transaction is fraudulent." *Bunk*, 842 F.3d at 273. Here, Bunk's only remaining grounds for successor liability is the fraudulent transaction exception, which, at its core, is based on fraudulent conveyances, the generally recognized remedy for which is either an unwinding of the transaction or holding the

successor entity liable to the extent of the value of the assets fraudulently transferred. No doubt for this reason, courts have concluded that creditors' rights in cases where the fraudulent transaction exception applies are limited to the assets of the predecessor acquired by the successor corporation. *See, e.g.*, *Stanley v. Miss. State Pilots of Gulfport, Inc.*, 951 So.2d 535, 539 (Miss. 2007). In fact, Bunk has acknowledged and relied on authority in the Fourth Circuit for the proposition that the remedy for successor liability based on a fraudulent transaction is limited to the value of the fraudulently transferred assets. *See* Memorandum in Support of Relators' Motion for Summary Judgment as to Successor Liability of Defendant Government Logistics N.V. [Doc. No. 1337-1], at 15 ("Moreover, the Fourth Circuit has recognized and relied on W. Fletcher, Cyclopedia of the Law of Corporations ('Fletcher'), in defining the successor liability exceptions. *See Carolina Transformer*, 978 F.2d at 838. That authoritative source provides that, 'if the transfer constitutes, either in fact or as a matter of law, a fraud upon the creditors of the other corporation, the creditors defrauded by the transfer may, *in equity, follow the property into the hands of the new corporation and subject it to the satisfaction of their claims, or hold the new corporation liable to the extent of its value*.' Fletcher § 7125.") (emphasis added).[5] Nevertheless, Bunk is seeking a much different remedy—upon a finding of liability, the automatic imposition on GovLog of the entire $24 million judgment, jointly and severally with Gosselin, without regard to the actual value of the assets transferred. Bunk has not cited and the Court has not found any case where the remedy for successor liability based only on a fraudulent transaction is the automatic imposition of an already determined money judgment, particularly where the predecessor corporation remains a viable entity. In any event,

---

[5] *See also* Fletcher § 7403 ("If a corporation conveys or transfers its property, with intent to hinder, delay or defraud creditors, or without consideration, existing creditors may sue to set the conveyance or transfer aside, to subject the property to the satisfaction of their claims, or to hold the grantee or transferee liable *for its value*. . . .) (emphasis added).

8

should Bunk establish successor liability, the Court will have to decide what particular remedy is appropriate since the transaction at issue was not simply "money payments of ascertained and definite amounts," and Bunk's claim would likely "call for an accounting or other equitable relief."[6] *Granfinanciera*, 492 U.S. at 49 (quoting *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 95 (1932)). In sum, Bunk necessarily seeks an equitable remedy for a claim that 18th-century courts of law would not have had jurisdiction to hear. As such, no jury right attaches to his claim. *Compare Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 186 (1st Cir. 2000) (holding there is no right to jury trial on successor liability claim based on mere continuation or actual fraud theories), *with In re G-I Holdings, Inc.*, 380 F. Supp. 2d 469, 474 (D.N.J. 2005) (holding there is a jury trial right in successor liability claim based on mere continuation theory). For these reasons, the May 17, 2017 trial will be tried by the Court without a jury.

Wherefore, it is hereby

ORDERED that Bunk's jury demand with respect to his claim for successor liability against GovLog be, and the same hereby is, STRICKEN, and the case will be tried without a jury.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
April 7, 2017

---

[6] In this respect, the remedy available for a successful successor liability claim based on de facto merger, agreement, or mere continuation appears to differ fundamentally from that available based solely on a fraudulent transaction. *See, e.g., Stanley*, 951 So. 2d at 539-41 ("[The transferee corporation] is unmistakably liable for [the plaintiff's] judgment against [the transferor corporation] up to the amount fraudulently transferred. The amount transferred includes all of the accounts receivable from [the transferor corporation], rather than one week's worth as the chancellor found. Because it is unclear from the record whether the value of the transferred assets would equal the amount of the judgment, it is necessary to discuss the alternative doctrine of 'continuity of enterprise.'... Under [precedent], the new corporation is a mere continuation of [the transferor corporation] and the new corporation is liable for *all* of [the transferor corporation's] debts.) (emphasis in original); *Colandrea v. Colandrea*, 401 A.2d 480, 489-91 (Md. App. 1979).